ALSON CLAYTON ALSTON, ESQ.
LAW OFFICES OF ALSON CLAYTON ALSTON, ESQ. PLLC
2836 W. GIRARD AVE.
PHILADELPHIA, PA 19130
OFFICE: (610)803-7124        FAX: (833) 672-3221

ATTORNEY FOR PLAINTIFFS SHLOMO PEER, LILACH PEER, PEER MANAGEMENT INC,
2727 THOMPSON WEBB LLC, SLNP PROPERTIES LLC, GOORIN LLC AND PAKAL PROPER-
TY INC.

## IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| Shlomo Peer,<br>Lilach Peer,<br>Peer Management Inc,<br>2727 Thompson Webb LLC,<br>SLNP Properties LLC,<br>Goorin LLC and<br>Pakal Property Inc.,<br>　　　　　　　Plaintiffs,<br><br>　　　　– against –<br><br>Alan L. Frank Law Associates, P.C.,<br>Alan L. Frank, Esq.,<br>Samantha A. Millrood, Esq. and<br>John/Jane Does 1-10,<br>　　　　　　　Defendants. | Civil Action No.: 2:26-cv-980 |

## COMPLAINT

Plaintiffs Shlomo Peer, Lilach Peer, Peer Management Inc, 2727 Thompson Webb LLC, SLNP

Properties LLC, Goorin LLC and Pakal Property Inc., represented by their attorney Alson Clayton Al-

ston, Esq. (PA Bar Id #333339), hereby complain of Alan L. Frank Law Associates, P.C., Alan L.

Frank, Esq., Samantha A. Millrood, Esq. and John/Jane Does 1-10, as follows:

# Table of Contents

TABLE OF AUTHORITIES..................................................................................................v

I. Introduction ...............................................................................................................1

II. Jurisdiction and Venue ...........................................................................................3

III. The Parties .............................................................................................................3

IV. Statutory Definitions .............................................................................................4

V. Factual Background ................................................................................................5

Negligent Acts Category 1: Absence of Written Engagement Agreement Resulting in Unpredictable, Unvalidated and Unconsented Scope Expansion and Exponential Billing ................................5
A. General Conduct..........................................................................................................5
B. Specific Acts................................................................................................................6

Negligent Acts Category 2: Discriminatory Coercion and Increased Risk in Residential Real Estate, Meridian Bank Settlement ..................................................................................................8
A. General Conduct..........................................................................................................8
B. Specific Acts................................................................................................................8

Negligent Act Category 3: Improper, Unrealistic and Misleading Litigation Guarantees.......................10
A. General Conduct........................................................................................................10
B. Specific Acts..............................................................................................................10

Negligent Acts Category 4:  Withdrawal Threats, Weaponized Litigation and Abuse of Legal Process 12
A. General Conduct........................................................................................................12
B. Specific Acts..............................................................................................................12

Category 5:  Injuries Caused by Defendants' Negligent Acts ...................................................22
A. General Description ...................................................................................................22
B. Specific Facts ............................................................................................................22

VI. Causes of Action ...................................................................................................24

Threshold Matters for All Counts .........................................................................................24
A. Pleading Standards Met..............................................................................................24
B. All Analysis Below, for All Counts, Is Consistent with  Beyers v. Richmond, 594 Pa. 654, 668, 937 A.2d 1082, 1091 (2007), et al. .........................................................................................25
C. The Defendant Law Firm Is Liable under Corporate and Vicarious Liability Standards .............26

COUNT 1 - DISCRIMINATION IN THE MAKING AND ENFORCEMENT OF CONTRACTS (42 U.S.C. § 1981) Against All Defendants Applies to Plaintiff Natural Persons Mr. and Mrs. Peer Only...................27
A. Statutory and Legal Framework .................................................................................27
B. Applying the Legal Framework ..................................................................................29

**COUNT 2 - DISCRIMINATION IN PROPERTY RIGHTS (42 U.S.C. § 1982) Against All Defendants** *Applies to Plaintiff Natural Persons Mr. and Mrs. Peer Only* ........................................................... **31**
A. Statutory and Legal Framework ................................................................................. 31
B. Applying the Legal Framework ................................................................................. 33

**COUNT 3 - VIOLATION OF THE FAIR HOUSING ACT (42 U.S.C. §§ 3601 - 3617) Against All Defendants** *Applies to Plaintiff Natural Persons Mr. and Mrs. Peer Only* ....................... **35**
A. Statutory Coverage and Legal Standard ................................................................... 35
B. Protected Class Status ............................................................................................... 35
C. FHA-Protected Housing Interests ............................................................................. 36
D. Coercion, Interference, and Discriminatory Conduct ............................................... 36
E. Discriminatory Motivation, Deliberate Indifference, and Disparate Impact ............ 37
F. Pattern and Practice .................................................................................................. 38
G. Damages ................................................................................................................... 38
H. Relief ....................................................................................................................... 39

**CROSS-ANCHORING ALLEGATIONS (Applicable to Counts 1, 2 and 3)** ................... **39**

**COUNT 4 - BREACH OF FIDUCIARY DUTY Against All Defendants** .............................. **40**
A. Definition/Descriptions of Fiduciary Duty ............................................................... 40
B. Legal Standard .......................................................................................................... 42
C. Application of Legal Standard .................................................................................. 44

**COUNT 5 - VIOLATION OF THE FAIR DEBT COLLECTION PRACTICES ACT ("FDCPA," 15 U.S.C. § 1692 et seq.) Against All Defendants** *Applies to Plaintiff Natural Persons Mr. and Mrs. Peer Only* ...... **51**
A. Statutory Framework for Consumer Protections against Abusive Debt Collection  Provided by the FDCPA ................................................................................................. 51
B. Application of Legal Framework to Prove FDCPA Violations. ................................ 54
C. Damages. .................................................................................................................. 58

**COUNT 6 - VIOLATION OF THE PENNSYLVANIA FAIR CREDIT EXTENSION UNIFORMITY ACT ("FCEUA," 73 P.S. § 2270.1 et seq.) and PENNSYLVANIA UNFAIR TRADE PRACTICES & CONSUMER PROTECTION LAW ("UTPCPL," 73 P.S. § 201-1 et seq.) Against All Defendants** *Applies to Plaintiff Natural Persons Mr. and Mrs. Peer Only* ............................................................. **59**
A. Statutory Framework for Consumer Protections against Abusive Debt Collection  Provided by and among the FCEUA and UTPCPL ......................................................... 59
B. Application of Legal Framework to Prove FCEUA and UTPCPL Violations. ........... 63
C. UTPCPL Violations (Per Se). ................................................................................... 65
D. Independent UTPCPL Violations. ............................................................................ 65
E. Damages. .................................................................................................................. 67

**COUNT 7 - LEGAL MALPRACTICE / PROFESSIONAL NEGLIGENCE / INTENTIONAL ABUSE OF PROCESS Against All Defendants** *Applies to All Plaintiffs, Except Where Indicated* ............ **67**
A. Legal Standard .......................................................................................................... 68
B. Summaries of Negligent Acts, Resulting Injuries and Non-Negligent Alternatives ...... 69
C. Proof of Each Element of Attorney Negligence ........................................................ 70
D. Abuse of Process ...................................................................................................... 78
E. Dragonetti Act Claim ............................................................................................... 78
F. Special Notes on Causation and Foreseeability. ....................................................... 78
G. Damages ................................................................................................................... 80
H. Prayer for Relief (Count 7 only) .............................................................................. 82

**COUNT 8 - DEFAMATION Against All Defendants**.................................................................. 83
A. Legal Standard ................................................................................................................... 83
B. Application of the Legal Standard .................................................................................... 89
C. Damages ........................................................................................................................... 92

**COUNT 9 NEGLIGENCE PER SE Against All Defendants For Plaintiff Natural Persons Mr. and Mrs.
Peer Only:** ............................................................................................................................. 93
A. Statutory Duties Breached ................................................................................................ 93
B. Class of Persons Protected ............................................................................................... 94
C. Type of Harm Protected ................................................................................................... 94
D. Duty, Breach, and Causation ........................................................................................... 95
E. Damages ........................................................................................................................... 95
F. Punitive Damages Reserved ............................................................................................. 96
G. Prayer for Relief (Count 9 only) ...................................................................................... 96

**COUNT 10 COMMON-LAW FRAUD Against Defendants Atty. Frank and Alan L. Frank Law Associates,
P.C.** ........................................................................................................................................ 97
A. Legal Framework .............................................................................................................. 97
B & C. Material Misrepresentations ..................................................................................... 97
D. Knowledge and Intent ...................................................................................................... 98
E. Justifiable Reliance .......................................................................................................... 99
F. Causation and Damages .................................................................................................... 99
G. No Intervening Cause ..................................................................................................... 100
H. Availability of Punitive Damages .................................................................................. 100
I. Prayer for Relief (Count 10 Only) .................................................................................. 100

**COUNT 11 BREACH OF CONTRACT / UNJUST ENRICHMENT / VOID DEFAULT Against All Defendants**
............................................................................................................................................... 101
A. Verbal Retainer / No Written Contract .......................................................................... 101
B. Contract Law Is Inapplicable ......................................................................................... 101
C. Attorneys Cannot Exploit Absence of Written Fee Terms ............................................ 102
D. Quantum Meruit Requires Reasonable Value — Not Inflated Invoices ....................... 102
E. Defendants Were Unjustly Enriched .............................................................................. 102
F1. The Unlawful Default Judgment Must Be Vacated or Addressed to Achieve Fundamental
Fairness. ............................................................................................................................... 103
F2. In the Alternative to the Default Judgment Being Vacated, This Court Should Award an Amount
Equal to the Default Judgment Amount against Them in the State Court Action ................ 104
G. Equity Requires Disgorgement ...................................................................................... 104
H. Relief Requested Under Count 11 .................................................................................. 104

**VII. DAMAGES  (in the alternative to other damages described above)** ......................... 105

A. Personal Damages ........................................................................................................... 105

B. Corporate-Entity Damages ............................................................................................. 106

**VIII. JURY DEMAND** ............................................................................................................ 106

**IX. PRAYER FOR RELIEF** .................................................................................................. 107

## Table of Authorities

### Cases

Agency Services, Inc. v. Reiter, 513 F.Supp. 586 (E.D.Pa.1981) ........................................ 85

Agriss v. Roadway Express, Inc., 483 A.2d 456, 474 (Pa. Super. 1984) ............................... 86

Altoona Clay Products v. Dun & Bradstreet, 367 F.2d 625 (3d Cir.1966)............................. 85

Ashcroft v. Iqbal, 556 U.S. 662 (2009)................................................................................... 2

ATACS Corp. v. Trans World Commc'ns, 155 F.3d 659, 666 (3d Cir. 1998).................... 101

Balk v. Ford Motor Co., 446 A.2d 1281, 1283 (Pa. 1982) ................................................. 103

Barto v. Felix, 250 Pa.Super. 262, 378 A.2d 927, 930 (1977)............................................ 89

Basil v. Wolf, 193 A.3d 150, 169–70 (Pa. Super. Ct. 2018)................................................ 65

Basile v. H & R Block, Inc., 777 A.2d 95, 102 (Pa.Super.2001) ........................................ 41

Bauer v. Pennsylvania State Bd. of Auctioneer Examiners, 154 A.3d 899, 904 (Pa. Commw. Ct. 2017)
................................................................................................................................... 25

Beckman v. Dunn, 276 Pa.Super. 527, 419 A.2d 583 (1980)............................................... 84

Bell Atl. Corp. v. Twombly, 550 U.S. 544 (2007)................................................................ 2

Belmont v. MB Inv. Partners, Inc., 708 F.3d 470, 487 (3d Cir. 2013) ............................... 27

Beverly Enters., Inc. v. Trump, 182 F.3d 183, 188 (3d Cir. 1999)...................................... 86

Beyers v. Richmond, 594 Pa. 654, 668, 937 A.2d 1082, 1091 (2007) ................................ 25

Bilt-Rite Contractors, Inc. v. The Architectural Studio, 581 Pa. 454, 478–79, 866 A.2d 270, 285 (2005)
................................................................................................................................... 82

Bochetto v. Gibson, 580 Pa. 245, 251, 860 A.2d 67, 71 (2004) ......................................... 88

Borough of West Chester v. Coleman, 50 A.2d 676, 679 (Pa. 1947) .................................. 26

Bortz v. Noon, 729 A.2d 555, 561 (Pa. 1999) ..................................................................... 99

Brinich v. Jencka, 757 A.2d 388, 2000 PA Super 209 (Pa. Super. Ct. 2000)..................... 88

Brown v. Card Serv. Ctr., 464 F.3d 450, 453 (3d Cir. 2006).............................................. 52

Brown v. Philip Morris Inc., 250 F.3d 789 (2001) ............................................................. 32

Capital Care Corp........................................................................................................ 41

Carrigan v. Cent. Adjustment Bureau, Inc., 502 F. Supp. 468, 471 (N.D. Ga. 1980) ........ 58

Carter v. Bentley Motors Inc., 489 F.Supp.3d 316 (2020) ................................................. 28

Cellucci v. Laurel–Wilson Co., Inc., 701 A.2d 532, 536 (Pa. Super. Ct. 1997)................. 76

Cintas Corp. v. Lee's Cleaning Servs., 700 A.2d 915, 917 (Pa. 1997)............................. 103

Comcast Corporation v. National Association of African American-Owned Media, 589 U.S. 327 (2020)
................................................................................................................................... 28

Commonwealth v. Fink, 317 Pa.Super. 171, 463 A.2d 1140, 1141 (1983) ........................ 49

Corabi v. Curtis Publishing Company, 441 Pa. 432, 442, 273 A.2d 899, 904 (1971)......... 85

Cortez v. Trans Union, LLC, 617 F.3d 688 (2010) ............................................................. 54

Costalas v. Newport Television LLC, 760 F. Supp.2d 489, 493 (S.D. Pa. 2011) ............... 26

Crossley v. Lieberman, 868 F.2d 566, 569–70 (3d Cir. 1989) ..................................... 53, 58

Dinger v. Allfirst Financial, Inc., 82 Fed. Appx. 261, 265 (3d Cir. 2003) ........................ 43

Donsco, Inc. v. Casper Corp., 587 F.2d 602, 606 (3d Cir.1978) ........................................ 44

Dougherty v. Pepper Hamilton LLP, 2016 PA Super 23, 133 A.3d 792, 796–98 (2016) .... 41

Duckson v. Wee Wheelers, Inc., 620 A.2d 1206, 1209 (Pa. Super. Ct. 1993) .............. 76, 104

Dun & Bradstreet, Inc. v. Greenmoss Builders, Inc., 472 U.S. 749, 760-61, 105 S.Ct. 2939, 86 L.Ed.2d
593 (1985)................................................................................................................... 87

Durst v. Milroy Gen. Contracting, Inc., 52 A.3d 357, 360 (Pa. Super. Ct. 2012) ............................... 102
Ellenbogen v. PNC Bank, 731 A.2d 175, 187 (Pa. Super. Ct. 1999)................................................. 79, 105
Ellenbogen, 731 A.2d at 187 ................................................................................................................. 80, 82
F.T.C. v. Check Invs., Inc., 502 F.3d 159, 165 (3d Cir. 2007) abrogated by Henson v. Santander
   Consumer USA Inc., 582 U.S. 79, 137 S. Ct. 1718, 198 L. Ed. 2d 177 (2017) ............................... 51
Feld v. Merriam, 485 A.2d 742, 745 (Pa. 1984) ................................................................................ 26, 88
Fiorentino v. Rapoport, 693 A.2d 208, 213 (Pa. Super. Ct. 1997) ............................................................ 42
Franklin Prescriptions, Inc. v. N.Y. Times Co., 424 F.3d 336, 341 (3d Cir. 2005)................................. 85
Gertz v. Robert Welch, Inc. 418 U.S. 323, 349, 94 S.Ct. 2997, 41 L.Ed.2d 789 (1974)....................... 87
Gibbs v. Ernst, 647 A.2d 882, 889 (Pa. 1994) ......................................................................................... 97
Gibbs, 647 A.2d at 889 ............................................................................................................................. 99
Glover v. F.D.I.C., 698 F.3d 139, 152 (3d Cir. 2012) ...................................................................... 52, 62
Gordon v. Lancaster Osteopathic Hospital Ass'n, 340 Pa.Super. 253, 489 A.2d 1364 (1985).............. 84
Gorwara v. AEL Industries, Inc., 784 F.Supp. 239 (1992) ...................................................................... 32
Gregg v. Ameriprise Fin., Inc., 245 A.3d 637, 646–48 (Pa. 2021)......................................................... 66
Guy v. Liederbach, 459 A.2d 744, 751 (Pa. 1983) ............................................................................ 68, 80
Harris v. Kellogg, Brown & Root Servs., Inc., 724 F.3d 458, 480 (3d Cir. 2013) ................................. 93
Harte-Hanks Communications, Inc. v. Connaughton, 491 U.S. 657, 688 (1989) .................................. 86
Heintz v. Jenkins, 514 U.S. 291, 299 (1995) ........................................................................... 53, 56, 103
Heller v. Pennsylvania League of Cities & Municipalities, 32 A.3d 1213, 1220 (Pa. 2011) ................. 27
Hutchison ex rel. Hutchison v. Luddy, 870 A.2d 766, 772 (Pa. 2005)....................................... 24, 80, 96
Hutchison, 870 A.2d at 772 .................................................................................................................... 100
In re Howe, 446 B.R. 153, 158–59 (Bankr. E.D. Pa. 2009)................................................................ 59, 61
In re Kitchin, 445 B.R. 472, 478–79 (Bankr. E.D. Pa. 2010) .................................................................. 43
Jones v. Alfred H. Mayer Co., 392 U.S. 409 (1968).................................................................................. 31
Joseph v. Scranton Times L.P., 959 A.2d 322, 334 (Pa. Super. Ct. 2008) ......................................... 83, 88
Kaites v. Com. of Pa., Dep't of Env't Res., 108 Pa. Cmwlth. 267, 273, 529 A.2d 1148, 1151 (1987)... 44
Kaplan v. Cairn Terrier Club of America, 2017 WL 2729667 at *3-*4 (Pa. Cmwlth. No. 218 C.D.
   2017, filed June 26, 2017)................................................................................................................... 43
Kaymark v. Bank of Am., N.A., 783 F.3d 168, 182 (3d Cir. 2015), abrogated by Obduskey v.
   McCarthy & Holthus LLP, 586 U.S. 466, 139 S. Ct. 1029, 203 L. Ed. 2d 390 (2019)..................... 60
Kern v. Lehigh Valley Hosp., Inc., 2015 PA Super 19, 108 A.3d 1281, 1290 (2015) ........................... 60
Kirschner v. K & L Gates LLP, 2012 PA Super 102, 46 A.3d 737, 757 (2012) .............................. 41, 43
Kituskie v. Corbman, 714 A.2d 1027 (Pa. 1998)................................................................................ 68, 70
LabMD Inc. v. Boback, 47 F.4th 164, 182–83 (3d Cir. 2022)........................................................... 83, 87
Lamps Plus, Inc. v. Varela, 587 U.S. 176, 186, 139 S. Ct. 1407, 1417, 203 L. Ed. 2d 636 (2019) ....... 56
LaRocca v. Pennsylvania, 246 A.2d 337, 339 (Pa. 1968)...................................................................... 104
Lewis v. Philadelphia Newspapers, Inc., 833 A.2d 185, 192 (Pa. Super. 2003) .................................... 86
Littles v. Lieberman, 90 B.R. 700, 707 (E.D. Pa. 1988)......................................................................... 52
Loeffler v. McShane, 372 Pa. Super. 442, 449, 539 A.2d 876, 880 (1988)............................................ 44
Mahan v. Am-Gard, Inc., 841 A.2d 1052, 1059 (Pa. Super. Ct. 2003) .................................................. 95
Maier v. Maretti, 448 Pa. Super. 276, 285–87, 671 A.2d 701, 706–07 (1995) ...................................... 84
Mamalis v. Atlas Van Lines, 560 A.2d 1380, 1382 (Pa. 1989) ............................................................... 26
Maritrans GP Inc. v. Pepper, Hamilton & Scheetz, 529 Pa. 241, 253, 602 A.2d 1277, 1283 (1992).... 40,
   41, 42, 43
Maritrans GP, 602 A.2d at 1277 ............................................................................................................. 73
McDermott v. Party City Corp., 11 F.Supp.2d 612, 626 n. 18 (E.D.Pa.1998) ........................... 42, 43, 47
McHugh v. Litvin, Blumberg, Matusow & Young, 574 A.2d 1040, 1042 (Pa. 1990) .......................... 68

Meyer, Darragh v. Malone, 137 A.3d 1247, 1257 (Pa. 2016) ....................................................... 43, 101

Miller v. Apartments and Homes of New Jersey, Inc., 646 F.2d 101 (1981) .................................. 29, 32

Morris v. Fallon, 2024 PA Super 190, 322 A.3d 956, 964 (2024) ................................................. 42

Morrison v. Rhoads & Sinon, LLP, No. 894 MDA 2019, 2020 WL 917697, at *10 (Pa. Super. Ct. Feb. 26, 2020) ....................................................................................................................... 41, 42

Mother's Restaurant, Inc. v. Krystkiewicz, 861 A.2d 327, 336 (Pa. Super. Ct. 2004) ...................... 103

Myers v. Wells Fargo Bank, N.A., 986 A.2d 171, 175 (Pa. Super. Ct. 2009) ..................................... 76

Nazar v. Clark, 892 A.2d 820, 829 (Pa. Super. Ct. 2006) ............................................................. 78

Nesselrotte v. Allegheny Energy, Inc., 615 F. Supp. 2d 397, 408–09 (W.D. Pa. 2009) .................. 40, 41

Office of Disciplinary Counsel v. Monsour, 549 Pa. 482, 701 A.2d 556, 558 (1997) ..................... 40

P.J.S. v. Pennsylvania State Ethics Comm'n, 555 Pa. 149, 158, 723 A.2d 174, 178 (1999) ............. 25

Pamintuan v. Nanticoke Memorial Hosp., 192 F.3d 378 (1999) ................................................. 28, 29

Pawlowski v. Smorto, 403 Pa.Super. 71, 588 A.2d 36, 41 n. 3 (1991) .......................................... 89

Peerless Heater Co. v. Mestek, Inc., Civ. No. 98–6532, 2000 WL 637082, *11 (E.D.Pa. May 11, 2000) ...................................................................................................................................... 43

Pierre v. Beebe Hospital/Medical Center, 38 F.Supp.3d 475 (2014) ........................................... 29

Pitts v. Vaughn, 679 F.2d 311 (1982) ...................................................................................... 29

Pollice v. Nat'l Tax Funding, L.P., 225 F.3d 379, 403 (3d Cir. 2000) ......................................... 61

Post v. Mendel, 510 Pa. 213, 507 A.2d 351, 355 (1986) ........................................................... 88

Rannels v. S.E. Nichols, Inc., 591 F.2d 242 (3d Cir.1979) ........................................................ 85

Ringer v. Finfrock, 340 Pa. 458, 462, 17 A.2d 348 (1941) ........................................................ 41

Rizzo v. Haines, 555 A.2d 58 (Pa. 1989) ................................................................................ 70

Roverano v. John Crane, Inc., 226 A.3d 526, 532 (Pa. 2020) .................................................... 26

Rutledge v. United Collection Bureau, Inc., 814 F. App'x 965, 969 (6th Cir. 2020) ...................... 76

Saint Francis College v. Al-Khazraji, 481 U.S. 604 (1987) ................................................... 28, 32

Schemberg v. Smicherko, 85 A.3d 1071, 1075 (Pa. Super. Ct. 2014) .......................................... 93

Schwartz v. Rockey, 932 A.2d 885, 897–98 (Pa. 2007) ............................................................ 65

Shiner v. Moriarty, 706 A.2d 1228, 1238 (Pa. Super. 1998) ...................................................... 26

Shipley v. First Federal Sav. & Loan Ass'n of Delaware, 703 F.Supp. 1122 (1988) ...................... 32

Silva v. Mid Atl. Mgmt. Corp., 277 F. Supp. 2d 460, 466 (E.D. Pa. 2003) ................................. 53

Snyder v. Crusader Servicing Corp., 2020 PA Super 67, 231 A.3d 20, 31–32 (2020) .................... 43

Sprague v. American Bar Ass'n, 276 F.Supp.2d 365 368 (E.D. Pa. 2003) ................................... 86

St. Pierre v. Retrieval-Masters Creditors Bureau, Inc., 898 F.3d 351, 361 (3d Cir. 2018) ......... 51, 55

Staub v. Harris, 626 F.2d 275, 277 (3d Cir. 1980) ............................................................... 4, 51

Stewart v. Rutgers, The State University, 120 F.3d 426 (1997) .................................................. 29

Synygy v. ZS Assoc., Inc., 110 F. Supp. 3d 602, 618 (E.D. Pa. 2015) ........................................ 87

Thompson v. Wagner, W.D.Pa.2008, 631 F.Supp.2d 664 .......................................................... 84

Toy v. Metro. Life Ins. Co., 928 A.2d 186, 208 (Pa. 2007) ....................................................... 97

Truver v. Kennedy, 425 Pa. 294, 306, 229 A.2d 468, 474 (1967) ............................................... 41

U.S. Bank N.A. v. Mallory, 982 A.2d 986, 992 (Pa. Super. Ct. 2009) ......................................... 76

Wajert v. State Ethics Comm'n, 491 Pa. 255, 420 A.2d 439, 442 (1980) ..................................... 25

Walder v. Lobel, 488 A.2d 622, 626 (Pa. Super. 1985) ............................................................. 88

Walker v. Grand Cent. Sanitation, Inc., 430 Pa. Super. 236, 246, 634 A.2d 237, 242 (1993) ......... 86, 88

Walters v. UPMC Presbyterian Shadyside, 187 A.3d 214, 232–33 (Pa. 2018) ............................... 66

Walton v. Pereira, 995 F. Supp. 2d 437, 441 (W.D. Pa. 2014) ................................................... 58

Wicks v. Milzoco Builders, Inc., 503 Pa. 614, 621, 470 A.2d 86, 89–90 (1983) ........................... 43

Wilson Area Sch. Dist. v. Skepton, 586 Pa. 513, 895 A.2d 1250, 1254 (2006) ............................. 101

Wilson v. Quadramed Corp., 225 F.3d 350, 354 (3d Cir. 2000), as amended (Sept. 7, 2000) ......... 53

Yelin v. Swartz, 790 F. Supp. 2d 331, 334–35 (E.D. Pa. 2011) ....................................... 51, 62

Zartman v. Lehigh Cnty. Humane Soc., 333 Pa. Super. 245, 250, 482 A.2d 266, 268 (1984).............. 85

**Constitutional Provisions & Statutes**

15 U.S.C. § 1692a(5) ......................................................................................... 4, 51

15 U.S.C. § 1692a(6) ............................................................................. 4, 5, 52, 56, 63

15 U.S.C. § 1692e ........................................................................................... 54, 93

15 U.S.C. § 1692e(2)(A) .......................................................................................... 57

15 U.S.C. § 1692f ............................................................................... 57, 64, 75, 93

15 U.S.C. § 1692g(a) ..................................................................... 53, 57, 63, 64

15 U.S.C. § 1692g(a)(3) ......................................................................................... 62

15 U.S.C. § 1692g(b) ...................................................... 53, 54, 57, 62, 63, 75, 93

15 U.S.C. § 1692k(a) ........................................................................................... 105

15 U.S.C. § 1692k(a)(1) ................................................................................... 58, 64

18 Pa. C.S. § 4904 ................................................................................................ 15

28 U.S.C. § 1331 ................................................................................................... 3

28 U.S.C. § 1367 ................................................................................................... 3

28 U.S.C. § 1391 ................................................................................................... 3

42 Pa. C.S. § 7102(a)(1) ......................................................................................... 26

42 Pa. C.S. § 8351 ................................................................................................ 78

42 Pa.C.S. § 8343 ................................................................................................. 83

42 U.S.C. § 1981 ............................................................................... 27, 28, 29, 31, 39

42 U.S.C. § 1982 ............................................................................... 31, 33, 34, 39

42 U.S.C. § 1988 ........................................................................................... 31, 34

42 U.S.C. § 3602(b) ............................................................................................... 36

42 U.S.C. § 3613(c) ............................................................................................... 39

42 U.S.C. §§ 1981-82 ....................................................................................... 24, 39

42 U.S.C. §§ 3601 - 3617 ........................................................................................ 35

73 P.S. § 201-2 .................................................................................................... 59

73 P.S. § 201-2(4)(xxi); § 201-9.2 ............................................................................. 60

73 P.S. § 201-3 ............................................................................................... 76, 93

73 P.S. § 201-9.2(a) ...................................................................................... 66, 105

73 P.S. § 2270.1 et seq. .......................................................................................... 59

73 P.S. § 2270.3 ............................................................................................. 59, 60

73 P.S. § 2270.3(3)(ii) ........................................................................................... 61

73 P.S. § 2270.4(b) ......................................................................................... 59, 76

73 P.S. § 2270.5(a) ......................................................................................... 60, 65

Civil Rights Act, 42 U.S.C. §§ 1981-1982, 2000e et seq. ............................................ 1, 3

Dragonetti Act, 42 Pa. C.S. § 8351 ............................................................................ 75

Fair Debt Collection Practices Act ("FDCPA"), 15 U.S.C. § 1692 et seq. . 1, 2, 3, 14, 18, 24, 25, 45, 51, 52, 53, 56, 57, 58, 61, 62, 82, 93, 103, 105, 106

Fair Housing Act ("FHA"), 42 U.S.C. §§ 3601–3619 ...................................... 1, 3, 24, 35, 39

FCEUA ...................................................................................................... 62, 106

Pa. R.P.C. 3.3(a)(1) ............................................................................................... 75

Pa. S.S.J.I. § 4.16 (1991) ................................................................................... 42, 47

Pennsylvania Fair Credit Extension Uniformity Act ("FCEUA"), 73 P.S. § 2270.1 et seq. ... 1, 2, 14, 18, 24, 59, 61, 93, 105

Pennsylvania Unfair Trade Practices and Consumer Protection Law ("UTPCPL"), 73 P.S. § 201-1 et seq. .............................................. 1, 2, 18, 24, 25, 45, 59, 60, 82, 105, 106

Section 3617 ..................................................................................................................... 35, 37

## Rules & Regulations

Pa. R.C.P. 1033 ................................................................................................................... 78
Pa. R.C.P. 205.4(g) ............................................................................................................. 75
Pa. R.C.P. 237.1(a)(2) ............................................................................................. 75, 94, 103
Pa. R.C.P. 237.3 .......................................................................................................... 75, 94
Pa. R.C.P. 237.5 .................................................................................................................. 103
Pa. R.P.C. 1.16 ............................................................................................................. 70, 77
Pa. R.P.C. 1.16(d) ............................................................................................................... 75
Pa. R.P.C. 1.2(a), 1.4(a)(2) ............................................................................................... 71
Pa. R.P.C. 1.4(a)(1)-(3) ..................................................................................................... 71
Pa. R.P.C. 1.5(b) ......................................................................................................... 70, 72
Pa. R.P.C. 1.7(a) .................................................................................................................. 73
Pa. R.P.C. 1.7(a)(2) ............................................................................................................. 75
Pa. R.P.C. 1.7, 1.8(i) ........................................................................................................... 70
Pa. R.P.C. 1.8(i) ................................................................................................................... 73
Pa. R.P.C. 3.4(c) .................................................................................................................. 75
Pa. R.P.C. 4.4(a) .................................................................................................................. 78
Pa. R.P.C. 7.1 ....................................................................................................................... 70
Pa. R.P.C. 8.4(c) ........................................................................................................... 73, 75
Pa. R.P.C. 8.4(d) .................................................................................................................. 75

## Other Authorities

Restatement (Second) Torts § 575 ..................................................................................... 87
Restatement (Third) of Restitution § 43. .......................................................................... 104
Restatement (Third) of the Law Governing Lawyers § 49 ................................................ 80
Restatement (Third) of the Law Governing Lawyers § 53 ................................................ 78

# I. Introduction

1.   Plaintiffs bring this action for violations of the Fair Housing Act ("FHA"), 42 U.S.C. §§ 3601–3619; Civil Rights Act, 42 U.S.C. §§ 1981-1982, 2000e et seq.; Fair Debt Collection Practices Act ("FDCPA"), 15 U.S.C. § 1692 et seq.; the Pennsylvania Fair Credit Extension Uniformity Act ("FCEUA"), 73 P.S. § 2270.1 et seq.; the Pennsylvania Unfair Trade Practices and Consumer Protection Law ("UTPCPL"), 73 P.S. § 201-1 et seq.; as well as for legal malpractice,[1] intentional abuse of process, defamation, breach of fiduciary duty, and either unjust enrichment or, in the alternative, breach of contract.

2.   Plaintiffs allege that they entered into a **verbal agreement** with attorney Alan L. Frank, Esq. and Alan L. Frank Law Associates, P.C. (the Defendant "Law Firm"),[2] for general legal representation on or about June 3, 2024, for which Plaintiffs paid the requested retainer of $15,000.  They understood that this amount would be their entire legal fee, subject to prior authorization for any new charges.  The first matter in which Atty. Frank and the Defendant Law Firm represented Plaintiffs was the Philadelphia Court of Common Pleas ("CCP") action *Ezri v. Peer, et al.* (case ID: 230200583), followed by a countersuit, *Peer v. Ezri* (case ID 240200161).  All cases implicated the Peer household income, expenses, residential mortgages, ability to service consumer credit card debt, obtain health insurance and protection of the personal assets of Mr. Mrs. Peer and their three children.

3.   Atty. Frank and the Defendant Law Firm escalated billing on their legal representation, without Plaintiffs' informed consent, to amounts repeatedly above $30,000/mo, duplicated drafting efforts using multiple senior attorneys, concealed catastrophic financial exposure, billed for services not received and fashioned other billing irregularities, and structured a settlement obligation on behalf of

---

[1] See Ex. 1 – Certificate of Merit as to Alan L. Frank Law Associates, P.C. and Alan L. Frank, Esq.
[2] The Letter Proposal in Ex. 1 captures a portion of this verbal agreement.  That letter was never signed by any of the Plaintiffs.  Only Mr. Peer acknowledges that he had a business relationship with Defendants and Mr. Peer asserts that the other Plaintiffs were, at best, third-party beneficiaries of his agreement with Defendants.

Plaintiffs with Meridian Bank that imposed personal liability on Shlomo Peer based on subjective calculations of Meridian.

4.   After Plaintiff's exhausted their cash reserves by giving a total of $40,000 to Atty. Frank for unforeseen legal fees and could not make any further payments, Atty. Frank and his Defendant Law Firm issued a demand letter for $134,243.91 in alleged unpaid legal fees, without informing them of their rights under the FDCPA or FCEUA. He sued Plaintiffs 15 days later – **during the debt validation period** – in the CCP case *Frank v. Peer et al.* (Case ID # 250601482), clearly overshadowing their consumer protection rights. Through these actions, Atty. Frank and the Defendant Law Firm used billing practices and litigation timing in a manner that exerted substantial pressure, foreseeably causing Plaintiffs severe financial harm, reputational ruin, emotional distress, and physical injury, including two miscarriages sustained during the period of litigation-induced stress.[3]

5.   Plaintiffs seek compensatory damages in the amount of $5,000,000; disgorgement of the $40,000 Mr. Peer paid Defendants for legal fees; punitive damages in the amount to be determined from discovery, expert witnesses and trial; treble damages under the UTPCPL; disgorgement of $40,000 in fees paid without informed consent and for negligent legal services; fee-shifting under the FDCPA; and other equitable relief. The scope and magnitude of damages pleaded herein reflect the severe financial deterioration, reputational impairment, business disruption, emotional trauma, and physical injuries foreseeably resulting from Defendants' conduct.  Plaintiffs do not challenge Defendants' right to collect earned fees, but do challenge the manner in which fees were structured, escalated and enforced.

_____

[3] This pleading satisfies the plausibility threshold articulated in *Bell Atl. Corp. v. Twombly*, 550 U.S. 544 (2007) (requiring facts permitting a reasonable inference of liability), and *Ashcroft v. Iqbal*, 556 U.S. 662 (2009) (requiring factual content showing entitlement to relief). The factual allegations herein are specific, detailed, temporally anchored, and traceable to invoices, correspondence, and litigation records. Plaintiffs plead harm that is economic, reputational, emotional, and physical in nature, for which Pennsylvania courts permit recovery when caused by attorney misconduct.

## II. Jurisdiction and Venue

6.   This Court has jurisdiction under 28 U.S.C. § 1331 because Plaintiffs assert claims under the Fair Housing Act, 42 U.S.C. §§ 3601–3619; Civil Rights Act, 42 U.S.C. §§ 1981-1982, 2000e et seq.; Fair Debt Collection Practices Act, 15 U.S.C. § 1692 et seq.; and supplemental jurisdiction under 28 U.S.C. § 1367 for all state-law claims. Each Plaintiff has suffered a concrete, particularized injury-in-fact that is fairly traceable to Defendants' conduct and redressable by this Court.

7.   Venue is proper under 28 U.S.C. § 1391 because substantial events occurred in this District and Defendants regularly conduct business here.

## III. The Parties

8.   Plaintiff Shlomo Peer, of 9908 Bustleton Avenue, Apt. A8, Philadelphia, Pennsylvania 19115, is a naturalized American citizen of Middle Eastern/Israeli national origin, who speaks with a heavy Israeli accent, and is a citizen of Pennsylvania. He retained Defendants for personal legal services and incurred debt collection consequences impacting his family and household.

9.   Plaintiff Lilach Peer, of 9908 Bustleton Avenue, Apt. A8, Philadelphia, Pennsylvania 19115, is a naturalized American citizen of Middle Eastern/Israeli national origin, who speaks with a heavy Israeli accent and is not fluent in English. She is a citizen of Pennsylvania and wife of Shlomo Peer. She is jointly impacted by Defendants conduct through her husband.

10. Plaintiffs Peer Management, Inc. and Pakal Property, Inc., both at 9908 Bustleton Avenue, Apt. A8, Philadelphia, Pennsylvania 19115, are Pennsylvania corporations who were third-party beneficiaries of the subject representation agreement and whose business operations were foreseeably impaired when Defendants filed a lawsuit that publicly implied dishonesty and inability to pay legal debts.

11. Plaintiffs 2727 Thompson Webb, LLC, SLNP Properties, LLC, Goorin, LLC, all at 9908 Bustleton Avenue, Apt. A8, Philadelphia, Pennsylvania 19115, are Pennsylvania limited liability com-

panies who were third-party beneficiaries of the subject representation agreement and whose business

operations were foreseeably impaired when Defendants filed a lawsuit that publicly implied dishonesty

and inability to pay legal debts.

12. Defendant Alan L. Frank, Esq. is a Pennsylvania-licensed attorney whose office is located at

135 Old York Road, Jenkintown, PA 19046, Phone #: (215)935-1000, and whose business includes

third-party debt collection.  He is responsible for billing strategy, litigation posture, settlement drafting,

and supervision of associates. He engaged in consumer debt collection conduct with the Plaintiffs and

orchestrated ethnic/racial discriminatory treatment of them.

13. Defendant Alan L. Frank Law Associates, P.C. (the "Law Firm") is a Pennsylvania profes-

sional corporation whose office is located at 135 Old York Road, Jenkintown, PA 19046, Phone #:

(215)935-1000, and whose business includes advertising creditor-rights, debt recovery, asset recovery,

and judgment enforcement services, thereby qualifying as a "debt collector" under 15 U.S.C. §

1692a(6). The firm regularly collects debts owed to others through legal process.

14. Defendant Samantha A. Millrood, Esq. is an associate attorney with the Law Firm, whose

office is located at 135 Old York Road, Jenkintown, PA 19046, Phone #: (215)935-1000, whose name

appears on case-related correspondence with Plaintiffs and who answered case-related inquiries for

Plaintiffs.

15. Defendants John/Jane Does 1–10 are additional billing attorneys employed by the Law Firm

whose identities appear on invoices and who billed significant hours without consent.


## IV. Statutory Definitions

16. The alleged legal fee obligation at issue constitutes a "debt" within the meaning of 15

U.S.C. § 1692a(5) because it was "primarily for personal, family, or household purposes," as per *Staub*

*v. Harris*, 626 F.2d 275, 277 (3d Cir. 1980); was authorized solely by Mr. Peer in his individual capaci-

ty; was invoiced and demanded personally from natural persons. (Ex. 4 – ALF Law Firm 2025-5-28 Invoice; Ex. 5 – ALF Law Firm Demand Letter; Ex. 6 – ALF Law Firm Account History) The structure of settlement terms imposing individual liability further confirms the consumer nature of the obligation.

17. Defendants are "debt collectors" within the meaning of 15 U.S.C. § 1692a(6) because they regularly collect debts owed to others, including through litigation. Their commercial advertising (https://www.facebook.com/alanfranklaw/) confirms their specialization in debt recovery, creditor rights, and judgment enforcement.

## V. Factual Background

The factual statements below are divided into five sections, roughly chronological, to classify the facts into broad, but related negligent acts of Defendants and the resulting injury to Plaintiffs. This categorization forms the basis of the most extensive count below (Count 7), which covers malpractice Plaintiffs attest was committed by Defendants. There is modest duplication when necessary to preserve the integrity of the categorizations. Plaintiffs explicitly refrain from including scandalous or impertinent materials, instead incorporating only the factual substance of Plaintiff's damages, causation, scienter, motive, and punitive entitlement.[4]

**Negligent Acts Category 1:**
**Absence of Written Engagement Agreement Resulting in Unpredictable, Unvalidated and Unconsented Scope Expansion and Exponential Billing**

### A. General Conduct

18. From June 3, 2024 through May 2025, Defendant Alan L. Frank and Alan L. Frank Law Associates, P.C. failed to provide Plaintiffs with a written engagement agreement defining scope, rates, staffing, billing cadence, ceilings, dispute procedures, interest, or withdrawal terms.

---

[4] Plaintiffs beg the indulgence of the Honorable Court for their necessary presentation of facts that are likely to be embarrassing, emotionally charged, and/or reputationally harmful to Defendants and for the occasional repetition of those facts in the Counts solely to satisfy the specific elements of each cause of action.

19. Atty. Frank, instead, escalated fees unpredictably, concealed burn rates, expanded scope without consent, and billed opaquely and without validation.[5] (Ex. 7 - ALF Time Run Hourly Billing; Ex. 8 - Breakdown of the Defendants' Self-Reported Billable Hours by Category)

### B. Specific Acts

20. **On June 3, 2024**, Atty. Frank signed a "Letter Proposal" naming "**Maneev Entity Holdings LLC**" as the proposed client. Atty. Frank did not list Shlomo Peer, Lilach Peer, or any other Plaintiff. (Ex. 2 - ALF-Frank Letter Proposal) Atty. Frank never asked them to sign the Letter Proposal. Atty. Frank never replaced it with a proper engagement letter.

21. Atty. Frank never provided any writing stating:

- his own hourly rate;
- his associates' rates;
- which attorneys would perform work;
- whether paralegals or clerical staff would be used;
- whether interest would accrue;
- whether any ceiling or budget existed;
- how Plaintiffs could dispute charges; or
- when Atty. Frank could withdraw.

22. **Almost immediately,** Atty. Frank instructed the Peers to provide a detailed list of all of their assets, so that he could cover **all of their legal issues**. The Peers felt uncomfortable with this request, but complied, believing that a prominent American lawyer such as Atty. Frank could never abuse the power that this information gave him over their personal, family and household affairs.

23. **On June 10, 2024**, the Peers wired Frank $7,500.

---

[5] As shown below, Atty. Frank refused to commit to writing the most basic terms of the attorney-client relationship, then used that informational asymmetry to escalate fees, expand scope, conceal burn rates, and extract money from Plaintiffs, who trusted him and feared the consequences of challenging him, due to their isolated racial/ethnic and national origin status. From the first day of representation, Defendant Alan L. Frank structured his relationship with the Peers in a way that maximized his own financial discretion over their affairs, while depriving them of basic information, predictability or control.

24. **On July 29, 2024,** the Peers wired another $7,500. Atty. Frank told them this $15,000 would cover the case, unless something "unexpected" happened. Atty. Frank never defined "unexpected."

25. Atty. Frank never warned Plaintiffs that fees could reach $100,000+, that his representation of them could last more than six months, or monthly billing could escalate to $30,000 per month.

26. **On September 2024**, Atty. Frank told Plaintiffs that they owed $24,819.43; **October 2024** - Atty. Frank told them they owed $33,845.43; **November 2024** - Atty. Frank told them they owed $64,933.23; **December 17, 2024** - Atty. Frank told them they owed $94,085.23.

27. Each time there was a new monthly charge, Atty. Frank announced the amount allegedly owed only *after* billing the Peers for it. Each time, Atty. Frank treated the number as final and that it did not require any explanation whatsoever to clients like them, who Atty. Frank clearly considered less intelligent and less worthy than he or his staff, due to their racial/ethnic background and immigrant status.

28. Atty. Frank never provided advance warning of new charges to the Peers, sought consent, offered alternatives or explained what work justified the explosion in cost.

29. Atty. Frank block-billed multiple unrelated tasks into single entries, obscuring inefficiency and preventing meaningful review.

30. When Plaintiffs protested, expressed fear, or stated that they did not understand the bills, Atty. Frank responded only: "Send what you can."

31. Atty. Frank's "send what you can" posture lulled Plaintiffs into believing that Atty. Frank treated the amounts as negotiable, flexible, and subject to later reconciliation — until Atty. Frank gradually disavowed them of such notions.

32. Defendants repeatedly billed tasks for which the Plaintiffs received no benefit or which were contrary to the Plaintiffs' interests. A principal example is the work he did to withdraw from

Plaintiffs' representation in May 2025. (Ex. 4 – ALF Law Firm 2025-5-28 Invoice) Plaintiffs were never told that such fees would be incurred. If they had been so alerted, they never would have approved them.

**Negligent Acts Category 2:**
**Discriminatory Coercion and Increased Risk in Residential Real Estate,**
**Meridian Bank Settlement**

### A. General Conduct

33. Atty. Frank exploited Plaintiffs' immigrant status, language difficulty, financial distress, cultural deference to authority, and emotional vulnerability to coerce them into dangerous financial positions that they did not understand and would never have accepted with full information.

### B. Specific Acts

34. **In February 2025,** Atty. Frank told Shlomo Peer that he had "very good friends" at Meridian Bank and that he could "take care of" the Peers' foreclosure problems.

35. **On February 26, 2025**, Atty. Frank rushed Mr. Peer into his office and presented a Meridian Bank settlement agreement. (Ex. 9 – Meridian Bank Settlement Agreement) Atty. Frank discouraged delay, urging Mr. Peer to sign it immediately. Atty. Frank never advised Mr. Peer to obtain independent counsel.

36. The settlement waived approximately $660,000 in mortgage debt, while simultaneously surrendering another approximately $600,000 in equity on two 2727 Thompson Webb, LLC properties: 2727 E. Thompson St. and 2728 Webb St., both in Philadelphia.

37. The alleged benefit of the Meridian Bank agreement to Mr. Peer was debt relief, but that benefit could only occur after sheriff's sales and could only be deemed temporary because the settlement agreement contained subjective and easily manipulated criteria for Mr. Peer to become permanently personally liable.

38. This personal-liability acceleration clause obligated Shlomo Peer, personally, to pay corporate amounts if certain triggering events occurred. This term rendered personal household assets exposed to commercial litigation outcomes, a foreseeable source of distress. Plaintiffs were not warned of this risk despite its magnitude.

39. The agreement contained a highly speculative provision for the possible recapture of equity in the two real properties – if the planned sheriff's sales ever occurred.  There was no guarantee that the two properties would sell for more than the indebtedness to Meridian, particularly at an auction.

40. The agreement further restricted Mr. Peer's constitutional rights to file future lawsuits against Meridian (Section 3-Personal Liability (b)(v)); file bankruptcy (Section 3-Personal Liability (b)(x)); or communicate with municipal authorities (Section 3-Personal Liability (b)(xvii)).

41. Mr. Peer had not been given a risk analysis of this agreement. Atty. Frank rushed Mr. Peer into signing before he could even read and fully discuss the agreement with Mrs. Peer.  Mr. Peer never gave informed consent.  Pursuant to the presentations of Atty. Millrood at Dec. 2025 discovery hearings in the fee collection suit against the Plaintiffs, **Defendants still had not recorded the deeds ten months after Mr. Peer allegedly signed them**.

42. Mr. Peer attests that Atty. Frank showed him contempt during this process, tied to the disrespect that Atty. Frank expressed for the Peers due to their immigrant, Middle Eastern/Israeli background.

43. Atty. Frank never explained any of the above details about the agreement to Mr. Peer before instructing Mr. Peer to sign.

44. **On April 4, 2025,** immediately after lis pendens cleared from several of Plaintiff's real properties, Atty. Frank told Plaintiffs that they owed over $100,000 to him for legal fees and demanded either payment or deeds to:

- 1230 Wagner Avenue and
- 4808 N. 13th Street

for $1 each, which was a fraction of the equity in these properties.

45. Atty. Frank said, "I like those properties."

46. Atty. Frank said, "I just want the deeds."

47. When Plaintiffs refused, Atty. Frank withdrew from all cases in which he represented them and commenced a fee-collection lawsuit.

48. At the hearing during which the state court allowed Atty. Frank to withdraw from representation of the Plaintiffs, the Peers emotionally recount that Atty. Frank disparagingly referred to the Peers as Israeli immigrants, suggesting that they had no long-term stake or plans to remain in the United States, never once pointing out to the court that they had become naturalized American citizens and that they had chosen the United States to be the permanent and only home for them and their three children.

49. Plaintiffs could find no such disparaging statements made by Atty. Frank about similarly situated native American-born citizens.

## Negligent Act Category 3:
## Improper, Unrealistic and Misleading Litigation Guarantees

### A. General Conduct

50. From the beginning of the representation, Defendant Alan L. Frank repeatedly made concrete, affirmative statements to Shlomo and Lilach Peer about how their litigation would unfold and how it would end. Atty. Frank induced Plaintiffs to continue paying by promising outcomes he could not guarantee.

### B. Specific Acts

51. In or about **June 2024**, Atty. Frank told the Peers that:

- He would resolve the underlying litigation within six months;

- The cases were straightforward, manageable, and routine;

- They would prevail and that they did not need to worry about long-term exposure, financial or otherwise.

52. Atty. Frank told the Peers, "Your problems are over" and that he had handled many similar cases. They reasonably concluded that his representation of them would not pose unusual risk.

53. The Peers relied on these statements. The Peers had no legal training, no access to internal court schedules, and no ability to independently assess litigation timelines. The Peers trusted Atty. Frank because Atty. Frank was their lawyer and because Atty. Frank presented himself as confident, authoritative, and experienced.

54. In or about **February 2025**, after fees had already escalated dramatically and after the Peers had expressed fear about their ability to continue paying, Atty. Frank told the Peers that he would recover money from the insurance carrier for the lawyers on the other side of the litigation. Atty. Frank told the Peers that the insurance recovery would provide meaningful financial relief.

55. Initially, Atty. Frank never told the Peers that insurance recovery was uncertain, speculative, or unlikely; that insurance coverage disputes often fail, take years, or produce no recovery at all.

56. The Peers believed Atty. Frank. They decided to find a way to continue paying because they believed that an insurance recovery would offset their mounting debt and escalating fees. The Peers did not seek alternative counsel because Atty. Frank's assurances created the impression that success was near and that abandoning Atty. Frank would jeopardize that success.

57. Atty. Frank only belatedly qualified his statements about insurance proceeds recovery and admitted that insurance payments were not certain.

58. Atty. Frank never recovered any insurance funds; never explained why he failed to recover them; and allowed the Peers to continue operating under false expectations, while their financial position deteriorated.

11

59. Atty. Frank's statements created a false sense of security; encouraged continued payment; discouraged exit; and prevented the Peers from making informed, protective decisions when they still had a degree of financial flexibility left.

**Negligent Acts Category 4:**
**Withdrawal Threats, Weaponized Litigation and Abuse of Legal Process**

### A. General Conduct

60. Atty. Frank used withdrawal threats and litigation timing to pressure Plaintiffs financially and emotionally. He used the Peers' immigrant background, accent, and language limitations as part of that pressure by delivering high-stakes demands quickly, in legalistic language, and without allowing time for translation, reflection, or outside advice, while knowing that the Peers depended on him to understand and navigate the legal system.

61. Atty. Frank's conduct caused the Peers to fear losing their home, losing access to refinancing, losing the ability to care for their three children and losing the ability to buy, sell, or hold property, unless they surrendered to Atty. Frank's coordination and orchestration.

### B. Specific Acts

62. On **March 14, 2025**, Atty. Frank texted the Peers and told them that he would withdraw from their cases if they did not make immediate payments. Atty. Frank knew that withdrawal at that stage would severely prejudice the Peers because the litigation involved multiple active real-estate matters, including the Meridian Bank foreclosure proceedings and properties located at **1230 Wagner Avenue, Philadelphia, PA** and **4808 N. 13th Street, Philadelphia, PA**, as well as ongoing procedural deadlines.

63. The Peers felt frightened by this message. The Peers felt trapped. The Peers felt that they had no safe way to continue and no safe way to stop. The Peers also felt that Atty. Frank's threat car-

ried extra weight because they would have difficulty finding substitute counsel, felt socially and professionally isolated, and believed that Atty. Frank understood those vulnerabilities.

64. On **March 28, 2025**, Shlomo Peer texted Atty. Frank and told him that he was obtaining $10,000 to $12,000 from his father's retirement fund in Israel and that he would send it shortly. Mr. Peer did send that payment.

65. However, on **April 4, 2025**, after Atty. Frank accepted the $10,000 payment, he told the Peers that the $10,000 or $12,000 would no longer suffice. He said that their balance exceeded $100,000. Atty. Frank then told the Peers that they could resolve the matter either by paying the full amount immediately or by deeding two properties — **1230 Wagner Avenue, Philadelphia, PA** and **4808 N. 13th Street, Philadelphia, PA** — to him for $1 each, far below the equity they contained.

66. Atty. Frank said, in that same conversation, that he had already looked at the properties, that he "liked them" and that he could "work with" the Peers.

67. The Peers experienced Atty. Frank's "take it or leave it" framing as coercive. The Peers experienced the demand as especially coercive because Atty. Frank made it while they feared foreclosure, feared losing housing, and feared that they could not navigate the legal system as immigrants without him.

68. Atty. Frank presented the proposed transfer of the properties as a method of resolving the fee dispute. Atty. Frank did not frame it as extraordinary or improper. Atty. Frank presented it as if it were a normal, acceptable way to resolve the dispute.

69. The Peers experienced this demand as deeply concerning and distressing. The Peers felt that Atty. Frank had created the perception that Defendants' interests had become adverse to Plaintiffs' interests.

70. On **May 28, 2025**, Atty. Frank emailed a formal demand letter to the Peers, triggering a thirty-day statutory dispute and validation period. (Ex. 5 – ALF Law Firm Demand Letter) The letter stated:



Ex. 5 - Final Demand letter that Defendants emailed to Plaintiffs.

Note that this final demand contains no statement of rights, that there is a 30-day validation period, etc., required by the FDCPA and FCEUA.

71. On **June 12, 2025**, only fifteen days later, Atty. Frank filed his fee-collection lawsuit, **Alan L. Frank Law Associates v. Peer et al.**, CCP Case ID #250601482, before the Peers could meaningfully dispute or validate the debt and while the Peers had no knowledge of their consumer protection rights. The suit alleged that the Plaintiffs' collectively failed to pay Defendants legal fees of $134,243.91.  (Ex. 10 – ALF Complaint in Case ID # 250601482, ¶ 21)

72. On June 26, 2025, Defendants misrepresented to the prothonotary their service of original process in the Case ID #250601482, stating in their ECF submission that all seven of the opposing parties had been served:

| 26-JUN-2025 08:47 AM | AFDVT - AFFIDAVIT OF SERVICE FILED | FRANK, ALAN L | |
|---|---|---|---|
| **Documents:** | Affidavit of Service.pdf | | |
| **Docket Entry:** | AFFIDAVIT OF SERVICE OF PLAINTIFF'S COMPLAINT UPON SLNP PROPERTIES LLC, SHLOMO PEER, PEER MANAGEMENT INC, PAKAL PROPERTY INC, LILACH PEER, GOORIN LLC AND 2727 THOMPSON WEBB LLC BY PERSONAL SERVICE ON 06/20/2025 FILED. (FILED ON BEHALF OF ALAN L FRANK LAW ASSOCIATES PC) | | |

Ex. 3 – Docket in Case ID # 250601482, June 26th Entry.

Yet, Defendants had only filed one affidavit of service, for Mr. Peer, on that date. (Ex. 11 - ALF-Frank's Case June 26, 2025 Dfts Filed Only One Aff of Svc) Five months later, on Dec. 11, 2025, Defendants filed alleged affidavits of service for the other six parties, long after the prothonotary had entered default judgment (see below) against the unserved parties. (Ex. 12 - ALF-Frank's Case Dec. 11, 2025 Dfts Praecipe to Attach 6 Belated Affidavits)

73. On July 29, 2025, Plaintiff filed its "Praecipe to Enter Default Judgment for Money Damages" (Ex. 13 - Praecipe to Enter Default Judgment for Money Damages) The failure of Defendants to certify the Service of Notice of Praecipe to Enter Judgment of Default under 18 Pa. C.S. § 4904 allowed them to mislead the prothonotary and Defendants about material facts concerning the Praecipe – without committing perjury.

74. In that Praecipe, Plaintiffs state that the amount of the default judgment should be **"$144, 028.91, being the amount demanded in the Complaint."** (Ex. 13 - Praecipe to Enter Default Judgment for Money Damages)

| | and<br>PAKAL PROPERTY, INC.<br><br>*Defendants.* | |
|---|---|---|

**SPECIFICATION OF DAMAGES**

**ASSESSED AGAINST DEFENDANTS**

| | |
|---|---|
| Amount specified in Complaint | $134,243.91 |
| Removal of credit specified in Complaint | $ 20,000.00 |
| Removal of Charges from<br>  4/24/2025 through 5/28/25 **(EX. A)** | $(10,215.00) |
| **TOTAL** | **$144,028.91** |

(Ex. 13 - Praecipe to Enter Default Judgment for Money Damages, p. 3)

75. The amount $144,028.91, however, is **not** the amount that Plaintiff demanded in the Complaint; the amount in the Complaint is $134,243.91.  (Ex. 10 – ALF Complaint in Case ID # 250601482, ¶ 21)  Nor could the difference between the two amounts be related to interest, because the verbal representation agreement with the Mr. Peer did not provide for interest on unpaid fees and the Letter Proposal did not provide for interest.  (Ex. 2 - ALF-Frank Letter Proposal)

76. **Apparent on the face of the record was that the correct default judgment amount was actually $128,388.91, not $144,028.91**.  The mistakes are obvious and should have been observed by the prothonotary:

- First, Defendants properly removed billing from the period 4/24/25 – 5/28/25 because that work was not for the benefit of Plaintiffs. (Ex. 13 - Praecipe to Enter Default Judgment for Money Damages, p. 3)  However, Defendants provided false calculations for the billing from 4/24/25 – 5/28/25. (Compare Ex. 13; p.3 to Ex. 4) The billing should have been $5,855, per Defendants' own calculation in its 5-28-2025 invoice. (Ex. 4) Yet, they submitted $10,215 to the prothonotary as shown above. (Ex. 13, p.3)

- Second, there was no authority cited by Defendants that would have allowed them to revoke the $20,000 "courtesy reduction" as per the calculation shown above.

16

- Thus, the correct amount to be requested, based solely on Defendants' own records present-ed to the court was: **$128,388.91 (=$134,243.91 demanded in complaint - $5,855 billing error).**

- The prothonotary should have rejected the default judgment amount of $144.028.91, be-cause Defendants submitted figures that were materially inconsistent with their own records.

77. Defendants also misled the state court when they provided the material and false attestation **EIGHT** times in their response to Plaintiffs' Petition to Strike/Open the Default Judgment (Ex. 15 - ALF-Frank's Case Petition to Strike Or Open Def Judgment) that Plaintiffs had **not attached prelimi-nary objections** to the Petition, though Plaintiff had clearly **attached SIX preliminary objections**. (Ex. 16 - ALF-Frank's Case Response Brief to Petition to Strike-Open)

78. The court accepted this representation, as intended by Defendants and used it as justification to deny the Petition. (Ex. 17 - ALF-Frank's Case Order Denying Pet to Strike Etc; Ex. 18 - ALF-Frank's Case Order Clarifying Denial of Pet to Strike-Open)

79. Defendants further stated in its Praecipe to Enter Default Judgement that the "Damages As-sessed Against Defendants" were $144,028.91, though this amount was not merely incorrect, it consist-ed only of self-report legal fees and no attestation was ever made that this amount was a judicial as-sessment.  This was designed to mislead the prothonotary into believing that the figure was a sum cer-tain, thereby requiring the clerk to enter it into the docket, while this figure was not supported by any judicial assessment and reflected only Defendants' self-reported invoices.

80. Only 6 days after the entry of the default judgment, while still unrepresented and before they could have known of the default judgment, Appellants attempted to continue their primary line of business – buying, selling and managing real estate.  They stopped imminent foreclosures of real estate held by one of their LLCs, Appellant Goorin LLC, by selling two properties (4808 N. 13th St, Phila., PA 19141 and 4685 N. 16th St., Phila., PA 19140), paying off the bank and netting approximately

17

$15,000 to cover basic living expenses. (*See* Ex. 14 - ALF-Frank's Case HUD-1 Goorin 16th St Properties - fsal-597 Hud.)

81. Defendants are debt collectors, based on their own public writings.

82. Defendants stated in their complaint that they successfully removed most lis pendens from Plaintiffs' real properties.  That list included the personal home of Mr. and Mrs. Peer, as well as numerous other residential properties.  This was all consumer debt, consistent with the fee dispute being under the auspices of the FDCPA, FCEUA and UTPCPL.

83. Between **August and November 2025**, Atty. Frank and his firm sent repeated discovery-in-aid-of-execution demands to Plaintiffs' counsel, while damages had not been judicially assessed and a default judgment had been improperly obtained.

84. On **November 12, 2025**, Atty. Frank filed a Petition to Void Transfers of Real Estate asserting that Plaintiffs had committed fraud and that the two transfers involving them (4808 N. 13th St, Phila., PA 19141 and 4685 N. 16th St., Phila., PA 19140) could be voided. (Ex. 19 - ALF-Frank's Case Petition to Void Xfers -- Actually Sent to 3r Pty)

85. On the same day, Atty. Frank sent that Petition to the buyers, **Terra Nova Real Estate 1, LLC** ("Business Associates A")**,** and to Terra Nova's mortgage lender ("Business Associates B"), although neither was a party.

86. Those recipients contacted the Peers, with extreme emotion, and told them during several hours of discussion that they had lost confidence in Mr. Peer, so could no longer do business with him.

87. On or about **November 30, 2025**, long-time associates of Mr. Peer ("Business Associates C"), who had promised to purchase additional Peer properties in a transaction expected to yield approximately $250,000, withdrew from that deal after learning of the Petition.

88. Plaintiffs allege that the inaccuracies in the Praecipe, with its self-reported legal fees and in-correct arithmetic, formed the basis of continued harassment of Plaintiffs and their solo practitioner counsel through detailed and methodical discovery-in-aid-of execution and other collection activities.

89. One example of the aggressive collection conduct against their former clients, the Peers, oc-curred in the surprise testimony of Atty. Frank at a Dec. 10, 2025 discovery hearing in Defendants' fee collection lawsuit against the Plaintiffs. He **suggested**, in open court, that his Petition to Void Transfers of Real Estate (Ex. 19 - ALF-Frank's Case Petition to Void Xfers -- Actually Sent to 3r Pty) was calcu-lated to impoverish and humiliate the Peers and their buyers of the two properties (4808 N. 13th St, Phi-la., PA 19141 and 4685 N. 16th St., Phila., PA 19140) by **foreclosing on those properties – which he did not own and for which he had no writ of execution or writ of possession – and selling them to collect on his improper, premature default judgment** (Ex. 20 - ALF-Frank's Case Transcript):

> **MR. FRANK**: We would initiate
> |[16] foreclosure proceedings because the final
> |[17] judgment, if that's what it is, is now senior
> |[18] to any other lien on the property. So the new
> |[19] lender, the new buyer's title, the deed, and
> |[20] the new lender's mortgage loan would both be
> |[21] junior to the final judgment. That's the way
> |[22] it would foreclose.

(Ex. 20 - Dec. 15, 2025 Hrg. Tr. 54:15-22)

90. Atty. Frank, who had already received an exhaustive list of the assets of the Peers, knew that there were numerous less painful and less humiliating ways to protect his default judgment, pending appeal.  In fact, Plaintiffs later submitted to Superior Court, in their Emergency Application to Stay Execution of the Default Judgment, proof of the ample equity in their real properties (**$455,700**) to pro-

tect the **$144,028.91** default judgement as collateral for a **$180,036.14** supersedeus bond – proof that Atty. Frank either knew or should have known.[6]

91. Instead, Atty. Frank brought uncertainty and despair to the Peers, a tiny title company and the innocent purchasers of two real properties. Mr. Peer had sold them before Mr. Peer could have possibly known of the default judgment. Atty. Frank accomplished this by willfully exposing a terrifying Petition to Void Transfers of Real Estate and his plans to foreclose on them, somehow – though he did not own those properties and did not need their equity to protect his **default** judgment.

92. During Dec. 2025 discovery hearings in the fee collection lawsuit, Defendants present confidential, unrecorded deeds for 2727 Thompson Webb, LLC properties: 2727 E. Thompson St. and 2728 Webb St., both in Philadelphia, without the consent of Plaintiffs.

93. At those Dec. 2025 hearings, Defendant Millrood, with Atty. Frank serving as her co-counsel, also presented a document purportedly evidencing a current lis pendens on 77-79 Wister Street in Philadelphia and another that purported to be the executed Meridian Settlement agreement. The documents had dates on them from the period of Defendants representation of the Plaintiffs. **These documents were submitted to the court without the permission of Plaintiffs** – solely to deny Plaintiffs desperately sought and needed relief from Defendants' relentless discovery-in-aid-of-execution.  This was Defendants' use of documents, pulled directly from their case files, for interests that benefitted Defendants and decidedly harmed Plaintiffs.

94. At a Feb. 13, 2026 discovery hearing, Defendants falsely and deceptively asserted ignorance of Defendants' assets and finances in Plaintiffs' fee-collection lawsuit, despite having received a full list of their assets from Mr. Peer when they represented him. Mr. Peer believed that this misrepresentation of their actual knowledge was strategic and was **solely to raise bad-faith objections** to Plaintiffs'

---

[6] The Peers attest that they have significant equity in their real estate holdings, but are unable to convert that to cash due to the representation and collection tactics of the Defendants.  The lack of liquid assets threatens their survival and sense of well-being, as shown in the next section on injuries.

urgently needed collateral-in-lieu-of-supersedeus bond request and have their objections to interrogatories sustained in an ongoing campaign to harass, punish and impoverish Plaintiffs.

95. Also at the Feb. 13th hearing, Plaintiff's lead counsel, Atty. Millrood, misrepresented Mr. Peer's right to give testimony about the value of his own real estate, allowed under Pa.R.E. 701. Plaintiff's misrepresentations to the court were relied upon by the court, preventing any direct valuations of Plaintiff's real estate to be entered into evidence. This led the court to deny the stay of execution of the default judgments, finding that there was insufficient collateral in the proffered properties.

96. These acts interfered with the Peers' ability to sell, refinance, or convey property, were detriments to the well-being of the Peers, and made third parties unwilling to contract with them, eliminating rare opportunities the Peers relied on to stabilize their finances.

97. Most profoundly in the perception of Mr. Peer, was what he heard next at the Feb. 13, 2026 hearing. The court asked Defendants whether there were any single or set of real properties owned by Shlomo Peer, Lilach Peer, Peer Management Inc, 2727 Thompson Webb LLC, SLNP Properties LLC, Goorin LLC and Pakal Property Inc. that Defendants would accept as collateral in lieu of a supersedeus bond. Defendants' counsel, Atty. Millrood, replied instantly – without asking for more time for due diligence to review the extensive list of their properties and without raising her eyes to meet the court's – "No."

98. Mr. Peer, upon hearing that decisive "No," thought that Atty. Millrood was merely acknowledging what the Peers always believed, that the Defendants wanted to humiliate, impoverish and ruin him, his wife and their businesses, not reach a settlement, and not find any cognizable, reasonable form of justice in the courts.

99. The Peers assert that they saw and felt in the above acts the contempt that Plaintiffs harbored for them, due to their Middle-Eastern/Israeli race/ethnicity and national origin.

**Category 5:**
**Injuries Caused by Defendants' Negligent Acts**

## A. General Description

100.    After Atty. Frank began escalating fees, threatening withdrawal, and pursuing litigation, the Peers' finances, business relationships, health, and daily functioning changed in concrete and observable ways.

101.    Atty. Frank's conduct also changed how the Peers interacted with banks, lawyers, buyers, other professionals and institutions. The Peers began to experience difficulty entering into or maintaining ordinary contracts and property transactions because third parties viewed them as legally risky or unstable. The Peers began to feel isolated and vulnerable because they believed Atty. Frank exploited their ethnic heritage, resulting accent, English limitations, and unfamiliarity with U.S. legal systems, and then used that imbalance to increase pressure when they tried to slow down, question bills, or seek safer options.

## B. Specific Facts

102.    As Atty. Frank's invoices increased between **September 2024 and March 2025**, the Peers exhausted their available savings. Shlomo Peer asked his father in Israel for money and used those funds to pay Atty. Frank.

103.    As payments continued through **late 2024 and early 2025**, the Peers fell behind on utilities, insurance, and household expenses. The Peers sold assets earlier than planned and at reduced prices.

104.    By **spring 2025**, Plaintiffs' business operations deteriorated as credit facilities tightened, vendors demanded stricter terms, and partners became hesitant. Clients delayed or declined to engage. Several transactions did not close after counterparties learned of the litigation.

105.    **2727 Thompson Webb, LLC** experienced losses after financing and development were disrupted by delays tied to the Meridian Bank settlement and subsequent litigation, resulting in investor losses of approximately $600,000.

106.    **Pakal Property, Inc.** experienced property decline during periods when refinancing and development stalled, leading to city fines, liens, and demolition costs and losses estimated between $500,000 and $750,000.

107.    In **mid-2025**, a real-estate partnership involving the Peers ("Business Associates D") dissolved after a partner became fearful of exposure and demanded a rapid sale of real estate, producing a loss of approximately $210,000.

108.    After Atty. Frank filed suit against his former clients, the Plaintiffs in the instant action, in **June 2025**, multiple attorneys declined to represent Plaintiffs, citing the pending fee litigation. The Peers felt embarrassed explaining the dispute. The Peers felt that their accent and language difficulties made these consultations harder and made them feel dismissed or misunderstood, which increased their reluctance to continue to seek help.

109.    During **2024–2025**, the Peers argued frequently about finances and litigation. These arguments occurred at home and in front of their children.

110.    Shlomo Peer experienced panic, racing thoughts, insomnia, and difficulty concentrating. Lilach Peer experienced anxiety, crying spells, and fear about losing their home and financial security.

111.    Lilach Peer suffered miscarriages on **August 19, 2024** and **May 15, 2025**. At some point, the Peers had lost their health insurance due to non-payment. Ms. Peer was rushed to the hospital on May 15, 2025 without any knowledge of how she would pay for the emergency treatment she knew that she needed.

112.    Both Peers experienced headaches, dizziness, fatigue, nausea, elevated blood pressure, and chronic tension.

23

113.    The Peers stopped investing, stopped pursuing new transactions, and became hesitant in professional settings. The Peers limited communications with third parties because they feared misunderstanding, stigma, and escalation.

114.    The Peers described feeling afraid to open mail, afraid to answer calls, and afraid of further legal action.

115.    The Peers are now both receiving medical and psychological care to address the past and ongoing harms inflicted by the Defendants on them and their three children. Plaintiffs will present competent medical and expert testimony to establish causation at the appropriate stage of proceedings.

# VI. Causes of Action

## Threshold Matters for All Counts

### A. Pleading Standards Met

116.    The facts above form the basis for statutory liability (FHA, 42 U.S.C. §§ 1981-82, FDCPA, FCEUA, UTPCPL and malpractice) as well as common-law liability (abuse of process, defamation, breach/unjust enrichment, fiduciary breaches).

117.    Each harm alleged herein was foreseeable, probable, and directly caused by Defendants' (a) professional judgment -- negligence, settlement drafting, litigation strategy; and/or (b) deceptive billing practices, weaponization of the legal process, and material misrepresentations.

118.    Defendants' acts and omissions were taken with reckless indifference to Plaintiffs' rights, warranting punitive damages. *See Hutchison ex rel. Hutchison v. Luddy*, 870 A.2d 766, 772 (Pa. 2005).

119.    All of these allegations are sufficiently detailed and plausible under *Twombly/Iqbal* and satisfy Rule 8 notice-pleading standards.

### B. All Analysis Below, for All Counts, Is Consistent with
### *Beyers v. Richmond*, 594 Pa. 654, 668, 937 A.2d 1082, 1091 (2007), et al.

120.    In every Court below, Plaintiffs apply statutes and case law that respect the Pennsylvania Supreme Court's directive that it has the exclusive power to regulate the practice of law and the conduct of attorneys in Pennsylvania, as per:

> Pursuant to Pa.R.D.E. 103, "[t]he Supreme Court declares that it has inherent and exclusive power to supervise the conduct of attorneys who are its officers" and this Court is vested with "the inherent and exclusive power to govern the conduct of those privileged to practice law in this Commonwealth." *Wajert v. State Ethics Comm'n*, 491 Pa. 255, 420 A.2d 439, 442 (1980).

*Beyers*, 594 Pa. at 668, 937 A.2d at 1091.

121.    More relevant to the instant matter, the Court has declared that attorneys attempting to collect their own fees are acting as debt collectors, not lawyers, so are appropriately subject to the UTPCPL, FDCPA, UTPCPL and other statutes for those activities, not the Pennsylvania Supreme Court. *See Id.* 594 Pa. at 664, 937 A.2d at 1089) ("'[a]ttorneys who regularly engage in debt collection practices, *apart form their legal representation,* are covered under the FDCPA.' *Daniels,* at *4, 2003 U.S. Dist. Lexis 7707 at *11–12 (emphasis supplied). The UTPCPL was interpreted to apply to debt collection as an act in trade or commerce."); *Id.*, 594 Pa. at 664, 937 A.2d at 1089.

122.    More broadly, the Supreme Court has also found that the General Assembly may regulate conduct **unrelated to the legal profession**. *See Bauer v. Pennsylvania State Bd. of Auctioneer Examiners*, 154 A.3d 899, 904 (Pa. Commw. Ct. 2017) ("The application to attorneys of statutes governing conduct unrelated to the legal profession, however, does not constitute regulation of the practice of law and is not barred by the Supreme Court's exclusive jurisdiction over the practice of law."); *P.J.S. v. Pennsylvania State Ethics Comm'n*, 555 Pa. 149, 158, 723 A.2d 174, 178 (1999) ("the jurisdiction of this court is not infringed when a regulation aimed at conduct is applied to all persons, and some of those persons happen to be attorneys.").

123.    All Counts herein reflect current constitutional law, based on precedential decisions, that respect the authority of the Supreme Court to be the exclusive measure of actual attorney conduct.

### C. The Defendant Law Firm Is Liable under Corporate and Vicarious Liability Standards

124.    In all Counts below, Plaintiffs allege joint and several liability among Defendant attorneys, in their individual capacities, and the Law Firm, under both corporate and vicarious liability standards.  Wherever Plaintiffs allege liability for Defendant attorneys, in their individual capacities, they also allege liability for the Law Firm.

125.    In Pennsylvania, a law firm is vicariously liable for the torts, negligence, and misconduct of its attorneys when those acts occur within the scope of employment and in furtherance of the firm's business.  *See Feld v. Me*rriam, 485 A.2d 742, 745 (Pa. 1984) (holding that a principal is liable for the torts of an agent acting within the scope of employment.); *Borough of West Chester v. Coleman*, 50 A.2d 676, 679 (Pa. 1947) ("A master is responsible for the acts of his servant committed during the course of employment."); *Shiner v. Moriarty*, 706 A.2d 1228, 1238 (Pa. Super. 1998) (holding that law firms are vicariously liable for malpractice of employed attorneys acting within scope); *Costalas v. Newport Television LLC*, 760 F. Supp.2d 489, 493 (S.D. Pa. 2011) (holding that vicarious liability attaches whenever an employee commits a tort within the scope of employment.)

126.    Under Pennsylvania law, where two defendants are liable for the same indivisible harm, each is jointly and severally liable for the full amount of damages. *See* 42 Pa. C.S. § 7102(a)(1) (establishing that joint and several liability survives for intentional torts, vicarious liability, and concerted action); *Roverano v. John Crane, Inc.*, 226 A.3d 526, 532 (Pa. 2020) (holding that joint and several liability applies fully to vicarious liability claims.); *Mamalis v. Atlas Van Lines*, 560 A.2d 1380, 1382 (Pa. 1989) (holding that where liability is vicarious, liability is automatically joint and several.).

127.    Even apart from vicarious liability, a firm may be directly liable (corporate negligence) when it: fails to supervise an attorney, allows incompetent representation, fails to train or implement

ethical safeguards, allows retaliatory litigation tactics to be pursued under its name. *See Heller v. Pennsylvania League of Cities & Municipalities*, 32 A.3d 1213, 1220 (Pa. 2011) (holding that employer is liable for negligent supervision of agent/employee); *Belmont v. MB Inv. Partners, Inc.*, 708 F.3d 470, 487 (3d Cir. 2013) (holding that employer may be directly liable for failure to supervise employees engaging in deceptive conduct).

128.     Applied to a law firm, this means that, if the Law Firm allowed Atty. Frank, Atty. Millrood and Attys. John/Jane Does 1-10 to represent clients without proper supervision, or allowed any of them to file retaliatory lawsuits using firm letterhead, or failed to control client-fund handling or billing practices, the firm is directly liable independent of each individual attorney's own liability. Plaintiffs allege that the Law Firm committed all of these acts because Defendant Frank is the principal of the Law Firm, so clearly directed all of its acts, and the other attorneys were employed there at all relevant times.

## COUNT 1 - DISCRIMINATION IN THE MAKING AND ENFORCEMENT OF CONTRACTS
### (42 U.S.C. § 1981)
### Against All Defendants
*Applies to Plaintiff Natural Persons Mr. and Mrs. Peer Only*

129.     Plaintiffs incorporate by reference all preceding paragraphs as though fully set forth herein.

### A. Statutory and Legal Framework

130.     Section 1981 provides that "[a]ll persons within the jurisdiction of the United States shall have the same right in every State and Territory to make and enforce contracts, to sue, be parties, give evidence, and to the full and equal benefit of all laws and proceedings for the security of persons and property as is enjoyed by white citizens." The statute protects the right to make and enforce contracts, including "the making, performance, modification, and termination of contracts, and the enjoy-

ment of all benefits, privileges, terms, and conditions of the contractual relationship." These rights are protected against both nongovernmental discrimination and discrimination under color of state law.

131.    Section 1981 protects "identifiable classes of persons who are subjected to intentional discrimination solely because of their ancestry or ethnic characteristics." *Saint Francis College v. Al-Khazraji*, 481 U.S. 604 (1987) (holding that a plaintiff must prove "that he was subjected to intentional discrimination based on the fact that he was born an Arab, rather than solely on the place or nation of his origin, or his religion" to succeed under § 1981.).

132.    Courts in the Third Circuit have identified four essential elements for establishing a § 1981 discrimination claim:

> a.    The plaintiff must be a member of a racial/ethnic/ancestry minority. *Carter v. Bentley Motors Inc.*, 489 F.Supp.3d 316 (2020).
>
> b.    The plaintiff must demonstrate intent to discriminate on the basis of race by the defendant. *Id.*
>
> c.    The discrimination must concern activities enumerated in § 1981, specifically the right to make and enforce contracts. *Id.*
>
> d.    The plaintiff must establish but-for causation, meaning the plaintiff must "initially plead and ultimately prove that, but for race, it would not have suffered the loss of a legally protected right." *Comcast Corporation v. National Association of African American-Owned Media*, 589 U.S. 327 (2020).

133.    Section 1981 claims are analyzed under the *McDonnell Douglas* burden-shifting framework used in Title VII discrimination cases. *Pamintuan v. Nanticoke Memorial Hosp.*, 192 F.3d 378 (1999); *Nahas v. Shore Medical Center*, 473 F.Supp.3d 383 (2019). Under this framework, the plaintiff must first establish a prima facie case of discrimination by a preponderance of the evidence. *Stewart v.*

*Rutgers, The State University*, 120 F.3d 426 (1997). The elements of the prima facie case depend on the specific factual context but generally require showing:

    a.  membership in a protected class,

    b.  either that similarly-situated non-protected individuals were treated more favorably or that the adverse action occurred under circumstances giving rise to an inference of discrimination. *Pierre v. Beebe Hospital/Medical Center*, 38 F.Supp.3d 475 (2014).

134.    Once the plaintiff establishes a prima facie case, the burden shifts to the defendant to provide legitimate, non-discriminatory reasons for its actions. *Pamintuan v. Nanticoke Memorial Hosp.*, 192 F.3d 378 (1999). If the defendant meets this burden, the burden reverts to the plaintiff to demonstrate that the defendant's proffered reasons are pretextual. *Id.*

135.    Pain and suffering damages, as well as attorneys' fees are available and there is no puni-tive damages cap under this statute. *Pitts v. Vaughn*, 679 F.2d 311 (1982); *Miller v. Apartments and Homes of New Jersey, Inc.*, 646 F.2d 101 (1981).

### B. Applying the Legal Framework

136.    Plaintiffs Shlomo Peer and Lilach Peer are Israeli immigrants of Jewish and Middle-Eastern ancestry, speak with noticeable foreign accents, and are members of a protected class within the meaning of 42 U.S.C. § 1981.

137.    Plaintiffs entered into a contractual attorney-client relationship with Defendants for legal representation, billing, settlement negotiation, and litigation services.

138.    Defendants intentionally discriminated against Plaintiffs on the basis of race, ethnicity, ancestry, and national origin in the making, performance, modification, and enforcement of that con-tractual relationship, including but not limited to disparately:

a. Failing to provide Plaintiffs with a written engagement agreement, scope definition, or fee structure, while escalating billing to catastrophic levels without informed consent;

29

b. Making oral guarantees, assurances of victory, and promises of limited cost exposure that were not honored, inducing Plaintiffs' reliance while exploiting their unfamiliarity with U.S. legal norms;

c. Escalating fees at rates and in patterns inconsistent with reasonable or customary attorney billing judgment, including duplicative staffing, partner-rate clerical work, and block billing, while discouraging inquiry or objection;

d. Drafting settlement agreements that imposed personal household liability on Plaintiffs without disclosure, informed consent, or recommendation of independent counsel, exposing Plaintiffs' family assets to severe risk;

e. Attempting to extract Plaintiffs' real property through coercive fee demands, including demands that Plaintiffs deed properties to Defendants for nominal consideration; and

f. Weaponizing litigation to enforce disputed fees, including failing to send a proper notice of debt, filing a collection suit during the federal debt-validation period – overshadowing their consumer protection rights, and pursuing default-judgment tactics that magnified Plaintiffs' vulnerability.

139.    Defendants treated Plaintiffs differently from similarly situated legal clients by exploiting Plaintiffs' Middle Eastern/Israeli immigrant status, accent, cultural expectations, and reliance on counsel, thereby imposing harsher contractual terms, inflated financial obligations, and coercive enforcement practices.

140.    Defendants' discriminatory intent is evidenced by the totality of circumstances, including the pattern of disparate exploitation due to their Middle-Eastern/Israeli background including, selective escalation, coercive enforcement, and attempts to leverage Plaintiffs' real estate and household assets once Plaintiffs were financially exhausted and isolated in their community.

141.    As a direct and proximate result of Defendants' violations of 42 U.S.C. § 1981, **and but-for those violations**, Plaintiffs suffered severe economic loss, reputational harm, emotional distress, physical injury, business collapse, loss of property interests, and loss of contractual and legal protections.

142.    Defendants acted willfully, maliciously, and with reckless indifference to Plaintiffs' federally protected rights, in contrast to Defendants' treatment of similarly situated native-born Americans not of Middle-Eastern/Israeli national origin, entitling Plaintiffs to compensatory damages, punitive damages, and attorneys' fees pursuant to 42 U.S.C. § 1988.

143.    WHEREFORE, Plaintiffs demand judgment against Defendants on Count 1 for compensatory damages, punitive damages, attorneys' fees, costs, and all other relief the Court deems just and proper.

### COUNT 2 - DISCRIMINATION IN PROPERTY RIGHTS
### (42 U.S.C. § 1982)
### Against All Defendants
### *Applies to Plaintiff Natural Persons Mr. and Mrs. Peer Only*

144.    Plaintiffs incorporate by reference all preceding paragraphs as though fully set forth herein.

### A. Statutory and Legal Framework

145.    42 U.S.C. § 1982 provides comprehensive protection for property rights, stating that "All citizens of the United States shall have the same right, in every State and Territory, as is enjoyed by white citizens thereof to inherit, purchase, lease, sell, hold, and convey real and personal property" The Supreme Court established that § 1982 "bars all racial discrimination, private as well as public, in the sale or rental of property, and that the statute, thus construed, is a valid exercise of the power of Congress to enforce the Thirteenth Amendment" *Jones v. Alfred H. Mayer Co.*, 392 U.S. 409 (1968).

This broad construction means the statute applies to both private individuals and government entities engaging in discriminatory conduct. *Id.*

146.    The statute covers all forms of property transactions, including both real property (such as land and buildings) and personal property (movable assets). *Id.* The protected activities encompass the complete spectrum of property rights from acquisition through disposition, ensuring that citizens cannot be denied property opportunities based on their race or ethnicity *Id.*

147.    To bring an action under § 1982, a plaintiff must allege with specificity facts sufficient to show or raise a plausible inference of:

      a.    The defendant's racial animus;

      b.    Intentional discrimination; and

      c.    That the defendant deprived plaintiff of his rights because of race.

*Brown v. Philip Morris Inc.*, 250 F.3d 789 (2001). District courts have confirmed that "intentional racial discrimination is a concededly essential element of a section 1982 claim." *Shipley v. First Federal Sav. & Loan Ass'n of Delaware*, 703 F.Supp. 1122 (1988).  The Court established that § 1982 was "intended to protect from discrimination identifiable classes of persons who are subjected to intentional discrimination solely because of their ancestry or ethnic characteristics." *Saint Francis College v. Al-Khazraji*, 481 U.S. 604 (1987).

148.    Courts apply the *McDonnell Douglas* burden-shifting framework to analyze discrimination claims where direct evidence is lacking. *Gorwara v. AEL Industries, Inc.*, 784 F.Supp. 239 (1992). Under this approach, the plaintiff must first establish a prima facie case of discrimination, then the defendant must articulate a legitimate, non-discriminatory reason for its actions, and finally the plaintiff must prove that the stated reason is pretextual. *Gorwara*.

149.    Pain and suffering damages, as well as attorneys' fees are available and there is no punitive damages cap under this statute. *Miller*.

## B. Applying the Legal Framework

150.    Plaintiffs Shlomo Peer and Lilach Peer are members of a protected class under 42 U.S.C. § 1982 by virtue of their Jewish and Middle-Eastern ancestry and Israeli national origin.

151.    Plaintiffs owned, controlled, or had substantial interests in multiple real properties, including personal residences and investment properties, during the period of Defendants' representation.

152.    Defendants intentionally interfered with Plaintiffs' property rights on the basis of race, ethnicity, ancestry, and national origin by disparately:

a. Drafting settlement agreements that exposed Plaintiffs' personal and household real estate to accelerated personal liability without disclosure or informed consent;

b. Leveraging Plaintiffs' financial distress to demand transfer of real property to Defendants for nominal consideration;

c. Timing coercive fee demands and withdrawal threats to coincide with the removal of lis pendens, thereby increasing Defendants' leverage over Plaintiffs' real estate;

d. Filing and disseminating litigation materials to non-parties that chilled Plaintiffs' ability to sell, refinance, or transact in real estate in their isolated community by implying fraud, dishonesty, or voidable transfers; and

e. Engaging in litigation conduct that foreseeably disrupted pending property sales, financing arrangements, and business transactions involving Plaintiffs' real estate.

153.    Defendants' conduct was undertaken with discriminatory intent on the basis of race and national origin, and had the purpose and effect of depriving Plaintiffs of the full and equal enjoyment of their property rights, including the right to hold, convey, and profit from real property without racial or ethnic discrimination.

154.    As a direct and proximate result of Defendants' violations of 42 U.S.C. § 1982, **and but-for those violations**, Plaintiffs suffered loss of equity, failed property transactions, reputational con-tamination affecting title and financing, emotional distress, physical injury, and catastrophic financial harm.

155.    Defendants acted intentionally, maliciously, and with reckless indifference to Plaintiffs' federally protected property rights, in contrast to Defendants' treatment of similarly situated native-born Americans not of Middle-Eastern/Israeli national origin, warranting compensatory and punitive damages and attorneys' fees under 42 U.S.C. § 1988.

156.    WHEREFORE, Plaintiffs demand judgment against Defendants on Count 2 for compen-satory damages, punitive damages, attorneys' fees, costs, and such other relief as the Court deems just and proper.

### COUNT 3 - VIOLATION OF THE FAIR HOUSING ACT
#### (42 U.S.C. §§ 3601 - 3617)
#### Against All Defendants
*Applies to Plaintiff Natural Persons Mr. and Mrs. Peer Only*

157.    Plaintiffs incorporate by reference all preceding paragraphs as though fully set forth herein.

### A. Statutory Coverage and Legal Standard

158.    The Fair Housing Act ("FHA"), 42 U.S.C. §§ 3601–3619, is a broad remedial statute enacted to eliminate discrimination and coercion affecting access to, retention of, financing for, or enjoyment of housing.

159.    Section 3617 of the FHA makes it unlawful for any person to coerce, intimidate, threaten, or interfere with any individual in the exercise or enjoyment of rights protected by §§ 3603–3606, whether or not a completed eviction, foreclosure, sale, or denial ultimately occurs.

160.    Liability under § 3617 extends to third parties, including attorneys and other non-housing actors, where their conduct meaningfully interferes with housing rights through coercion, intimidation, leverage, or discriminatory practices.

161.    At the pleading stage, Plaintiffs need only allege facts supporting a plausible inference that Defendants' conduct (a) related to housing, (b) interfered with FHA-protected rights, and (c) was motivated by discriminatory animus, deliberate indifference, or had a discriminatory or coercive effect.

### B. Protected Class Status

162.    Plaintiffs Shlomo Peer and Lilach Peer are of the Middle-Eastern/Israeli race and ethnicity, are of Israeli national origin and Jewish ancestry, and are members of protected classes under the FHA on the bases of religion, ethnicity, ancestry, and national origin.

163.    Plaintiffs speak with noticeable foreign accents and are observably non-native English speakers, characteristics that Defendants encountered directly and repeatedly during representation.

164.    Plaintiffs are also a familial household, and Defendants' conduct foreseeably impacted the stability, security, and enjoyment of their family housing.

## C. FHA-Protected Housing Interests

165.    During the relevant period, Plaintiffs owned, occupied, financed, refinanced, leased, attempted to sell, or attempted to stabilize multiple residential and mixed-use properties, including their personal residence and income-producing dwellings.

166.    These properties constitute "dwellings" within the meaning of 42 U.S.C. § 3602(b), and the rights to hold, convey, refinance, lease, and enjoy such properties free from coercion or discrimination are protected by the FHA.

## D. Coercion, Interference, and Discriminatory Conduct

167.    Defendants, acting individually and in concert, disparately engaged in a deliberate course of conduct, on the basis of the Peers' Middle-Eastern/Israeli race/ethnicity/national origin, that coerced, intimidated, and interfered with Plaintiffs' housing rights, including but not limited to:

a. Drafting and inducing execution of settlement and fee-related instruments that converted corporate obligations into personal household liability, thereby placing Plaintiffs' family residence and housing equity at risk without disclosure or informed consent;

b. Leveraging Plaintiffs' racial/ethnic/national origin background, and resulting accents and unfamiliarity with U.S. legal and financial systems, to impose undisclosed and extreme housing-related risk, including foreclosure exposure, forced liquidation, and loss of housing equity;

c. Attempting to coerce Plaintiffs into deeding residential properties to Defendants for nominal consideration as a condition of resolving fee disputes;

d. Timing withdrawal threats, fee demands, and litigation activity to coincide with the removal of lis pendens, thereby interfering with Plaintiffs' ability to sell, refinance, or stabilize housing assets;

e. Disseminating litigation filings, accusations of dishonesty, and default-related pleadings to non-party lenders, investors, title companies, and real-estate counterparties, foreseeably chilling housing transactions and financing; and

f. Initiating premature and coercive litigation designed to destabilize Plaintiffs financially, impair their credit worthiness, and threaten their continued housing security in their small, isolated community of ethnic Middle-Eastern/Israeli emigres of Jewish background.

168.    These actions were not legitimate advocacy or for routine fee collection, but instead constituted affirmative interference with housing rights, actionable under 42 U.S.C. § 3617, based on the race/ethnic background of the Peers.

### E. Discriminatory Motivation, Deliberate Indifference, and Disparate Impact

169.    Defendants' conduct was undertaken because of and in reckless disregard of Plaintiffs' protected characteristics, including national origin, ethnicity, and religion.

170.    Defendants exploited linguistic, cultural, and informational asymmetries that were not imposed on similarly situated non-immigrant, native-English-speaking clients, constituting discriminatory treatment.

171.    Alternatively and independently, Defendants' conduct had a disparate and foreseeable impact on Plaintiffs' housing rights and was undertaken with deliberate indifference to those consequences, which is sufficient to state a claim under § 3617.

## F. Pattern and Practice

172.    Defendants' conduct reflects a pattern and practice of coercive and discriminatory be-

havior, including the use of litigation leverage, billing escalation, and asset-exposure threats to extract

concessions involving residential property from vulnerable clients of Middle-Eastern/Israeli

race/ethnicity and national origin.

173.    **But-for that conduct, the Plaintiffs would have been uninjured, unimpaired and**

**suffered none of the damages referenced herein.**

174.    This pattern and practice supports a finding of willfulness and reckless disregard for fed-

erally protected housing rights and warrants punitive and injunctive relief.

## G. Damages

175.    As a direct and proximate result of Defendants' FHA violations, Plaintiffs suffered:

a. Loss of housing equity and failed real-estate transactions;

b. Impairment of the ability to sell, refinance, or retain residential property;

c. Housing instability and fear of foreclosure or forced liquidation;

d. Severe emotional distress and physical injury;

e. Reputational harm affecting housing and financing access; and

f. Economic collapse directly tied to housing-related coercion.

176.    These injuries were the natural, probable, and foreseeable consequences of Defendants'

interference with Plaintiffs' housing rights. **But-for that interference, the Plaintiffs would not have**

**been injured as alleged herein.**

## H. Relief

177.    Defendants acted willfully, recklessly, and with conscious indifference to Plaintiffs' federally protected housing rights on the basis of the race/ethnicity/national origin of the Peers.

178.    Plaintiffs seek all relief authorized under 42 U.S.C. § 3613(c), including compensatory damages, punitive damages, injunctive relief, attorneys' fees, and costs.

## CROSS-ANCHORING ALLEGATIONS
### (Applicable to Counts 1, 2 and 3)

179.    Defendants' discriminatory interference – as a result of the race, ethnicity and national origin of the Peers – with Plaintiffs' housing rights also impaired Plaintiffs' rights to contract, hold property, and convey property on equal terms, in violation of 42 U.S.C. §§ 1981 and 1982.

180.    The same conduct alleged herein – including coercive billing, litigation leverage, asset seizure threats, and discriminatory exploitation of Plaintiffs' race, ethnicity and national origin status – deprived Plaintiffs of the full and equal benefit of contractual and property rights guaranteed by federal law.

181.    The FHA, § 1981, and § 1982 claims arise from a common nucleus of discriminatory and coercive conduct, based on the race, ethnicity and national origin of the Peers, and reinforce one another as alternative and complementary theories of liability.

182.    **But-for that conduct, the Plaintiffs would have been uninjured, unimpaired and suffered none of the damages referenced herein.**

## COUNT 4 - BREACH OF FIDUCIARY DUTY
### Against All Defendants

183.    Plaintiff incorporates by reference all preceding paragraphs as though fully set forth

herein.

### A. Definition/Descriptions of Fiduciary Duty

184.    **Attorneys in Pennsylvania are bound by common law fiduciary duties.** *See Mari-*

*trans GP Inc. v. Pepper, Hamilton & Scheetz*, 529 Pa. 241, 253, 602 A.2d 1277, 1283 (1992) ("Our

common law imposes on attorneys the status of fiduciaries *vis a vis* their clients; that is, attorneys are

bound, at law, to perform their fiduciary duties properly.").[7]

185.    **Common law fiduciary duties include the "highest standards" within the Rules of**

**Professional Conduct.** *Nesselrotte v. Allegheny Energy, Inc.*, 615 F. Supp. 2d 397, 408–09 (W.D. Pa.

2009) ("This public trust that an attorney owes his client is in the nature of a fiduciary relationship in-

volving **\*409** the highest standards of professional conduct." *Office of Disciplinary Counsel v. Mon-*

*sour,* 549 Pa. 482, 701 A.2d 556, 558 (1997)).[8]

---

[7] **Fiduciary duty** (fi-**d[y]oo**-shee-er-ee) (1842) . . . a duty of utmost good faith, trust, confidence, and candor owed by a fiduciary (such as a lawyer or corporate officer) to the beneficiary (such as a lawyer's client or a shareholder). DUTY, Black's Law Dictionary (12th ed. 2024). **Attorneys owe their clients common law duties of honesty, fidelity and confidentiality.** *Capital Care Corp. v. Hunt,* 847 A.2d 75, 84 (Pa.Super.Ct.2004) ("[A]n attorney who undertakes representation of a client owes that client both a duty of competent representation and the highest duty of honesty, fidelity, and confidentiality."). **Attorneys owe their clients the common law fiduciary duties of undivided loyalty and absence of conflicts of interest.** *See Maritans GP Inc. v. Pepper, Hamilton & Scheetz*, 529 Pa. 241, 253, 602 A.2d 1277, 1283 (1992) ("At common law, an attorney owes a fiduciary duty to his client; such duty demands undivided loyalty and prohibits the attorney from engaging in conflicts of interest, and breach of such duty is actionable."). **Attorneys breach their fiduciary duties to their clients, for example, through self-dealing.** *McDermott v. Party City Corp.*, 11 F. Supp. 2d 612, 628 (E.D. Pa. 1998) ("Further, plaintiffs offered sufficient evidence for a reasonable jury to find, that through self-dealing, Nasuti breached these [fiduciary] duties."). **An attorney who threatens to breach a fiduciary duty has violated his fiduciary duties**. *See Maritrans GP Inc. v. Pepper, Hamilton & Scheetz*, 529 Pa. 241, 253, 602 A.2d 1277, 1283 (1992) ("Threatened failure to so perform gives rise to a request for injunctive relief to prevent the breach of duty. . . . At common law, an attorney owes a fiduciary duty to his client; such duty demands undivided loyalty and prohibits the attorney from engaging in conflicts of interest, and breach of such duty is actionable.").

[8] In addition to common law-defined fiduciary duties, the highest standards within the Rules of Professional Conduct also are deemed fiduciary duties, including: Pa.R.P.C. **7.1(a)** (no guarantees of outcome), **1.1** (competence), **1.3** (reasonable diligence), **1.7(a)** (self-interest conflicts), **1.8(i)** (no proprietary interest); **1.5(b)** (basis or rate of fee must be communicated, preferably in writing, when reasonably practicable), **1.4(b)** (lawyer shall explain matters to the extent reasonably necessary to permit the client to make informed decisions); 1.4(a)(1)-(3) (communication), 1.5(a) (reasonableness of fees); **1.2(a),** **1.4(a)(2)** (consultation on objectives); *Kituskie* (client must control strategy); 1.5(a) & 1.4(a)(3) (reasonable fees & communication); client must be able to make informed decisions – breach where attorney deprives client of meaningful infor-

40

186.    Under Pennsylvania law, therefore, an incomplete, but representative list of fiduciary duties includes:

- Honesty (*Capital Care Corp.*, <u>*Nesselrotte*</u>);

- Fidelity (*Capital Care Corp.*; *Kirschner v. K & L Gates LLP*, 2012 PA Super 102, 46 A.3d 737, 757 (2012), *Morrison v. Rhoads & Sinon, LLP*, No. 894 MDA 2019, 2020 WL 917697, at *10 (Pa. Super. Ct. Feb. 26, 2020));

- Confidentiality (*Capital Care Corp.*; <u>*In re Clark's Est.;*</u> *Truver v. Kennedy*, 425 Pa. 294, 306, 229 A.2d 468, 474 (1967); *Ringer v. Finfrock*, 340 Pa. 458, 462, 17 A.2d 348 (1941); *Dougherty v. Pepper Hamilton LLP*, 2016 PA Super 23, 133 A.3d 792, 796–98 (2016); *Basile v. H & R Block, Inc.,* 777 A.2d 95, 102 (Pa.Super.2001));

- Undivided loyalty, charging only for work performed for the benefit of Plaintiffs (*Maritrans GP Inc.*);

- Absence of conflicts of interest (*Maritrans GP Inc.*);

- No **threats** to violate fiduciary duties (*Maritrans GP Inc.*); and

- Highest standards within the Rules of Professional Conduct, including:

  o Pa. R.P.C. **7.1(a)** (no guarantees of outcome),

  o **1.1** (competence),

  o **1.3** (reasonable diligence),

  o **1.7(a)** (no self-interest conflicts),

  o **1.8(i)** (no proprietary interest);

  o **1.5(b)** (basis or rate of fee must be communicated, preferably in writing; full disclosure of fee arrangements);

---

mation. *See Kituskie v. Corbman*, 714 A.2d 1027, 1030 (Pa. 1998); *Nesselrotte* and *Office of Disciplinary Counsel v. Monsour*.

- o **1.4(b)** (lawyer shall explain matters to the extent reasonably necessary to permit the client to make informed decisions); [9]

- o 1.4(a)(1)-(3) (communication),

- o 1.5(a) (reasonableness of fees);

- o **1.2(a)**, **1.4(a)(2)** (consultation on objectives);

- o 1.5(a) & 1.4(a)(3) (reasonable fees & communication).

## B. Legal Standard

187.    **A breach of fiduciary duties by an attorney** is actionable. *See Maritrans GP Inc. v. Pepper, Hamilton & Scheetz*, 529 Pa. 241, 253, 602 A.2d 1277, 1283 (1992) ("At common law, an attorney owes a fiduciary duty to his client . . . and breach of such duty is actionable.").

188.    To prevail in a claim against an attorney for breach of fiduciary duty, the plaintiff must prove three elements, that:

> "(1) that the defendant negligently or intentionally failed to act in good faith and solely for the benefit of plaintiff in all matters for which he or she was employed; (2) that the plaintiff suffered injury; and (3) that the agent's failure to act solely for the plaintiff's benefit ... was a real factor in bring about plaintiff's injuries," Pa. S.S.J.I. § 4.16 (1991).

*McDermott v. Party City Corp.*, 11 F.Supp.2d 612, 626 n. 18 (E.D.Pa.1998). *See also Spinelli by Morris v. Fallon*, 2024 PA Super 190, 322 A.3d 956, 964 (2024); *Morrison v. Rhoads & Sinon, LLP,* No. 894 MDA 2019, 2020 WL 917697, at *10 (Pa. Super. Ct. Feb. 26, 2020).

189.    Similarly, Superior Court held, more generally (inclusive of attorney-client relationships, which we have already shown as having a fiduciary relationship), that proving breach of fiduciary duty requires:

---

[9] *See Fiorentino v. Rapoport*, 693 A.2d 208, 213 (Pa. Super. Ct. 1997) ("[T]o advise a client adequately, a lawyer is obligated to scrutinize any contract which the client is to execute and thereafter must disclose to the client the full import of the instrument and any possible consequences which might arise therefrom.").

the existence of a fiduciary relationship between Plaintiff and [Defendant], that Plaintiff negligently or intentionally failed to act in good faith and solely for [Defendant]'s bene-fit, and that [Defendant] suffered an injury caused by Plaintiff's breach of his fiduciary duty. *Kirschner v. K & L Gates LLP*, 46 A.3d 737, 757-58 (Pa. Super. 2012); *32 Kaplan v. Cairn Terrier Club of America*, 2017 WL 2729667 at *3-*4 (Pa. Cmwlth. No. 218 C.D. 2017, filed June 26, 2017); *Dinger v. Allfirst Financial, Inc.*, 82 Fed. Appx. 261, 265 (3d Cir. 2003).

*Snyder v. Crusader Servicing Corp.*, 2020 PA Super 67, 231 A.3d 20, 31–32 (2020).

190.    Fiduciary-duty claims are independent of malpractice claims and do not require a case-within-a-case analysis. *See, e.g., Maritrans GP Inc. v. Pepper, Hamilton & Scheetz*, 529 Pa. at 258, 602 A.2d at 1285 ("Attorneys have always been held civilly liable for engaging in conduct violative of their fiduciary duties to clients, *despite the existence of professional rules under which the attorneys could also have been disciplined*." (emphasis added)); *Meyer, Darragh v. Malone*, 137 A.3d 1247, 1257 (Pa. 2016) (holding that relief for the breach of the fiduciary duty of a law firm partner did not require neg-ligence action); *McDermott v. Party City Corp.*, 11 F. Supp. 2d 612, 627 (E.D. Pa. 1998) ("[A]n agent who embezzles from his principal may be in breach of both the contract between the parties which spelled out his authority and functions, as well as the agent's duty imposed by operation of law.")

191.    Through the participation theory, each lawyer who participates in the breach of a com-mon law fiduciary duty is personally liable. *In re Kitchin*, 445 B.R. 472, 478–79 (Bankr. E.D. Pa. 2010); *Wicks v. Milzoco Builders, Inc.*, 503 Pa. 614, 621, 470 A.2d 86, 89–90 (1983) ("Under the par-ticipation theory, the court imposes liability on the individual as an actor rather than as an owner. Such liability is not predicated on a finding that the corporation is a sham and a mere alter ego of the indi-vidual corporate officer. Instead, liability attaches where the record establishes the individual's partici-pation in the tortious activity."). *Peerless Heater Co. v. Mestek, Inc.*, Civ. No. 98–6532, 2000 WL 637082, *11 (E.D.Pa. May 11, 2000) ("The touchstone for personal liability under Pennsylvania case law, therefore, is knowing participation in the tortious conduct." (emphasis added)).

43

192.    Additionally, the law firm may still be subject to vicarious liability, pursuant to the Pennsylvania Supreme Court. *Loeffler v. McShane*, 372 Pa. Super. 442, 449, 539 A.2d 876, 880 (1988) ("'The fact that an officer is acting for a corporation also may make the corporation vicariously or secondarily liable under the doctrine of respondeat superior; it does not however, relieve the individual of his responsibility.' 503 Pa. at 619, 470 A.2d at 89 n. 5 (*citing Donsco, Inc. v. Casper Corp.*, 587 F.2d 602, 606 (3d Cir.1978)).").

193.    The offending attorney will then be treated along with the law firm as having "joint tort-feasor liability." *Kaites v. Com. of Pa., Dep't of Env't Res.*, 108 Pa. Cmwlth. 267, 273, 529 A.2d 1148, 1151 (1987) ("Thus, if individual liability is to be imposed on Petitioner, it must be by analogizing the tort law 'participation' theory of liability . . . . As a general rule, corporate officers are individually liable for their own tortious actions."). Liability, then, may not be found for a corporate officer simply due to his title as officer.

## C. Application of Legal Standard

### 1. The Defendants negligently or intentionally failed to act in good faith and solely for the benefit of Plaintiffs in all matters for which they were employed;

194.    Defendants negligently or intentionally failed to act in good faith and solely for the benefit of Plaintiffs by breaching numerous of the above fiduciary duties, as follows:

    a.  Failure to provide a written engagement agreement;

    b.  Failure to provide advance written notice of fees, scope of representation, conflicts of interest;

    c.  Engaging in deceptive billing;

    d.  Charging for work not performed for the benefit of Plaintiffs;

    e.  Orchestrating extraordinary billing escalation;

    f.  Financial-risk nondisclosure, particularly in the Meridian Bank settlement;

    g.  Personal-liability settlement drafting;

h.  Improper, unrealistic and misleading litigation guarantees.

i.  Issuing representation withdrawal threats repeatedly;

j.  Conflicts of interest/self-dealing in placing Defendants' own convenience and interests above Plaintiffs', particularly in (1) the Meridian Bank settlement agreement, which rewarded a friend of Defendant Frank (and any extent to which those benefits flowed back to Frank) and cost the Peers approximately $600,000 in lost equity as well as subjected them to personal liability on subjective grounds under the exclusive control of Meridian; (2) demanding that the Peers sign over two properties to Defendants in lieu of exorbitant and disputed legal fees – for $1 each – far below their equity; and

k.  Filing a retaliatory fee-collection lawsuit after making good on their threats to withdraw from representation and after exhibiting numerous conflicts of interest then, pursuant to that action, violating the FDCPA, FCEAU, UTPCPL; subjecting Plaintiffs to harassment via the weaponization of discovery-in-aide of execution; presenting confidential information to the state court in Dec. 2025 in the form of deeds Defendants coerced Plaintiff Mr. Peer to sign, **yet Defendants had not recorded ten months later** to defeat an attempt by Plaintiffs to stay unrelenting discovery efforts; willfully misrepresenting Plaintiffs' inclusion of Preliminary Objections to coerce the trial court into denying Plaintiffs' Petition to Strike/Open – a tactic that clearly worked as intended because the trial court later cited those exact misrepresentations as reasons for denyi0ng the Petition.

### *2. The Plaintiffs suffered injury.*

195.  Plaintiffs suffered injury, including the following:

- unnecessary litigation expenses (***tortfeasors***: **Atty. Frank, Atty. Millrood,**

45

John/Jane Does 1-10, and Law Firm),

- economic collapse and household budget destabilization (*tortfeasors*: **Atty. Frank, Atty. Millrood, John/Jane Does 1-10, and Law Firm**),

- reputational harm and community stigma (*tortfeasors*: **Atty. Frank, Atty. Millrood, John/Jane Does 1-10, and Law Firm**),

- anxiety, fear, sleeplessness, and chronic psychological distress (*tortfeasors*: **Atty. Frank, Atty. Millrood, John/Jane Does 1-10, and Law Firm**),

- physical manifestations of stress (*tortfeasors*: **Atty. Frank, Atty. Millrood, John/Jane Does 1-10, and Law Firm**),

- loss of substitute counsel access / legal vulnerability (*tortfeasors*: **Atty. Frank, Atty. Millrood, John/Jane Does 1-10, and Law Firm**),

- marital strain and family deterioration (*tortfeasors*: **Atty. Frank, Atty. Millrood, John/Jane Does 1-10, and Law Firm**),

- miscarriages and serious medical consequences (*tortfeasors*: **Atty. Frank, Atty. Millrood, John/Jane Does 1-10, and Law Firm**),

- business revenue decline and partner reticence (*tortfeasors*: **Atty. Frank, Atty. Millrood, John/Jane Does 1-10, and Law Firm**),

- creditworthiness decline and interference with financial transactions (*tortfeasors*: **Atty. Frank, Atty. Millrood, John/Jane Does 1-10, and Law Firm**), and

- forced liquidation of personal assets (*tortfeasors*:**Atty. Frank, Atty. Millrood, John/Jane Does 1-10, and Law Firm**);

- the state court's denial on four occasions of a stay of discovery-in-aid-of-execution pending appeal and the denial of a similar motion by the Superior Court – all upon the reliance of material deceptions by the Defendants in carefully orchestrated

46

argument that featured the disclosure of confidential information obtained from the Peers (*tortfeasors*:**Atty. Frank, Atty. Millrood, John/Jane Does 1-10, and Law Firm**).

### (3) The agent's failure to act solely for the plaintiff's benefit ... was a real factor in bring about plaintiff's injuries," Pa. S.S.J.I. § 4.16 (1991). McDermott v. Party City Corp.,

196.    Defendants' directly caused injuries to Plaintiffs through the above breaches because each of those breaches caused one or more of the listed injuries, as the Facts above clearly describe. These breaches were the specific and chronicled actions of Law Firm principal/owner Atty. Frank (who was the primary point of contact for Plaintiffs, chief strategist and decision-maker for Law Firm, and always represented Plaintiffs in court), and also through others employed by Law Firm (who provided instructions to Plaintiffs by phone and email and appeared dozens of times in the billing records), particularly Atty. Millrood, who was the lead counsel during the retaliatory suit, and through Defendant Law Firm via vicarious liability as the employer of the other Defendants.

197.    Specifically:

a.    Failure to provide a written engagement agreement **led to**, among other harms, inability of Mr. Peer to plan for litigation expenses or shape litigation objectives, lack of understanding the nature of representation, inability to fight escalating billing (*tortfeasors*: **Atty. Frank, Atty. Millrood, John/Jane Does 1-10, and Law Firm**),;

b.    Failure to provide advance written notice of fees, changing scope of representation, conflicts of interest **led to**, among other harms, unnecessary and surprise litigation expenses, economic uncertainty and household budget destabilization (*tortfeasors*: **Atty. Frank, Atty. Millrood, John/Jane Does 1-10, and Law Firm**),;

c.    Engaging in deceptive billing, orchestrating extraordinary billing escalation and charging for work not performed for the benefit of Plaintiffs **led to**, among other

harms, Mr. and Mrs. Peer's anxiety, fear, sleeplessness, and chronic psychological distress, marital strain and family deterioration, physical manifestations of stress including miscarriages and serious medical consequences financial collapse (***tortfeasors***:**Atty. Frank, Atty. Millrood, John/Jane Does 1-10, and Law Firm**);

d.  Financial-risk nondisclosure and personal-liability settlement drafting, particularly in the Meridian Bank settlement, **led to**, among other harms, chronic psychological distress, financial instability (***tortfeasors***: **Atty. Frank, Atty. Millrood, John/Jane Does 1-10, and Law Firm**);

e.  Improper, unrealistic and misleading litigation and insurance proceeds guarantees **led to**, among other harms, inability to budget or make strategic decisions about course of representation, economic collapse, marital strain, reputational harm and community stigma (***tortfeasors***: **Atty. Frank, Atty. Millrood, John/Jane Does 1-10, and Law Firm**);

f.  Issuing representation withdrawal threats **led to**, among other harms, fear, anxiety, sleeplessness, marital strain and family deterioration (***tortfeasors***: **Atty. Frank, Atty. Millrood, John/Jane Does 1-10, and Law Firm**);

g.  Placing Defendants' own convenience and interests above Plaintiffs' and self-dealing **led to**, among other harms, the Meridian Bank settlement agreement, which rewarded a friend of Defendant Frank (and any extent to which those benefits flowed back to Frank) and cost the Peers approximately $600,000 in lost equity as well as subjected them to personal liability on subjective grounds under the exclusive control of Meridian (***tortfeasors***: **Atty. Frank, Atty. Millrood, John/Jane Does 1-10, and Law Firm**);

48

h.  Self-dealing and conflicts of interest[10] when demanding that Plaintiffs surrender two properties to Defendants and whose equity was far greater than any cognizable correct legal fees owed, **leading to** increased fear, anxiety, sleeplessness and despair (*tortfeasors*: **Atty. Frank, Atty. Millrood, John/Jane Does 1-10, and Law Firm**);

i.  Commencing a retaliatory fee-collection lawsuit two weeks after withdrawing from representation, coupled with violations of the FDCPA, FCEAU, UTPCPL (*tortfeasors*: **Atty. Frank, Atty. Millrood, John/Jane Does 1-10, and Law Firm**):

   i.  **Prevented** Plaintiffs from timely securing further representation because any attorney would be skeptical of working for clients who, according to the hastily filed retaliatory lawsuit, did not pay their legal fees; the timing of the retaliatory lawsuit was aimed at creating this very outcome – which succeeded; this timing directly led to the default judgments because Plaintiffs could not find an attorney to answer the complaint or file preliminary objections before the deadline;

   ii.  **Subjected** Plaintiffs to harassment via the weaponization of discovery-in-aide of execution;

   iii.  Willfully misrepresenting Plaintiff's inclusion of Preliminary Objections to coerce the trial court into denying their Petition to Strike/Open – a tactic that **clearly worked, as intended**, because the trial court later cited those exact misrepresentations as reasons for denying the Petition.

---

[10] A potential conflict of interest or appearance of a conflict of interest can taint the entire representation and can be deemed a breach of fiduciary duties. *See Com. v. Johnson*, 325 Pa. Super. 186, 188–89, 472 A.2d 710, 711–12 (1984) ("If such a potential conflict existed prior to the filing of the motion, it may have permeated the entire proceedings. Therefore, given the circumstances and our inability to dispose of the issue on the record before us, we must remand for an evidentiary hearing on whether trial counsel's **712 potential conflict of interest existed prior to the filing *189 of the motion to withdraw. *Commonwealth v. Fink*, 317 Pa.Super. 171, 463 A.2d 1140, 1141 (1983)").

      iv. **Led to** reputational harm and community stigma, loss of access to substitute counsel, increased legal vulnerability, diversion of scarce family resources to a baseless lawsuit;

    j. Released confidential information during retaliatory lawsuit hearings in Dec. 2025 – including submitting to the trial court deeds that Defendants instructed Mr. Peer to sign under duress, but that Defendants had **not recorded in ten months** – solely and exclusively to defeat an attempt by Plaintiffs to stay Defendants' unrelenting discovery efforts; **Defendants were successful, forcing Plaintiffs to suffer continued anxiety and denying them the opportunity to conduct their real estate business and pay for basic household expenses**, forcing them further into financial collapse and despair. (*tortfeasors*: **Atty. Frank, Atty. Millrood, John/Jane Does 1-10, and Law Firm**)

    k. Falsely and deceptively asserting ignorance of Defendants' assets and finances during a Feb. 13, 2026 discovery hearing in Plaintiffs' fee-collection lawsuit, **solely to raise bad-faith objections** to Defendants urgently needed collateral-in-lieu-of-supersedeus bond request and have their objections to interrogatories sustained in an ongoing campaign to harass, punish and impoverish Plaintiffs.

198.   Plaintiffs are entitled to compensatory damages, fee disgorgement, injunctive relief, emotional-distress damages, and punitive damages.

### COUNT 5 - VIOLATION OF THE FAIR DEBT COLLECTION PRACTICES ACT ("FDCPA," 15 U.S.C. § 1692 et seq.)
#### Against All Defendants
#### *Applies to Plaintiff Natural Persons Mr. and Mrs. Peer Only*

199.    Plaintiffs incorporate by reference all preceding paragraphs as though fully set forth herein

### A. Statutory Framework for Consumer Protections against Abusive Debt Collection Provided by the FDCPA.

#### *1. General Principles and Definitions.*

200.    The "primary goal of the FDCPA is to protect **consumers** from abusive, deceptive, and unfair **debt collection practices** . . . . [Even] consumers who have mismanaged their financial affairs resulting in default on their debt, deserve the right to be treated in a reasonable and civil manner." *F.T.C. v. Check Invs., Inc.*, 502 F.3d 159, 165 (3d Cir. 2007) *abrogated by Henson v. Santander Consumer USA Inc.*, 582 U.S. 79, 137 S. Ct. 1718, 198 L. Ed. 2d 177 (2017) (internal citation omitted).

201.    A "debt" or "consumer debt," under the FDCPA is defined, generally, as obligations arising "**from personal, family or household purposes"** and only consumer debts are protected by the FDCPA. *See* 15 U.S.C. § 1692a(5); *Yelin v. Swartz*, 790 F. Supp. 2d 331, 334–35 (E.D. Pa. 2011); *Staub v. Harris*, 626 F.2d 275, 277 (3d Cir. 1980).

202.    More specifically, the Third Circuit has identified a three-part test to evaluate whether an obligation constitutes "debt" under the FDCPA, pursuant to *St. Pierre v. Retrieval-Masters Creditors Bureau, Inc.,* 898 F.3d 351, 361 (3d Cir. 2018).[11] Effectively, the court seeks to identify: (a) an

---

[11] The Third Circuit has identified a three-part test to evaluate whether an obligation constitutes "debt" under the FDCPA:
    a.   We test whether the underlying obligation "aris[es] out of a transaction," 15 U.S.C. § 1692a(5)—that is, a consensual exchange involving an affirmative "request," *Pollice*, 225 F.3d at 400, and "the rendition of a service or purchase of property or other item of value," *Staub*, 626 F.2d at 278, such as a contract;
    b.   We next identify what "money, property, insurance, or services ... [ ] are the subject of the transaction," 15 U.S.C. § 1692a(5), *i.e.*, what it is that is being rendered in exchange for the monetary payment; and
    c.   Finally, we consider the characteristics of that "money, property, insurance, or services" to ascertain whether they are "primarily for personal, family, or household purposes." *Id*.

51

agreement governing the transaction; (b) what "money, property, insurance, or services" are the subject of the transaction;" and (c) the characteristics of that "money, property, insurance, or services" to ascertain whether they are "primarily for personal, family, or household purposes." *Id.*

203.    Unpaid legal fees for the representation of personal assets, household interests and residential mortgages, therefore, plainly meet the definition of "debt" under the FDCPA.

204.    The FDCPA provides a debtor with a **private right of action** against a debt collector for violations of the FDCPA. *Brown v. Card Serv. Ctr.*, 464 F.3d 450, 453 (3d Cir. 2006) (citing 15 U.S.C. § 1692k) ("the FDCPA 'provides consumers with a private cause of action against debt collectors who fail to comply with the Act.").

### 3. The FDCPA includes actions within the litigation activities used by attorneys in the debt collection process.

205.    The FDCPA regulates all debt collection activities **including litigation**.  The Third Circuit recounts that a "debt collector" under the FDCPA includes "any person who uses any instrumentality of interstate commerce or the mails in any business the principal purpose of which is the collection of any debts, or who regularly collects or attempts to collect, directly or indirectly, debts owed or due or asserted to be owed or due another," 15 U.S.C. § 1692a(6), and this collection activity includes "litigation," *see* FN 8, *Glover v. F.D.I.C.*, 698 F.3d 139, 152 (3d Cir. 2012).

### 2. A lawyer engaged in collection activities for his own consumer debts is governed by the FDCPA.

206.    Attorneys **collecting their own debts** are included within the definition of "debt collectors," pursuant to the FDCPA, when they **regularly** collect debt. *See Littles v. Lieberman*, 90 B.R. 700, 707 (E.D. Pa. 1988) ("I find that FDCPA does apply to a lawyer, such as defendant, with a general

---

*St. Pierre v. Retrieval-Masters Creditors Bureau, Inc.*, 898 F.3d 351, 361 (3d Cir. 2018).  All three prongs must be answered in the affirmative and/or "primarily for personal, family, or household purposes," as appropriate. *Staub v. Harris*, 626 F.2d 275, 277 (3d Cir. 1980).

practice including a minor but regular practice in debt collection."); *Silva v. Mid Atl. Mgmt. Corp.*, 277 F. Supp. 2d 460, 466 (E.D. Pa. 2003) (holding that although a lawyer's debt collection activities may "not be substantial in relation to its general legal practice," such a lawyer is defined as a debt collector under the FDCPA when those activities occur "regularly"). *See also Heintz v. Jenkins*, 514 U.S. 291, 299 (1995) (attorneys engaged in litigation to collect debts fall within debt-collector statutes); *Crossley v. Lieberman*, 868 F.2d 566, 569–70 (3d Cir. 1989) (lawyer regularly collecting debts is a debt collector under federal law).

### *4. Debt collectors must respect a 30-day validation period.*

207.    The FDCPA requires debt collectors to send a "Notice of debt" that informs the consumer, in relevant part, that:

> **(3)** . . .  unless the consumer, within thirty days after receipt of the notice, disputes the validity of the debt . . . the debt will be assumed to be valid . . .;
> **(4)** . . . if the consumer notifies the debt collector in writing within the thirty-day period that the debt . . . is disputed, the debt collector will obtain verification of the debt . . .; and
> **(5)** . . . upon the consumer's written request within the thirty-day period, the debt collector will provide the consumer with the name and address of the original creditor . . . .

15 U.S.C. § 1692g(a).

208.    As well, any "collection activities and communication during the 30-day period may not overshadow or be inconsistent with the disclosure of the consumer's right to dispute the debt or request the name and address of the original creditor." 15 U.S.C. § 1692g(b).

209.    "Overshadowing … occurs in a collection letter that "is deceptive" and "when it can be reasonably read to have two or more different meanings, one of which is inaccurate." *Wilson v. Quadramed Corp.*, 225 F.3d 350, 354 (3d Cir. 2000), *as amended* (Sept. 7, 2000).  The Third Circuit found that such overshadowing occurred where an attorney debt collector sent a notice to the debtor that included "a demand for payment within ten days and a threat of immediate legal action if payment is not made in that time." *Wilson v. Quadramed Corp.*, 225 F.3d 350, 355 (3d Cir. 2000), *as amended*

(Sept. 7, 2000).[12]  The court reasoned that the debtor in such circumstances, "would be induced to over-look his statutory right to dispute the debt within thirty days." *Id.*

210.    Thus, while 15 U.S.C. § 1692g(b) does not explicitly bar debt collectors from pursuing litigation activity until the debtor's 30-day dispute period expires, it prohibits activity, including litiga-tion where it "overshadows" the Notice requirements. 15 U.S.C. § 1692e prohibits false or misleading representations, and 15 U.S.C. § 1692f prohibits unfair or unconscionable collection means.

### 5. Evidence required to support emotional distress damages.

211.    Emotional-distress damages under the FDCPA do not require medical expert testimony, but may be established through Plaintiff testimony. See *Cortez v. Trans Union, LLC, 617 F.3d 688 (2010)* (holding that the Third Circuit does not require "corroborating testimony or medical or psycho-logical evidence in support of the damage award.").

### B. Application of Legal Framework to Prove FDCPA Violations.

212.    Plaintiffs incorporate all prior paragraphs, as though fully set forth herein. These para-graphs describe Defendants' billing conduct, personal-liability drafting, and premature litigation activi-ty, all of which bring Defendants within the FDCPA regulatory framework.

### 1. The Factual Background establishes the consumer nature of the debt, pursuant to the le-gal framework provided in the preceding section, triggering validation rights.

213.    Plaintiffs assert that the subject legal fees are for matters that involve a personal resi-dence and residential mortgages, personal liability clauses in the Meridian Bank agreement that impli-

---

[12] The Third Circuit summarized the concept of "overshadowing" in the Notice with:
  [E]very court of appeals case to have found a violation of section 1692g in which the least sophisticated debtor standard was applied involved a written communication containing language which demanded payment within a **\*360** time period less than the statutory thirty-day period and the demand was communicated in a format that em-phasized the duty to make payment and obscured the fact that the debtor had thirty days to dispute the debt.

*Wilson v. Quadramed Corp.*, 225 F.3d 350, 359–60 (3d Cir. 2000), *as amended* (Sept. 7, 2000).

cated household income, personal and family health and well-being, invoices addressed solely to natural persons Mr. and Mrs. Peer – never to companies and LLCs – and unlimited personal liability.

214.    The Letter Proposal supports this depiction. It contains the following characterizations of the purpose of the proposed legal representation: (a) the party to whom it is address is Mr. Peer, in his individual capacity; (b) "Maneev Entity Holdings LLC" appears without attribution, (c) "Litigation" appears, without attribution, (d) "Related Matters" appears, without attribution. The Peers contend that items (a), (c) and (d) relate pimarily to "personal, family, or household purposes" and item (b) relates to an LLC owned by Mr. Peer **for which Defendants did no actual legal work**.  Effectively, the great majority of the work contracted was for "personal, family, or household purposes," as required by *Staub*. That the legal fees trace directly back to the personal, family and household liability, which necessarily includes income, as well as home expenses, living expenses and the well-being of the Peer family, explicitly and clearly establishes the consumer nature of the legal fees, per *Staub*.

215.    Further support is that each prong of the three-part test of *St. Pierre* is satisfied for a finding that the subject fees were consumer debt.  First, the legal fees arose exclusively as a result of the verbal agreement between Mr. Peer, the individual, and Defendants, not a tax or other status attribution. Second, the "money, property, insurance, or services [that] are the subject of the transaction" include: all personal wealth of the Peer family, all LLCs and companies being held by them for which they and their personal assets are 100% at risk, all of their personal/household wealth, household expenses, personal bank accounts, health insurance, life insurance, respect in their small community, savings funds for their children and general well-being.  These personal/household items are the bulk, if not entirety of what they sought to protect by entering into a contract for legal services with Defendants. Third, the characteristics of the "money, property, insurance, or services" that are to be protected by this legal representation of Mr. Peer and Defendants are exclusively the assets and liabilities of the

Peer family, hence are "primarily for personal, family, or household purposes." This establishes the legal fees as consumer debts.

216.    It should be noted that the Letter Proposal has a degree of vagueness that can only be decided through *contra proferentem*, a rule that resolves the ambiguity against the drafter based on public policy factors, primarily equitable considerations about the parties' relative bargaining strength. *See Lamps Plus, Inc. v. Varela*, 587 U.S. 176, 186, 139 S. Ct. 1407, 1417, 203 L. Ed. 2d 636 (2019). Here, the perceptions and accounts of the Plaintiffs should prevail, as in a contract of adhesion, because highly skilled attorneys drafted the agreement for the consumption of immigrant clients who possessed poor English skills and could not have been expected to understand the written implications of an agreement they simply thought would help them to protect their personal, family and household assets. *See Id.*, 587 U.S. at 187, 139 S. Ct. at 1417, 203 L. Ed. at 636 ("Unlike contract rules that help to interpret the meaning of a term, and thereby uncover the intent of the parties, *contra proferentem* is by definition triggered only after a court determines that it *cannot* discern the intent of the parties. When a contract is ambiguous, *contra proferentem* provides a default rule based on public policy considerations.").

217.    The legal fees that arose from the subject representation, therefore, should be deemed consumer debt and fully governed by the FDCPA.

### 2. Defendants are liable for damages pursuant to the FDCPA.

218.    Defendants are "debt collectors" under 15 U.S.C. § 1692a(6) because they regularly collect debts owed to others as part of their commercial enterprise. Their published marketing materials emphasize creditor rights, delinquent debt recovery, and judgment enforcement, which courts treat as evidence of professional debt collection activity. *See Heintz v. Jenki*ns, 514 U.S. 291, 294 (1995) (holding attorneys engaged in consumer debt collection are subject to FDCPA).

219.    Defendants violated 15 U.S.C. § 1692g(b) by filing litigation during the 30-day dispute and validation period following issuance of a defective final demand, overshadowing the notice provisions of the FDCPA because:

- The notice lacked the required disclosures under 15 U.S.C. § 1692g(a);

- The litigation occurred within two weeks after the commencement of the validation period. The lest sophisticated consumer would have no knowledge of their rights under the FDCPA when confronted with the existence of the sudden litigation, in light of the failure to have received a proper 15 U.S.C. § 1692g(a) notice.

220.    The **commencement of the litigation and the litigation itself are governed by the** FDCPA because all collection activity, including litigation, is covered.

221.    The notice provisions of 15 U.S.C. § 1692g(a) are central to the Plaintiffs claims.

222.    Plaintiffs were entitled to dispute or seek verification of the asserted debt during this statutory window, but litigation was filed only fifteen (15) days later. Premature litigation constitutes unlawful overshadowing.

223.    Defendants violated 15 U.S.C. § 1692e(2)(A) by misrepresenting the amount and legal status of the debt, including "pay what you can" demands, charges generated through duplicative drafting, excessive conferencing and senior-rate clerical tasks. Misrepresentation occurs when billing practices artificially inflate a consumer's obligation. These practices foreseeably created confusion about the legitimacy of the charges.

224.    Defendants violated 15 U.S.C. § 1692f by employing unfair and unconscionable billing methods, including block billing that concealed inefficiency, billing that was inconsistent with the "pay what you can" demand promised, and coercive acceleration through litigation threats. Courts have recognized that obscured billing impairs a consumer's ability to dispute debt. Plaintiffs reasonably feared reputational and financial consequences.

225.    As a direct and proximate result of these FDCPA violations, Plaintiffs suffered emotional distress, reputational injury, loss of credit access, humiliation, marital strain, business losses, and multipe miscarriages. These harms are recoverable as "actual damages" under 15 U.S.C. § 1692k(a)(1). FDCPA fee-shifting (§ 1692k(a)(3)) also applies.  Emotional-distress damages under the FDCPA do not require medical expert testimony, but may be established through Plaintiff testimony. *See Walton v. Pereira*, 995 F. Supp. 2d 437, 441 (W.D. Pa. 2014) (holding that plaintiffs may collect statutory damages under the FDCPA even if they have suffered no actual damages"); *Crossley v. Lieberman*, 90 B.R. 682 (1988) (holding that emotional distress damages can be awarded when plaintiffs provide specific manifestations and circumstances of their emotional distress); *Carrigan v. Cent. Adjustment Bureau, Inc.*, 502 F. Supp. 468, 471 (N.D. Ga. 1980) (holding that emotional distress damages can be awarded based on "Plaintiff's own testimony").

226.    Each allegation in Counts 4-7 demonstrates patterns of billing exploitation, coercive litigation, opaque invoicing, and personal-liability drafting designed to extract payments. These harms were foreseeable to any reasonable attorney, and Defendants' misconduct breached duties of communication, loyalty, billing judgment, and candor. Plaintiffs therefore assert common-law claims in addition to statutory violations.

### C. Damages.

227.    Plaintiffs are entitled to:

- actual damages;

- statutory damages under FDCPA;

- attorney's fees and costs;

- emotional distress damages;

- all equitable relief allowed by law.

## COUNT 6 - VIOLATION OF THE PENNSYLVANIA FAIR CREDIT EXTENSION UNI-FORMITY ACT
### ("FCEUA," 73 P.S. § 2270.1 et seq.) and
## PENNSYLVANIA UNFAIR TRADE PRACTICES & CONSUMER PROTECTION LAW
### ("UTPCPL," 73 P.S. § 201-1 et seq.)
### Against All Defendants
#### *Applies to Plaintiff Natural Persons Mr. and Mrs. Peer Only*

228.    Plaintiffs incorporate by reference all preceding paragraphs as though fully set forth herein

### A. Statutory Framework for Consumer Protections against Abusive Debt Collection Provided by and among the FCEUA and UTCPL.

#### *1. General Principles and Definitions.*

229.    The FCEUA prohibits unfair or deceptive debt collector and creditor practices.  73 P.S. § 2270.1 et seq.; *In re Howe*, 446 B.R. 153, 158–59 (Bankr. E.D. Pa. 2009) ("Unlike the federal law, the FCEUA provides that a creditor . . . and . . . a debt collector . . . may liable under that act. *See* 73 P.S. § 2270.4(b).").

230.    Only consumer debts are protected by the FCEUA, which provides a comprehensive definition of "debt" at 73 P.S. § 2270.3, as, in relevant part, obligations arising **from personal, family or household purposes** by consumers (who are defined, in relevant part, as natural persons residing in the Commonwealth).[13]

231.    In contrast, the UTPCPL does **not** define "consumer debt" or "debt." *See* 73 P.S. § 201-2. Instead, the UTPCPL focuses on broad definitions of "trade" and "commerce" as "the advertising, offering for sale, sale or distribution of any services and any property, tangible or intangible, real, per-

---

[13] 1. The FCEUA defines debt, in relevant part, as "an actual or alleged past due obligation, claim, demand, note or other similar liability of a consumer to pay money, arising out of a single account as a result of a purchase, lease or loan of goods, services or real or personal property for personal, family or household purposes . . . ." 73 P.S. §  2270.3. The definition re-quires that the debt arise from a "consumer" as defined in the statute, meaning "a natural person residing in this Common-wealth who owes or is alleged to owe a debt or one who has incurred or is alleged to have incurred liability for the debt within this Commonwealth" *In re Marshall*, 613 B.R. 194 (2020). These definitions inherently encompass what would commonly be understood as "consumer debt" by limiting coverage to obligations arising from personal, family, or house-hold purposes.

sonal or mixed . . . or thing of value." 73 P.S. § 201-2. The UTPCPL prohibits unfair or deceptive

practices, including fraudulent or deceptive conduct, and provides for treble damages and attorney's

fees.  73 P.S. § 201-2(4)(xxi); § 201-9.2.

232.    The FCEAU and UTPCPL work in tandem to permit residents of the Commonwealth to

protect their consumer rights in courts.  First, the FCEUA has no private right of action. *Kaymark v.*

*Bank of Am., N.A.*, 783 F.3d 168, 182 (3d Cir. 2015), *abrogated by Obduskey v. McCarthy & Holthus*

*LLP*, 586 U.S. 466, 139 S. Ct. 1029, 203 L. Ed. 2d 390 (2019) ("The FCEUA therefore does not pro-

vide its own private cause of action."). However, violations of the FCEUA constitute per se violations

of the UTPCPL. 73 P.S. § 2270.5(a) ("If a debt collector or creditor engages in an unfair or deceptive

debt collection act or practice under this act, it shall constitute a violation of the UTPCPL."). Therefore,

a party can prosecute FCEUA violations under the UTPCPL, which does have a private right of action:

> Any person who purchases . . . services primarily for personal, family or household purposes
> and thereby suffers any ascertainable loss . . . as a result of the use . . . by any person of a meth-
> od, act or practice declared unlawful by section 3 of this act, **may bring a private action to re-**
> **cover** actual damages . . .; [Court may] award up to three times the actual damages sustained, . .
> . in addition to other relief provided in this section, costs and reasonable attorney fees.

73 P.S. § 201-9.2 (emphasis added).  *See also Kern v. Lehigh Valley Hosp., Inc.*, 2015 PA Super 19,

108 A.3d 1281, 1290 (2015) ("Because violations of the UTPCPL can be filed as private actions, the

inclusion of FCEUA claims as additional violations of the UTPCPL permits them to be brought as pri-

vate actions as well.).

### 2. A lawyer engaged in collection activities for his own consumer debts is governed by the FCEUA and UTPCPL.

233.    Recall that a "debt" under the FCEAU means "an actual or alleged past due obligation of

a consumer to pay money." 73 P.S. § 2270.3. Unpaid legal fees for the representation of personal as-

sets, household interests and residential mortgages, therefore, plainly meet the definition of "debt" un-

der the FCEUA.

234.    The term "debt collector," pursuant to the FCEUA,  includes:

"An attorney, whenever such attorney attempts to collect a debt, as herein defined, except in connection with the filing or service of pleadings or discovery or the prosecution of a lawsuit to reduce a debt to judgment." 73 P.S. § 2270.3(3)(ii).

235.    As shown in the previous section, attorneys **collecting their own debts** are included within the definition of "debt collectors," pursuant to the FDCPA, when they **regularly** collect debt – even *when* a lawyer's debt collection activities may "not be substantial in relation to its general legal practice." *Silva*.

236.    FDCPA definitions of lawyers who collect their own debts and are defined as debt collectors apply to the FCEUA as well. *See Pollice v. Nat'l Tax Funding, L.P.*, 225 F.3d 379, 403 (3d Cir. 2000) (holding that FDCPA definitions of attorneys who qualify as 'debt collectors' also apply to FCEUA claims); *In re Howe*, 446 B.R. 153, 158 (Bankr. E.D. Pa. 2009) ("liability of a debt collector under the FCEUA . . . is derivative: a violation of the FDCPA is a per se violation of the FCEUA.").

### *3. FCEAU restrains lawyer debt collection until filing or service of pleadings, discovery or prosecution of a lawsuit to obtain judgment, while FDCPA includes restraints for litigation activities.*

237.    Because the FCEUA defines an attorney as a debt collector "except in connection with the filing or service of pleadings or discovery or the prosecution of a lawsuit to reduce a debt to judgment," 73 P.S. § 2270.3(3)(ii) , such an attorney is clearly defined as a debt collector for **non-judicial** activities only, **ending with service of the lawsuit**, if any, commencing the judicial debt collection action.

238.    In contract, the FDCPA governs all debt collection activities **including litigation**. The courts resolve an obvious conflict in the application of the FDCPA to the FCEAU. The FCEAU at 73 P.S. § 2270.4  asserts that, "It shall constitute an unfair or deceptive debt collection act or practice under this act **if a debt collector violates any of the provisions of the Fair Debt Collection Practices Act.**" Clearly, this cannot apply once a lawyer debt collector commenced litigation because a lawyer is

no longer deemed a debt collector under the FCEAU at that point.  In fact, *Glover* explicitly excludes

FDCPA violations that occur once litigation begins from applying to the FCEAU:

> we adhere to the plain meaning of the text. *Id.* § 1921(b). Rather than stating that the FCEUA incorporates "any violation of the FDCPA," the FCEUA states that such a violation must be committed by a "debt collector," for which it provides a definition that departs from that contained in the FDCPA. We will respect this legislative choice.

FN 8, *Glover v. F.D.I.C.*, 698 F.3d 139, 152 (3d Cir. 2012).  This guidance from the Third Circuit is

clear.  The violations of the FDCPA that are relevant to attorneys who are debt collectors are those vio-

lations of the FDPCA committed by FCEAU debt collectors. For our purposes, the activities subject to

such restraints, under the FCEAU, are those FDCPA debt collector violations that occur **up to the**

**point at which the attorneys serve pleadings** in a debt collection lawsuit.

### 4. Debt collectors under the FCEAU must respect a 30-day validation period.

239.    Because the FDCPA requires debt collectors to send a "Notice of debt" before litigation

can commence, so does the FCEAU. That FCEAU notice must inform the consumer that they have

"thirty days after receipt of the notice . . . to dispute[] the validity of the debt, or any portion thereof."

15 U.S.C. § 1692g(a)(3)  As well, any "collection activities and communication during the 30-day pe-

riod may not overshadow or be inconsistent with the disclosure of the consumer's right to dispute the

debt or request the name and address of the original creditor." 15 U.S.C. § 1692g(b).

### 5. Unlike the FDCPA, the FCEAU does not permit emotional distress damages.

240.    The FCEAU (via a private right of action under the UTPCPL) does NOT permit emo-

tional distress damages. *See* 73 P.S. §  201-9.2 which specifically limits recovery to "any ascertainable

loss of money or property, real or personal." Third Circuit courts have uniformly interpreted this lan-

guage as excluding emotional distress damages, reasoning that such damages do not constitute a loss of

money or property. *See Yelin v. Swartz*, 790 F.Supp.2d 331 (2011), which explicitly held that "damages

for emotional distress are not recoverable under the UTPCPL," and *Krisa v. Equitable Life Assur. Soc.*,

113 F.Supp.2d 694 (2000), which found that emotional distress damages are not recoverable under the UTPCPL because it "expressly limits recovery to actual damages," defined as ascertainable loss of money or property.

### B. Application of Legal Framework to Prove FCEUA and UTPCPL Violations.

241.    Plaintiffs incorporate all prior paragraphs, as though fully set forth herein. These paragraphs describe Defendants' billing conduct, personal-liability drafting, and premature litigation activity, all of which bring Defendants within the FDCPA, FCEUA and UTPCPL regulatory frameworks.

### 1. The above facts establish the consumer nature of the debt, triggering validation rights.

242.    As shown above, the legal fees that arose from the subject representation should be deemed consumer debt and fully governed by the FDCPA, FCEUA and UTPCPL.

### 2. Defendants are liable for damages pursuant to the FCEUA and UTPCPL.

243.    Defendants are "debt collectors" under 15 U.S.C. § 1692a(6) because they regularly collect debts owed to others as part of their commercial enterprise. Defendants violated 15 U.S.C. § 1692g(b) by filing litigation during the 30-day dispute and validation period following issuance of a final demand. These are violations because they overshadowed the notice provisions of the FDCPA. Thus, in all matters prior to the service and commencement of litigation, lawyers collecting their own debts, as in the instant matter, are subject to the FCEAU provisions.  The Defendants, therefore, violated the FCEAU because:

- The notice sent on May 28, 2025 lacked the required disclosures under 15 U.S.C. § 1692g(a);

- The litigation occurred within two weeks after the commencement of the validation period and the least sophisticated consumer would have no knowledge of their rights under the

FDCPA or FCEUA when confronted with the existence of the litigation, in light of the failure to have received a proper 15 U.S.C. § 1692g(a) notice.

244.    The commencement of the litigation and the litigation itself are not governed by the FCEAU because such attorney actions are explicitly excluded from the legislation.  However, the notice provisions of 15 U.S.C. § 1692g(a) arise *before* any other communication with the debtor and litigation, so can **be deemed violations of the FCEUA**.

245.    Plaintiffs were entitled to dispute or seek verification of the asserted debt during this statutory window, but litigation was filed only fifteen (15) days later. Courts have held that premature litigation constitutes unlawful overshadowing.

246.    Defendants violated the FCEAU because they violated 15 U.S.C. § 1692e(2)(A) by misrepresenting the amount and legal status of the debt, as discussed in the previous section.

247.    Defendants violated the FCEAU because they violated 15 U.S.C. § 1692f by employing unfair and unconscionable billing methods, as discussed in the previous section.

248.    As a direct and proximate result of these FDCPA (and, by extension, FCEAU) violations, Plaintiffs suffered emotional distress, reputational injury, loss of credit access, humiliation, marital strain and business losses. During the period of extreme litigation-induced financial and emotional stress described above, Plaintiff Lilach Peer suffered two miscarriages, which she asserts resulted from the above violations of the FDCPA and, therefore, FCEAU. These harms, except for emotional distress damages (for the reasons described above), are recoverable as "actual damages" under 15 U.S.C. § 1692k(a)(1). FDCPA fee-shifting (§ 1692k(a)(3)) also applies.

249.    Each allegation in Counts 4-7 demonstrates patterns of billing exploitation, coercive litigation, opaque invoicing, and personal-liability drafting designed to extract payments. These harms were foreseeable to any reasonable attorney, and Defendants' misconduct breached duties of communi-

cation, loyalty, billing judgment, and candor. Plaintiffs therefore assert common-law claims in addition to statutory violations.

### C. UTPCPL Violations (Per Se).

250. FCEUA violations are per se UTPCPL violations under 73 P.S. § 2270.5(a).

251. Because Plaintiffs sufficiently plead FCEUA violations under *Twombly/Iqbal*, UTPCPL liability follows automatically. Courts do not require additional proof of scienter for per se liability.

252. This entitles Plaintiff to bring the instant matter pursuant to the UTPCPL

### D. Independent UTPCPL Violations.

253. Even absent FCEUA violations, Defendants separately violated the UTPCPL by:

- deceptive billing practices;

- charging for services never performed;

- attempting to acquire Plaintiffs' real property using deceptive means and pursuant to deceptive billing;

- the conduct of filing a retaliatory lawsuit (not legal or professional judgments associated with the filing);

- causing Plaintiffs to lose business contacts through deception, defamation;

- causing Plaintiffs to lose lucrative deals through improper and deceptive communication with third-parties.

254. Plaintiffs assert these UTPCPL claims exclusively with respect to Defendants' billing practices, marketing representations, inducements to continue payment, and omissions regarding material financial risks—not professional negligence in litigation strategy—consistent with *Basil v. Wolf*, 193 A.3d 150, 169–70 (Pa. Super. Ct. 2018) (holding that the UTPCPL applies to deceptive practices relating to services provided to consumers and rejecting the argument that professional-services providers are categorically exempt); *Schwartz v. Rockey*, 932 A.2d 885, 897–98 (Pa. 2007) (permitting

UTPCPL claims based on deceptive and unconscionable billing practices, including misleading invoices and improper fee conduct); and *Walters v. UPMC Presbyterian Shadyside*, 187 A.3d 214, 232–33 (Pa. 2018) (holding that services offered to the public for compensation fall within "trade or commerce" under the UTPCPL).

255.    The claim concerns deceptive billing, inducement of payment, misleading invoices, and concealment of material financial risk, which are commercial acts governed by the UTPCPL under *Schwartz, Basil*, and *Walters*.[14]

256.    The UTPCPL applies where, as here, the gravamen of the misconduct is deceptive billing practices, debt-collection conduct, and asset leverage, not the exercise of learned professional judgment. Scienter under the UTPCPL is relaxed and does not require proof of common-law fraud. *See Gregg v. Ameriprise Fin., Inc.*, 245 A.3d 637, 646–48 (Pa. 2021).

257.    Defendants engaged in unfair and deceptive acts by failing to disclose the magnitude of billing escalation, obscuring costs through block billing, and misrepresenting the value of services rendered. Courts require attorneys to disclose material cost consequences where nondisclosure would mislead a reasonable consumer.

258.    Defendants further violated UTPCPL by drafting settlement obligations that imposed personal household liability for business debts without disclosure. Consumers cannot meaningfully consent to undisclosed financial risk, and nondisclosure constitutes a deceptive practice.

259.    Plaintiffs suffered "ascertainable loss," including business revenue impairment, destroyed creditworthiness, reputational injury, and physical injury. UTPCPL authorizes treble damages and attorneys' fees under 73 P.S. § 201-9.2(a).

---

[14] Plaintiffs do not assert this claim as a substitute for professional negligence liability, but rather for deceptive commercial conduct in connection with the sale of legal services, which Pennsylvania courts recognize as actionable under the UTPCPL.

260.    Such conduct constitutes deceptive conduct under the UTPCPL § 201-2(4)(xxi) and is, therefore, actionable.

### E. Damages.

261.    Plaintiff is entitled to:

- actual damages;

- treble damages under UTPCPL;

- statutory damages under FCEUA;

- attorney's fees and costs;

- all equitable relief allowed by law.

### COUNT 7 - LEGAL MALPRACTICE / PROFESSIONAL NEGLIGENCE / INTENTIONAL ABUSE OF PROCESS
### Against All Defendants
### *Applies to All Plaintiffs, Except Where Indicated*

262.    Plaintiffs incorporate all prior paragraphs, as though fully set forth herein. These paragraphs describe Defendants' extraordinary billing escalation; billing inconsistent with "pay what you can" instructions; duplicative drafting cycles; senior-rate clerical billing; opaque block entries; financial-risk nondisclosure; personal-liability settlement drafting; failure to provide advance written notice of fees, scope of representation, conflicts of interest; and general disregard for the fiduciary and related duties required all attorneys under Pa. R.P.C. Each reflects a breach of fiduciary and/or professional duties and describes the injuries they caused to Plaintiffs.

263.    Because there are literally scores of negligent acts committed by Defendants and dozens of actual injuries they proximately caused to Plaintiffs, our analysis proceeds by grouping and summarizing the negligent acts (N1-10), resulting injuries (I1-10) and non-negligent alternatives (A1-10).

264.    This is a daunting task due to the sheer magnitude of the Defendants' malpractice.  Below, we step through the laborious proofs required by our case law.

## A. Legal Standard

265.    In a legal malpractice case, the Plaintiff must first establish that an attorney-client relationship existed.  *McHugh v. Litvin, Blumberg, Matusow & Young*, 574 A.2d 1040, 1042 (Pa. 1990) (holding that the threshold element of any legal malpractice claim, whether brought in contract or tort, is the existence of an attorney-client relationship).  Under *Guy v. Liederbach*, 459 A.2d 744, 751 (Pa. 1983), legal malpractice requires a showing of duty, breach, causation, and damages.

266.    Pursuant to *Kituskie v. Corbman, 714 A.2d 1027 (Pa. 1998)*, the Plaintiff in a PA legal malpractice case must "prove that he had a viable cause of action against the party he wished to sue in the underlying case and that the attorney he hired was negligent in prosecuting or defending that underlying case (often referred to as proving a 'case within a case)."  *Kituskie*, 714 A.2d at 1030 (Pa. 1998) ("[P]laintiff must establish by a preponderance of the evidence that he would have recovered a judgment but for the attorney's negligence.").

267.    Unfortunately, Defendants withdrew from all legal representation across numerous related cases prior to discovery being completed and final decisions being rendered, with two major exceptions: (a) the negligent acts that led to the Meridian Bank settlement caused approximately $600,000 in Plaintiffs' lost equity from surrendered real estate and (b) the vexacious lawsuit (violative of the FCDCPA) for allegedly unpaid legal fees that resulted in default judgment ($144,028.91) against all Plaintiffs, except Mr. Peer.

268.    Our case-within-a-case analysis, therefore, will show how a non-negligent attorney would have prevented the injuries, including not preparing the Meridian settlement; not filing the lawsuit leading to the default judgment; not filing an improper praecipe for default judgment.

## B. Summaries of Negligent Acts, Resulting Injuries and Non-Negligent Alternatives

269.    <u>Summary of Negligent Acts of Defendants</u>: The totality of the negligent acts of Defendants can be organized and categorized as follows (concluding with the factual statement of the resulting injuries):

- N1. Absence of Written Engagement Agreement Resulting in Unpredictable, Unvalidated and Unconsented Scope Expansion and Exponential Billing.
- N2. Discriminatory Coercion and Increased Risk in Residential Real Estate, Meridian Bank Settlement.
- N3. Improper, Unrealistic and Misleading Litigation Guarantees.
- N4. Withdrawal Threats, Weaponized Litigation and Abuse of Legal Process.
- N5. Injuries Caused by Defendants.

270.    <u>Summary of Injuries Caused by Negligent Acts of Defendants</u>: The totality of the injuries caused by the negligent acts of Defendants can be organized and categorized as follows:

- I1. Economic Collapse and Household Budget Destabilization.
- I2. Reputational Harm and Community Stigma.
- I3. Anxiety, Fear, Sleeplessness, and Chronic Psychological Distress. *
- I4. Physical Manifestations of Stress. *
- I5. Loss of Substitute Counsel Access / Legal Vulnerability.
- I6. Marital Strain and Family Deterioration. *
- I7. Miscarriages and Serious Medical Consequences. *
- I8. Business Revenue Decline and Partner Reticence.
- I9. Creditworthiness Decline and Professional Deal Friction.
- I10. Forced Liquidation of Personal Assets. *

**\* This injury applies only to Plaintiffs Mr. and Mrs. Peer.**

271.    <u>Summary of Non-Negligent Alternative Acts That Would Be Exercised by Attorneys of the Degree of Skill, Knowledge, and Care Ordinarily Exercised by Members of the Profession</u>: The to-

tality of the non-negligent alternative actions that should have been executed by Defendants can be organized and categorized as follows:

- A1. Written Retainer with Scope, Rates, and Ceilings (Pa. R.P.C. 1.5(b)).
- A2. No Guarantees; Risk-Balanced Communication (Pa. R.P.C. 7.1).
- A3. Monthly Billing Forecasts and Burn-Rate Estimates.
- A4. Client Pre-Authorization for Material Scope Expansion.
- A5. Conflicts Screening and Prohibition on Proprietary Interest (Pa. R.P.C. 1.7, 1.8(i)).
- A6. Written Disclosure of Personal Liability Terms.
- A7. Withdrawal Only After Avoidable Prejudice (Pa. R.P.C. 1.16).
- A8. No Outcome-Based Promises About Insurance Proceeds.
- A9. Fully Itemized Time Entries and Validation Documents.
- A10. Strict Compliance with Default-Judgment Timing, Notices, and Certifications.

272.    Below, we demonstrate the required elements of legal malpractice.

## C. Proof of Each Element of Attorney Negligence

273.    A Pennsylvania attorney also has a **duty** to use the degree of skill, knowledge, and care ordinarily exercised under like circumstances by members of the profession. *See Kituskie*, 714 A.2d at 1030.  We distill this duty into relevant obligations that were breached by Defendants.

### Malpractice Demonstrated in Negligent Acts Category N1: Absence of Written Engagement Agreement Resulting in Unpredictable, Unvalidated and Unconsented Scope Expansion and Exponential Billing.

274.    **Duty**: <u>Duty</u> to communicate scope, basis of fees, staffing responsibilities, and terms of representation so that the client can make informed decisions. See Pa. R.P.C. 1.5(b) (basis or rate of fee must be communicated, preferably in writing, when reasonably practicable); Pa. R.P.C. 1.4(b) (lawyer shall explain matters to the extent reasonably necessary to permit the client to make informed decisions); *Kituskie*, 714 A.2d at 1030 (client must be able to make informed decisions; breach where attorney deprives client of meaningful information); *Rizzo v. Haines*, 555 A.2d 58 (Pa. 1989) (fiduciary duties include full disclosure of fee arrangements and conflicts of interest). <u>Duty</u> to disclose material in-

70

formation affecting cost and strategy. See Pa. R.P.C. 1.4(a)(1)-(3) (communication), 1.5(a) (reasona-

bleness of fees); *Rizzo*, 555 A.2d at 58. <u>Duty</u> to consult with the client regarding the means of represen-

tation. *See* Pa. R.P.C. **1.2(a)**, **1.4(a)(2)** (consultation on objectives); *Kituskie* (client must control strate-

gy). <u>Duty</u> to offer reasonable fees and communicate clearly to others. *See* Pa. R.P.C. 1.5(a) & 1.4(a)(3)

(reasonable fees & communication).

275. **Breach**: Defendants failed to provide written agreement defining scope, rates, staffing

roles, interest charges, dispute procedures, client obligations, cost ceilings, professional responsibilities

and memorialization of Defendants' "pay what you can" instructions to Plaintiffs; failure of Plaintiffs

to adhere to Defendants' "pay what you can" commitment. This category includes the absence of doc-

umentation on who is being represented, how fees would be invoiced, late-fee policies, risk analysis

responsibilities, and terms for cost escalation, depriving Plaintiffs of predictability and informed con-

sent. Failed to warn that fees would escalate into tens of thousands per month or propose alternatives.

*This category includes lack of budget forecasting, shock invoices, and omission of cheaper pathways.*

Expanded scope through parallel pleadings, repetitive memos, and multiple edits without authorization.

*This category includes work multiplication, staffing inflation, and undisclosed strategic changes.* Bill-

ing Opaqueness, Block-Billing, and Lack of Validation. This includes bundling unrelated services in

single entries, refusing line-item clarification, and resisting validation despite repeated requests under

penalty-of-perjury forms.

276. **Injuries**: I1. Economic collapse and household financial destabilization; I3. Anxiety,

fear, sleeplessness, and chronic psychological distress; I6. Marital strain and family deterioration; I7.

Reputational harm; I10. Forced liquidation of personal assets due to unexpected financial demands.

277. **Causation**: Unpredictable fees, absent disclosure, failure to memorialize "pay what you

can" instructions → budgetary instability → panic, marital conflict, liquidation of assets, and chronic

stress responses. Escalating, unpredictable invoices, failure to adhere to "pay what you can" commit-

ment → panic + debt stress → liquidation and deterioration. Duplicative tasks → runaway costs → emotional + financial harm. Default risk multiplies panic, creates public stigma, and threatens credit-worthiness.

278.     **Case-within-a-case**: (i) **Non-Negligent Alternatives:** [A1. Written Retainer with Scope, Rates, and Ceilings (Pa. R.P.C. 1.5(b)).] Provide a written agreement defining scope, rates, staffing roles, expense policies, interest terms, dispute procedures, client responsibilities, cost ceilings and memorialization of "pay what you can" commitment to eliminate ambiguity and facilitate informed consent. A prudent attorney under like circumstances would have disclosed any escalation; explained expanded scope, cost, foreseeable consequences, and alternatives; and obtained informed financial consent before generating extraordinary fees. [A3. Monthly Billing Forecasts, Adherence to "pay what you can" commitment, and Burn-Rate Estimates.] Provide monthly burn-rate forecasting; furnish written cost projections; update clients as fees approach budget limits and expectations of what Plaintiffs could afford to pay; flag alternative strategy paths before invoices escalate; provide written consent before expansion. [A4. Client Pre-Authorization for Material Scope Expansion.] Obtaining written consent for additional research, parallel pleadings, repeat drafting cycles, or expanded litigation issues, with projected cost impact stated in advance. [A9. Fully Itemized Time Entries and Validation Documents.] Break out discrete tasks by timekeeper, list services separately, provide validation on request, and enable objective review of billed hours. A reasonably skillful Pennsylvania attorney would have disclosed that the litigation strategy being pursued required multiple attorneys drafting, revising, conferencing, and editing the same pleadings, resulting in tens of thousands of dollars in monthly fees.  (ii) **New Causation**: Predictable billing allows financial planning, prevents panic responses, removes household destabilization, and eliminates need for forced liquidation. Cost transparency prevents shock billing and downstream personal collapse. Reduced redundancy controls costs, preserving household stability. Eliminates default risk, reducing panic and reputational damage.

*Malpractice Demonstrated in Negligent Acts Category N2:*
*Discriminatory Coercion and Increased Risk in Residential Real Estate,*
*Meridian Bank Settlement.*

279.    **Duty:** <u>Duty</u> to avoid conflicts of interest and proprietary acquisition. *See* Pa. R.P.C.

**1.7(a)** (self-interest conflicts), **1.8(i)** (no proprietary interest); *Maritrans GP*, 602 A.2d at 1277. <u>Duty</u> of

honesty and communication. *See* Pa. R.P.C. **8.4(c)** (dishonesty), **7.1(a)** (false statements); *Brandt*, 48

A.3d 186 (Pa. 2012).

280.    **Breach:** Settlement clauses exposing household assets, acceleration triggers, and deed

leverage demands. *This includes surrender of equity, risk of personal liability, and rushed signature*

*without independent counsel.* Promised guaranteed insurance recovery conditioned on continued pay-

ment. *This category includes statements inducing continued reliance on false financial expectations.*

281.    **Injuries:** I4. Personal-liability exposure; I1. Economic Collapse and Household Budget

Destabilization; I2. Reputational Harm and Community Stigma; I8. Marital/family deterioration; I3.

Anxiety; I8. Marital strain; I10. Liquidation

282.    **Causation:** Exposure of home assets → chronic fear, panic, and marital tension. False

hope causes over-commitment and later collapse when promise fails.

283.    **Case-within-a-case:** (i) **Non-Negligent Alternatives:** [A5. Conflicts Screening and

Prohibition on Proprietary Interest (Pa. R.P.C. 1.7, Pa. R.P.C. 1.8(i)).] Avoid acquisition of client prop-

erty, disclose financial or personal conflicts, ensure no leverage is created over client assets in distress.

Advise clients to seek independent counsel advisement; provide risk analysis memorandum. e.  De-

fendants drafted settlement language exposing household assets and accelerating personal liability

without advising Plaintiffs to seek independent counsel. A prudent attorney would have drafted a set-

tlement agreement that protected her client's constitutional rights and assets, while shielding them from

personal liability; and warned clients when risk profile changed materially as well as recommended in-

dependent review, especially cince the Peers risked losing $600,000 in equity with the stroke of a pen.

[A6. Written Disclosure of Personal Liability Terms.] Identify when obligations may become personally enforceable, clarify insurance limitations, and warn before risks expand beyond corporate boundaries. (ii) **New Causation:** Proper warnings prevent irreversible asset exposure and psychosocial trauma. Client allocates resources conservatively, preventing collapse.

### *Malpractice Demonstrated in Negligent Acts Category #3.*
### *Improper, Unrealistic and Misleading Litigation Guarantees.*

284.    **Duty:** <u>Duty</u> not to make false or misleading statements regarding results or value. *See* Pa. R.P.C. **7.1(a)** (no guarantees of outcome), **1.1** (competence), **1.3** (reasonable diligence); *Office of Disciplinary Counsel v. Anonymous*, 681 A.2d 1216 (Pa. 1996) (false assurances violate ethical duties). <u>Duty</u> of truthfulness and honesty. *See* **Pa. R.P.C. 7.1(a)** and **8.4(c)** (truthfulness & honesty)

285.    **Breach:** Promised that Case ID #230200583 would be resolved in the Peers' favor and within six months. *This category includes unrealistic litigation timelines, assurances of victory, and inducement of reliance without disclosure of risk.* Misrepresentations about Insurance Proceeds or Litigation Outcome. *This includes implying guaranteed insurance recovery, exaggerating likely results, and presenting litigation benefits without factual support or documentation.*

286.    **Injuries:** I3. Anxiety/Fear/Sleeplessness; I2. Reputational Harm and Community Stigma; I8. Marital strain; I9. Physical manifestations of stress. I10. Financial collapse

287.    **Causation:** Unmet guarantees → shock, panic, reputational embarrassment → family deterioration. Misrepresentations induced reliance on illusory recoveries, delaying risk-containment steps and driving anxiety, family strain, and eventual financial collapse.

288.    **Case-within-a-case:** (i) **Non-Negligent Alternatives:** [A2. No Guarantees; Risk-Balanced Communication (Pa. R.P.C. 7.1).] Refrain from assurances of favorable results, communicate uncertainty candidly, and prevent reliance on unrealistic success timelines. (Pa. R.P.C. 7.1 comment). [A8. No Outcome-Based Promises About Insurance Proceeds.] Verify coverage before representation,

characterize potential reimbursements as uncertain, and avoid statements implying guaranteed recovery. (ii) **New Causation:** Realistic expectations reduce shock response, preserving stability, avoiding secondary harms. Transparency reduces panic and supports informed budgeting.

### *Malpractice Demonstrated in Negligent Acts Category #N4.*
### *Withdrawal Threats, Weaponized Litigation and Abuse of Legal Process.*

289.    **Duty:** <u>Duty</u> not to prejudice the client during withdrawal or to coercively threaten withdrawal. *See* Pa. R.P.C. **1.16(d)**; duty of loyalty Pa. R.P.C. **1.7(a)(2)**; Dragonetti Act, 42 Pa. C.S. **§ 8351**. <u>An attorney has a duty</u> to comply strictly with procedural notice requirements, validation windows, service rules, and certification accuracy when pursuing default judgment. Pa. R.P.C. 3.3(a)(1) prohibits false statements of fact or law to a court, and Pa. R.P.C. 3.3(a)(3) prohibits offering evidence the lawyer knows to be false. Pa. R.P.C. 3.4(c) forbids knowingly disobeying tribunal rules, while Pa. R.P.C. 4.1(a) requires truthfulness in statements to third parties, including opposing counsel.

290.    Conduct involving dishonesty, fraud, deceit, or misrepresentation violates Pa. R.P.C. 8.4(c), and conduct prejudicial to the administration of justice (such as discriminating against clients on the basis of ethnicity and national origin or misleading the court about the arguments of opposing counsel) violates Pa. R.P.C. 8.4(d). Procedurally, Pennsylvania requires strict compliance with default-judgment prerequisites, including proper timing, service, and certification. Pa. R.C.P. 237.1(a)(2) requires a valid 10-day notice before seeking default, and Pa. R.C.P. 237.3 permits striking or opening defaults where notice or certification is defective. Pa. R.C.P. 205.4(g) requires accurate electronic service certifications. Federal law independently prohibits pursuing collection efforts that overshadow consumer protection rights during the statutory validation window. 15 U.S.C. § 1692g(b), 15 U.S.C. Section 1692e prohibits false or misleading representations, and 15 U.S.C. § 1692f prohibits unfair or unconscionable collection means.

291.    Pennsylvania incorporates these federal standards through the Fair Credit Extension Uniformity Act, 73 P.S. § 2270.4(b), and prohibits deceptive or misleading collection conduct under the Unfair Trade Practices and Consumer Protection Law, 73 P.S. § 201-3. Attorneys must not pursue default unless and until all notice periods, validation rights, service rules, and certification requirements are fully satisfied.

292.    **Breach:** Defendants threatened withdrawal unless payments for incorrect and unconscionable billing made, then initiated litigation during distress. *This category includes coercion tied to real-property exposure and debt-validation interference.* Billing Opaqueness, Block-Billing, and Lack of Validation. This includes bundling unrelated services in single entries, refusing line-item clarification, and resisting validation despite repeated requests under penalty-of-perjury forms. Procedural Irregularities in Default-Judgment Efforts. Procedural Irregularities in Default-Judgment Efforts. This includes attempting or pursuing default judgments during notice/validation periods, overshadowing their consumer protection rights; using defective or premature 10-day notices; relying on incomplete or inaccurate certifications/affidavits (amounts, service, required attachments); and seeking default without strict compliance with service and timing requirements. *See, e.g., Cellucci v. Laurel–Wilson Co., Inc.*, 701 A.2d 532, 536 (Pa. Super. Ct. 1997) (strict compliance with default-judgment rules required); *Duckson v. Wee Wheelers, Inc.*, 620 A.2d 1206, 1209 (Pa. Super. Ct. 1993) (procedural defects justify opening default); *U.S. Bank N.A. v. Mallory*, 982 A.2d 986, 992 (Pa. Super. Ct. 2009) (premature 10-day notice renders default voidable); *Myers v. Wells Fargo Bank, N.A.*, 986 A.2d 171, 175 (Pa. Super. Ct. 2009) (defective affidavits and incorrect amounts are fatal irregularities); *Wells Fargo Bank, N.A. v. Spivak*, 289 A.3d 1295, 1302 (Pa. Super. Ct. 2023) (incomplete certifications invalidate default); *U.S. Bank Nat'l Ass'n v. Powell*, 2020 WL 6118491, at *6 (Pa. Super. Ct. Oct. 16, 2020) (non-precedential) (service/notice defects require vacatur of default); *Rutledge v. United Collection Bureau, Inc.*, 814 F. App'x 965, 969 (6th Cir. 2020) (litigation during FDCPA validation window is deceptive). Pennsylva-

76

nia courts repeatedly hold that **default judgment is a drastic remedy**, strictly construed against the moving party, and **any defect in notice, timing, amount, certification, or service warrants relief**.

293.    **Injuries:** I1. Economic collapse; I3. Anxiety/insomnia; I2. Reputational Harm and Community Stigma; I9. Physical manifestations. I6. Marital strain; I10. Forced liquidation.

294.    **Causation:** Sudden abandonment + unconscionable billing + lawsuit → panic → reputational contagion → physical stress. Default risk multiplies panic, creates public stigma, and threatens creditworthiness.

295.    **Case-within-a-case:** (i) **Non-Negligent Alternatives:** [A7. Withdrawal Only After Avoidable Prejudice (Pa. R.P.C. 1.16).] Ensure no threats of withdrawal when "pay what you can" commitments met; ensure continuity of representation through critical deadlines, coordinate substitution of counsel, and avoid timing that increases client vulnerability. [A10. Strict Compliance with Default-Judgment Timing, Notices, and Certifications.] Wait to file debt collection lawsuit until notice/validation windows fully expire; use accurate, properly served, and non-premature 10-day notices; ensure certifications reflect correct amounts, required attachments, and service details; and refrain from seeking default absent strict procedural compliance. Attorneys of ordinary skill understand that litigation during the validation period is coercive and exposes clients to reputational and credit harm, that proceeding regardless demonstrates a deviation from ordinary care and is negligence per se – therefore, no prudent attorney would have ever taken any of these actions.  (ii) **New Causation:** Avoids trauma, preserves options, prevents reputational harm. Eliminates coercive threats of withdrawal, actual withdrawal. Eliminates default risk, reducing panic and reputational damage. Dramatic cost reduction prevents collapse and preserves stability.

### *Conclusion.*

296.    We have identified four categories of negligent acts committed among the scores of Defendants' negligent activities.  We have demonstrated that each element of legal malpractice is satisfied

for each category, thereby demonstrating that the Defendants are liable for the significant and devastating injury they caused the Plaintiffs.

### D. Abuse of Process

297.    Defendants prematurely weaponized litigation as a collection tool, breaching Pa. R.P.C. 4.4(a), which prohibits using legal process to burden third parties. Filing during the FDCPA validation period overshadowing Plaintiff Mr. and Mrs. Peer's consumer protection rights is coercive. Courts treat premature litigation as abuse. Defendants used process for an ulterior purpose unrelated to adjudicating a legitimate debt, namely to coerce asset leverage and extract disproportionate financial concessions.

### E. Dragonetti Act Claim

298.    Plaintiffs reserve a Dragonetti Act claim, without waiver pursuant to Pa. R.C.P. 1033, pending favorable termination of the underlying debt-collection proceedings, as required by statute (42 Pa. C.S. § 8351). The malicious filing of debt-collection suits often forms actionable Dragonetti claims, but procedural posture currently requires reservation.

### F. Special Notes on Causation and Foreseeability.

299.    Defendants foreseeably interfered with business relationships by publicly filing debt suits against clients. Pennsylvania permits recovery where attorney negligence foreseeably damages business interests (*Nazar v. Clark*, 892 A.2d 820, 829 (Pa. Super. Ct. 2006)). Plaintiffs' revenue collapse is directly traceable to these actions.

300.    Each category of harm alleged was a natural, probable, and foreseeable consequence of Defendants' conduct (Restatement (Third) of the Law Governing Lawyers § 53). Reasonable attorneys know that surprise invoices, personal liability, and premature litigation cause distress. These harms satisfy proximate-cause pleading.

301.    Business revenue impairment, credit tightening, vendor distrust, and failed transactions are foreseeable consequences of litigation implying dishonesty. Commercial parties rely heavily on credit reputation. Defendants' actions foreseeably contaminated that reputation.

302.    Physical injury to Plaintiffs Mr. and Mrs. Peer, including **two miscarriages**, is foreseeable during periods of extreme litigation-induced stress. Courts permit recovery for physical injury flowing from emotional trauma when foreseeable (*Ellenbogen v. PNC Bank,* 731 A.2d 175, 187 (Pa. Super. Ct. 1999)). These injuries would not have occurred absent Defendants' misconduct.

303.    Plaintiffs Mr. and Mrs. Peer's emotional injuries (panic, insomnia, humiliation) were foreseeable. Pennsylvania does not require "impact" for emotional-distress recovery in malpractice where conduct is outrageous. Litigation-induced trauma is well-recognized.

304.    Had Atty. Frank disclosed (1) the risk of personal liability, (2) the speculative nature of recapturing equity after sheriff's sale, (3) the material restrictions on bankruptcy and communication with authorities, and (4) the actual probability of recovery from an insurer, the Peers would not have signed the Meridian agreement, would not have continued making escalating fee payments, and would have retained independent counsel. These injuries were reasonably foreseeable to an attorney exercising ordinary professional skill.

305.    Atty. Frank's failure to provide a written fee agreement, memorializing "pay what you can" commitment, cost projections, budget disclosures, and litigation alternatives deprived Plaintiffs of informed consent to the escalating fees. Plaintiffs suffered financial, physical, emotional, and reputational damages as a direct result. *See Ellenbogen* (malpractice damages may include physical injury).

306.    [Proximate Cause – Reputational Contamination] Plaintiffs' inability to obtain substitute counsel until after default judgment was issued is directly traceable to Defendants' lawsuit, which implied dishonesty and nonpayment. Reputational contamination in the legal-services market foreseeably impairs access to counsel, thereby exacerbating damages.

307.    [Proximate Cause – Reputational Contamination] Plaintiffs were forced to disclose and self-publish the allegations in order to secure representation. Under the self-publication doctrine, reputational harm is actionable where a plaintiff has no reasonable alternative but to repeat the defamatory implication to mitigate further injury. This harm was a direct and foreseeable consequence of Defendants' conduct.

### G. Damages

#### 1. Ordinary Damages

308.    Defendants impaired Plaintiffs' ability to retain substitute counsel by publicly implying dishonesty. Pennsylvania recognizes reputational injury in malpractice when it affects litigation posture (*Guy*, 459 A.2d at 752). This impairment amplified emotional distress.

309.    Plaintiffs Mr. and Mrs. Peer suffered severe emotional and physical injury (panic, hypertension, miscarriages), for which courts permit recovery when attorney conduct foreseeably causes physiological impact (*Ellenbogen*, 731 A.2d at 187). Such harm is neither speculative nor remote.

#### 2. Punitive/Malice Damages (Restatement (Third) of the Law Governing Lawyers § 49)

310.    A lawyer is subject to punitive damages when conduct demonstrates "**conscious indifference to the rights of the client, or reckless disregard for the consequences of the lawyer's actions**" (Restatement § 49). Punitive damages are warranted where a defendant acts with reckless indifference or conscious disregard of the rights of the client. *Hutchison ex rel. Hutchison v. Luddy*, 870 A.2d 766 (Pa. 2005). Plaintiffs seek punitive damages in an amount to be determined after discovery of Defendants' net worth.  Pennsylvania courts recognize that punitive damages may be awarded in legal malpractice actions where the conduct involves fraud, malice, or reckless indifference to the client's rights.

311.    Defendants' escalation of fees without contemporaneous disclosure of cost projections or risk exposure constitutes reckless indifference to Plaintiffs' financial rights under the attorney–client fiduciary relationship.

312.    Defendants weaponized litigation to extract payment during a period of active federal validation rights, overshadowing Plaintiffs Mr. and Mrs. Peer's consumer protection rights. Leveraging process during ongoing dispute-resolution windows demonstrates reckless indifference to procedural safeguards designed to protect legal consumers.

313.    Defendants drafted personal-liability language into corporate-only settlement terms without disclosure, thereby exposing household assets of Mr. and Mrs. Peer. Undisclosed transmutation of corporate obligations into personal exposure constitutes reckless disregard for fiduciary duties.

314.    The duplication, senior-rate clerical billing, and scope creep show conscious disregard for client finances). Pennsylvania recognizes punitive liability where attorneys exploit billing asymmetry.  Plaintiffs reasonably relied on Defendant's superior knowledge and had no equal access to the information withheld.

315.    After withdrawing, Atty. Frank filed a legal fee lawsuit against the Peers in a manner calculated not merely to collect alleged fees, but to apply pressure to obtain property interests through threat of judgment and coerced settlement. Plaintiffs Peers believe this constitutes a perverted use of process for an ulterior purpose beyond adjudication of a fee dispute: acquisition of real estate. Such coercive leveraging of litigation is reasonably foreseeable to cause severe financial hardship and distress.

316.    Plaintiffs relied on Atty. Frank's advice in circumstances in which he possessed superior knowledge, created the appearance of guaranteed outcomes, and discouraged seeking independent counsel. This violated duties of loyalty, candor, and communication. Pa. R.P.C. 1.2, 1.4, 1.7, 1.8.

317.    [Scienter – Deceitful Billing Intent] The pattern of violating "pay what you can" billing commitment, duplicative staffing, block billing, and partner-rate clerical work demonstrates knowing

inflation of fees. Pa. R.P.C. 8.4(c) prohibits conduct involving dishonesty, deceit, or misrepresentation. Scienter elevates damages.

318.    [Scienter – Intentional Violation of FDCPA for Litigation Advantage] Premature litigation filing during the FDCPA validation period demonstrates intentional disregard for statutory rights. Intentional disregard elevates culpability. Plaintiffs plausibly allege knowing misconduct.

319.    [Severe Emotional Distress Threshold] Plaintiffs Mr. and Mrs. Peer's distress exceeds transient anxiety and includes panic attacks, humiliation, occupational dysfunction, marital strain, and two miscarriages. Pennsylvania permits recovery for severe emotional injury caused by attorney misconduct. These allegations surpass pleading thresholds.

320.    [Economic-Loss Doctrine Exemption] The economic-loss doctrine does not apply to legal malpractice because attorneys owe independent fiduciary duties (torts) imposed by statute and ethics rules. *See Bilt-Rite Contractors, Inc. v. The Architectural Studio*, 581 Pa. 454, 478–79, 866 A.2d 270, 285 (2005); *Ellenbogen*, 731 A.2d at 187. Plaintiffs allege breach of professional duties independent of contract. Consequential damages are therefore recoverable.

### H. Prayer for Relief (Count 7 only)

321.    WHEREFORE, Plaintiffs respectfully request that this Court enter judgment in their favor and against Defendant(s), awarding:

(1) Compensatory damages in an amount to be proven at trial;

(2) Treble damages under UTPCPL, where applicable;

(3) Attorney's fees and costs;

(4) Pre- and post-judgment interest;

(5) Punitive damages for reckless disregard of statutory duties; and

(6) Such other relief as this Court deems just and proper.

## COUNT 8 - DEFAMATION
### Against All Defendants

322.    Plaintiffs incorporate all prior paragraphs, as though fully set forth herein.

323.    Below, Plaintiffs define the elements necessary to establish defamation when the plaintiff is a private (non-public) party, the defendant is a non-media entity and the defamatory statements do not regard matters of public importance.  Plaintiffs define the availability of presumed damages, actual damages (general and special), punitive damages, as well as the standards of proof required for each. Finally, Plaintiffs demonstrate that Defendants have defamed Plaintiffs, entitling Plaintiffs to relevant damages.

### A. Legal Standard

324.    The Third Circuit defines defamation, in cases involving a private plaintiff and a non-media defendant on a matter that is of private concern, as is present here, to be:

> the tort of detracting from a person's reputation, or injuring a person's character, fame, or reputation, by false and malicious statements." *Joseph v. Scranton Times L.P.*, 959 A.2d 322, 334 (Pa. Super. Ct. 2008). Under Pennsylvania law, the plaintiff bears the burden of proving, inter alia, the defamatory character of a statement and harm resulting from its publication. 42 Pa. Cons. Stat. Ann. § 8343(a)(6). The plaintiff does not have to affirmatively prove that the statement was false; rather, a defendant who disputes falsity has to prove the truth *183 of the defamatory communication. *Id.* § 8343(b)(1).

*LabMD Inc. v. Boback*, 47 F.4th 164, 182–83 (3d Cir. 2022) .

325.    Pennsylvania defines the defamation cause of action at 42 Pa.C.S. § 8343. A **plaintiff must prove** the seven elements below, with the final two being required when circumstances so warrant, as shown later:

1) The defamatory character of the communication.

2) Its publication by the defendant.

3) Its application to the plaintiff.

4) The understanding by the recipient of its defamatory meaning.

5) The understanding by the recipient of it as intended to be applied to the plaintiff.

     6)  Special harm resulting to the plaintiff from its publication.

     7)  Abuse of a conditionally privileged[15] occasion, if any.[16]  Examples of conditional privilege include managers sharing poor employee performance ratings among each other or parties sharing a recognized interest of the public  *See Thompson v. Wagner*, W.D.Pa.2008, 631 F.Supp.2d 664; *Maier v. Maretti*, 448 Pa. Super. 276, 285–87, 671 A.2d 701, 706–07 (1995).[17]

*See* 42 Pa.C.S. § 8343(a)(1)-(7).

326.    The **defendant must prove**:

    a.  The truth of the defamatory communication.

    b.  The privileged character of the occasion on which it was published.

    c.  The character of the subject matter of defamatory comment as of public concern.

42 Pa.C.S. §8343(b).

### 1. Defamatory Character of Statement

327.    The court must first determine if the alleged statements "are capable of a defamatory meaning." *Maier*, 448 Pa. Super. at 282, 671 A.2d at 704.[18]

---

[15] "Communications are privileged when made on a proper occasion, from a proper motive, and in a proper manner. *Beckman v. Dunn*, 276 Pa.Super. 527, 419 A.2d 583 (1980). This occurs when circumstances are such as to lead any one of several persons having a common interest in a particular subject matter correctly or reasonably to believe that facts exist which another sharing such common interest is entitled to know. *Id.* (citing *Rankin v. Phillippe*, 206 Pa.Super. 27, 211 A.2d 56 (1965))." *Maier*, 448 Pa.Super. at 286, 671 A.2d at 706.

[16] "An abuse of a conditional privilege occurs when the publication is actuated by malice or negligence, is made for a purpose other than that for which the privilege is given or to a person not reasonably believed to be necessary for the accomplishment of the purpose of the privilege or includes defamatory matter not necessary for the accomplishment of the purpose. *Beckman v. Dunn*, 276 Pa.Super. 527, 419 A.2d 583 (1980)." *Maier*, n.1, 448 Pa.Super. at 289, 671 A.2d at 707.

[17] We assert that the Defendants' defamatory statements about Plaintiffs are not privileged, conditionally or otherwise, because those parties to whom Defendants published the defamatory statements do not share a mutual interest with Defendants.

[18] The Superior Court explains that:
    A communication is defamatory if it tends to harm the reputation of another as to lower him in the estimation of the community or to deter third persons from associating or dealing with him. Elia, supra. A communication is also defamatory if it ascribes to another conduct, character or a condition that would adversely affect his fitness for the proper conduct of his proper business, trade or profession. *Gordon v. Lancaster Osteopathic Hospital Ass'n*, 340 Pa.Super. 253, 489 A.2d 1364 (1985).

328.    A court will find a statement to be defamatory if it "tends to harm an individual's reputation so as to lower him in the estimation of the community or deter third persons from associating or dealing with him. *Corabi v. Curtis Publishing Company*, 441 Pa. 432, 442, 273 A.2d 899, 904 (1971); *Rybas v. Wapner*, 311 Pa.Super., at 54, 457 A.2d at 110. " *Zartman v. Lehigh Cnty. Humane Soc.*, 333 Pa. Super. 245, 250, 482 A.2d 266, 268 (1984).

329.    Courts have found defamatory statements in matters including:

    a.    *Agency Services, Inc. v. Reiter*, 513 F.Supp. 586 (E.D.Pa.1981) (letter imputing dishonesty);

    b.    *Rannels v. S.E. Nichols, Inc.*, 591 F.2d 242 (3d Cir.1979) (words imputing fraud);

    c.    *Altoona Clay Products v. Dun & Bradstreet*, 367 F.2d 625 (3d Cir.1966) (publication imputing insolvency)."

*Gordon*, 340 Pa. Super. at 262, 489 A.2d at 1369.

## *2. Types of Injury Resulting from Defamation*

330.    The plaintiff's recovery and standard of proof depends on whether the injury from the defamation is presumed harm or actual harm; the damages, accordingly are presumed damages, actual damages and punitive damages.

### a. Presumed Harm and Establishing Damages Caused by Presumed Harm

331.    **Presumed harm**/injury are "those that are expected to result from defamation; they require no proof, but instead, as reflected in their name, are presumed under the law."[19]

332.    To demonstrate the entitlement to presumed damages, the plaintiff must show, with clear and convincing evidence, that the defendant acted with actual malice (with knowledge that [the State-

---

*Maier*, 448 at 282, 671 at 704.

[19] *See Sprague*, 276 F. Supp. 2d at 368. *LabMD, Inc. v. Tiversa Holding Corp.*, Civil Action No. 15-92 (W.D. Pa. Mar 24, 2020). They "allow a defamation plaintiff to recover compensatory damages without proving the defamatory statement caused actual harm." *Franklin Prescriptions, Inc. v. N.Y. Times Co.*, 424 F.3d 336, 341 (3d Cir. 2005).

ments] were false or with reckless disregard of whether [they] were false or not ) **without proving the defamatory statement caused actual harm**.[20]

b. Actual Harm/Damages and Establishing Actual Damages

333.  **Actual harm/damages** are defined as either: (a) general (reputational or humiliation) harm/damage or (b) special (monetary losses) harm/damages. *See Sprague v. American Bar Ass'n*, 276 F.Supp.2d 365 368 (E.D. Pa. 2003).

334.  **General damages** "typically flow from defamation, such as impairment of reputation and standing in the community, personal humiliation, and mental anguish and suffering." (internal quotations omitted) (internal citations omitted)." *LabMD, Inc. v. Tiversa Holding Corp.*, Civil Action No. 15-92 (W.D. Pa. Mar 24, 2020). [21]

335.  **Special harm**/damages are monetarily quantifiable injuries. *Beverly Enters., Inc. v. Trump*, 182 F.3d 183, 188 (3d Cir. 1999) ("Typically considered as a pecuniary loss, special damages are "actual and concrete damages capable of being estimated in money, established by specific instanc-

---

[20] *See Franklin Prescriptions, Inc. v. N.Y. Times Co.*, 424 F.3d 336, 341 (3d Cir. 2005). *Lewis v. Philadelphia Newspapers, Inc.*, 833 A.2d 185, 192 (Pa. Super. 2003). Proving actual malice involves an examination of the state of mind of the defendant:

> "Because 'actual malice' is a fault standard, it is not shown by the falsity of the statement in and of itself." Lewis, 833 A.2d at 192. "[T]he standard is a subjective one—there must be sufficient evidence that the defendant actually had a 'high degree of awareness of . . . probable falsity.'" *Joseph*, 129 A.3d at 437 (*quoting Harte-Hanks Communications, Inc. v. Connaughton*, 491 U.S. 657, 688 (1989)) (internal quotations omitted). This state of mind may be proven through circumstantial evidence. Id. "[E]vidence of ill will or a defendant's desire to harm the plaintiff's reputation, although probative of the defendant's state of mind, without more, does not establish 'actual malice.'" *Lewis*, 833 A.2d at 192.

*LabMD, Inc. v. Tiversa Holding Corp.*, Civil Action No. 15-92 (W.D. Pa. Mar 24, 2020).

[21] General damages require "proof that one's reputation was actually affected by the slander, or that [plaintiff] suffered personal humiliation, or both." *Walker v. Grand Cent. Sanitation, Inc.*, 430 Pa. Super. 236, 246, 634 A.2d 237, 242 (1993). The plaintiff is not required to prove special (monetary) damages; plaintiff's recovery is based on actual injury of any sort. *Agriss v. Roadway Express, Inc.*, 483 A.2d 456, 474 (Pa. Super. 1984) ("[A] plaintiff in libel in Pennsylvania need not prove special damages or [special] harm in order to recover; he may recover for any injury done his reputation and for any other injury of which libel is the legal cause."). *Joseph v. Scranton Times L.P.*, 129 A.3d 404, 429 n. 10 (Pa. 2015) ("[P]roof of special harm, i.e., monetary damages, is not a prerequisite to recovery in a defamation libel action.").

es such as actual loss due to withdrawal of trade of particular customers, or actual loss due to refusal of credit by specific persons, all expressed in figures."[22]

### 3. Fault: Actual Malice

336.    To recover presumed damages, no proof of actual damages is necessary *See Dun & Bradstreet, Inc. v. Greenmoss Builders, Inc.*, 472 U.S. 749, 760-61, 105 S.Ct. 2939, 86 L.Ed.2d 593 (1985) (discussing the common-law rule that allows juries to presume that damage occurred from defamatory statements, even when "proof of actual damage [is] impossible"); *LabMD Inc. v. Boback*, 47 F.4th 164, 186 (3d Cir. 2022).

337.    However, actual malice must be shown:

[T]he plaintiff must prove that the defendant made the defamatory statements with actual malice. *Joseph v. Scranton Times L.P.*, 634 Pa. 35, 129 A.3d 404, 432 (2015). Actual malice is "knowledge of falsity or reckless disregard for the truth." *Id.* at 426 (*quoting Gertz v. Robert Welch, Inc.* 418 U.S. 323, 349, 94 S.Ct. 2997, 41 L.Ed.2d 789 (1974)). Whether there has been actual malice is judged by a subjective standard. *Lewis v. Phila. Newspapers, Inc.*, 833 A.2d 185, 192 (Pa. Super. Ct. 2003). The question is whether there is "evidence that the defendant in fact entertained serious doubts as to the truth of his publication." *Id.* (emphasis and internal quotation marks omitted).

*LabMD Inc. v. Boback*, 47 F.4th 164, 186 (3d Cir. 2022).

### 4. Defamation Per Se

338.    Defamation per se in Pennsylvania refers to statements that are so egregious that harm is presumed, and the plaintiff is relieved from proving special damages. The categories recognized as defamation per se are:

- Imputation of a criminal offense;

- Imputation of a loathsome disease;

---

[22] *See Altoona*, 246 F.Supp. at 422; Restatement (Second) of Torts, § 575, comment b (special harm is "the loss of something having economic or pecuniary value"). "). "[S]pecial harm must result from the conduct of a person other than the defamer or the one defamed and must be legally caused by the defamation." *Synygy v. ZS Assoc., Inc.*, 110 F. Supp. 3d 602, 618 (E.D. Pa. 2015); (citing Restatement (Second) Torts § 575 cmt. b).

- Imputation of serious sexual misconduct;

- Statements that adversely affect the plaintiff's fitness for their profession, trade, or business.

*See Mongell v. Martell*, 1204 WDA 2023; *Walker v. Grand Cent. Sanitation, Inc.*, 634 A.2d 237, 430 Pa.Super. 236 (Pa. Super. Ct. 1993).

339.    In such cases, the plaintiff need not prove special damages (i.e., specific pecuniary loss), but must still show general damages, such as actual harm to reputation or personal humiliation. *See Walker v. Grand Cent. Sanitation, Inc.*, 634 A.2d 237; *Brinich v. Jencka,* 757 A.2d 388, 2000 PA Super 209 (Pa. Super. Ct. 2000).

### *5. Reputational and Punitive Damages*

340.    Pennsylvania requires reputational damages to be established before any others can be recovered. *See Joseph*, 634 Pa. at 79, 129 A.3d at 430 ("[R]eputational injury [is] a prerequisite to a defamation plaintiff's recovery of damages for mental and emotional injuries.").

341.    Punitive damages can be awarded in defamation only upon an actual malice standard. *Feld v. Merriam*, 506 Pa. 383, 395, 485 A.2d 742, 747–48 (1984) ("Punitive damages must be based on conduct which is " 'malicious,' 'wanton,' 'reckless,' **748 'willful,' or 'oppressive'"); *Walder v. Lobel*, 488 A.2d 622, 626 (Pa. Super. 1985) (actual malice gives rise to potential punitive damages).

### *6. Immunity for Statements Made within Lawsuits*
### *Is Voided When Published Outside That Suit.*

342.    Under Pennsylvania law, "Pursuant to the judicial privilege, a person is entitled to absolute immunity for 'communications which are issued in the regular course of judicial proceedings and which are pertinent and material to the redress or relief sought.' *Post v. Mendel*, 510 Pa. 213, 507 A.2d 351, 355 (1986)." *Bochetto v. Gibson*, 580 Pa. 245, 251, 860 A.2d 67, 71 (2004).

343.    However, the absolute immunity (judicial privilege) that protects statements made within the context of a lawsuit does not extend to those same statements if they are repeated or published outside the judicial proceeding; such extrajudicial republications are generally only protected, if at all, by a qualified privilege and may give rise to liability if abused. *Id.* at 251 – 54. *See also Pawlowski v. Smorto*, 403 Pa.Super. 71, 588 A.2d 36, 41 n. 3 (1991) ("[E]ven an absolute privilege may be lost through overpublication.... In the case of the judicial privilege, overpublication may be found where a statement initially privileged because made in the regular course of judicial proceedings is later republished to another audience outside of the proceedings."); *Barto v. Felix*, 250 Pa.Super. 262, 378 A.2d 927, 930 (1977) (holding that although allegations in attorney's brief were protected by judicial privilege, attorney's remarks concerning contents of brief during press conference were not likewise protected by privilege); *Bochetto*, 580 Pa. at 253, 860 A.2d at 73 ("As Gibson's act of sending the complaint to Dudick was an extrajudicial act that occurred outside of the regular course of the judicial proceedings and was not relevant in any way to those proceedings, it is plain that it was not protected by the judicial privilege.").

## B. Application of the Legal Standard

### 1. Defendants Made Defamatory Statements

344.    Defendants filed a fee collection lawsuit against Plaintiffs.

345.    The lawsuit Complaint stated or strongly implied that Plaintiffs were dishonest, were not the caliber of people/entities who paid their lawyers for services rendered, and that they had opportunities to service or settle their legal fee debts, but chose not to do so.  Their Petition to Void Real Estate Transfers contains similar defamatory statements and direct allegations of fraudulent behavior by Plaintiffs, leading to similar impressions about Plaintiffs as the above statements in the Complaint.

346.    Any reasonable partner or investor in real estate or in the companies of Plaintiffs would naturally draw from the Complaint and Petition these damaging impressions.

347.   Those impressions are false, however, because the legal fees cited in the Complaint and Petition were "pay what you can" and not subject to a payment schedule or sum certain, as the lawsuit implied; the statements in the Petition that Goorin's/Peer's transfers of properties were fraudulent acts and that implied that Defendants' were not suitable for business transactions, were also false because Mr. Peer transferred those properties in accordance with the prevailing law and the procedures of the title company.

348.   Had those defamatory remarks remained with the confines of that judicial matter, Defendants would receive absolute judicial immunity for offering them.

### 2. Publication by Defendants, Application to the Plaintiffs, Understanding by the Recipient of Defamatory Meaning and Application to Plaintiffs

349.   Defendants informed Plaintiffs' business partners of the lawsuit, when there was no material need to do so, leading to harm to Plaintiff's reputation and cancelled real estate transactions.

350.   When Defendants sent their Petition to Void Real Estate Transfers to third party business partners (Business Associates A, B and C), they were publishing statements to third parties that adversely implicate the Plaintiffs' fitness for their profession, trade, or business, by stating that:

- "Respondent Goorin, LLC's conveyance of the 4808 Property and the 4685 Property to Terra Nova Real Estate 1, LLC were fraudulent and voidable . . . ." (Ex. 13, ¶ 22)

- "Respondent Goorin, LLC was insolvent or became insolvent shortly after the transfers were made . . . ." (Ex. 13, ¶ 22)

- "Respondent Goorin LLC's and Defendant Shlomo Peer's conveyances of the 4808 and 4685 Properties was a choreographed scheme to hinder, delay and defraud its creditors, including the Petitioner and its mortgagor, and to underreport the selling prices of these assets." (Ex. 13, ¶ 24)

351.   These three statements, therefore, are defamation per se.

352.    Out of an abundance of caution, we also note that these statements are all false because the transactions were not fraudulent; Mr. Peer never attempted to hide these transactions from anyone, which is why he ensured that they were covered by a title insurance policy and a commercial lender was involved; Goorin was still in the black after the sale; and there was never a "choreographed scheme to hinder, delay and defraud its creditors."

353.    Defendants lost their judicial immunity once they overpublished their Petition to Void Real Estate Transfers, which contained defamatory statements about Defendants and referenced defamatory aspects of the Complaint, to Business Associates A, B and C.  That is because: (1) the Petition was **NOT** issued to the third parties during the regular course of the judicial proceedings; and (2) the publication of the Petition to the third parties was **NEITHER** pertinent **NOR** material to those proceedings.

### 3. Actual Malice Standard Met, Allowing Punitive Damages

354.    The Defendants published the defamatory statements to the third parties above with actual malice, namely, with "knowledge of falsity or reckless disregard for the truth," as per *Joseph v. Scranton Times L.P.*, 634 Pa. 35, 129 A.3d 404, 432 (2015). Defendants are the former attorneys of Plaintiffs, so were fully aware of the falsity of their own accusations in their lawsuit when they published it to third parties.  The defamatory statements made in their Petition could have easily been corrected by a conversation with Plaintiff Mr. Peer or his counsel, but Defendants intentionally chose to publish false statements about the intentions of Mr. Peer and the financial disposition of Goorin that they could not possibly have known to be true – and which were, in fact, all false.

355.    Plaintiffs' reputation suffered from the publication of the lawsuit to third parties and the submission of the Petition to Void Real Estate Transfers to third parties.  Plaintiffs immediately lost their good business reputation among their partners, suffered intense humiliation, lost hundreds of

thousands of dollars from cancelled deals, suffered emotional distress, and financial collapse from being unable to conduct their real estate buying, selling and renting business.

356.     Plaintiffs suffered reputational harm impairing their ability to retain counsel, maintain business relationships, and access credit.

357.     Plaintiffs were compelled to self-publish defamatory allegations to prospective counsel because seeking new counsel for a fee collection lawsuit required disclosure of the underlying, false allegations, amplifying injury. Pennsylvania recognizes self-publication where compelled by circumstance.

358.     The required elements of defamation have, thus, been shown.

### C. Damages

359.     Reputational damage to Plaintiffs was demonstrated above.

360.     Plaintiffs are entitled to presumed damages because they suffered general damages (reputational and humiliation damages) and the Defendants published their defamatory statements with actual malice.

361.     Plaintiffs suffered special damages in the form of lost business transactions of, at minimum, $210,000 and $250,000.

362.     Plaintiffs are eligible for punitive damages because the actual malice standard was met,

## COUNT 9
## NEGLIGENCE PER SE
## Against All Defendants
## For Plaintiff Natural Persons Mr. and Mrs. Peer Only:

363.    Plaintiffs incorporate all prior paragraphs, as though fully set forth herein.

364.    Pennsylvania recognizes **negligence per se** where a defendant violates a statute or duly-promulgated regulation (1) designed to protect a particular class of persons, (2) from the type of harm suffered, (3) and the violation is the proximate cause of the injury. *See Schemberg v. Smicherko*, 85 A.3d 1071, 1075 (Pa. Super. Ct. 2014) (articulating negligence-per-se elements); *Harris v. Kellogg, Brown & Root Servs., Inc.*, 724 F.3d 458, 480 (3d Cir. 2013) (negligence per se where statute imposes duty to protect class).

### A. Statutory Duties Breached

365.    Defendants violated **15 U.S.C. § 1692g(b)** (FDCPA), which bars debt-collection litigation and default efforts that overshadow their consumer protection rights, while the 30-day validation period remains open.

366.    Defendants violated **15 U.S.C. § 1692e**, which prohibits false, deceptive, or misleading representations in connection with debt collection, including misstating amounts, certification status, or timing.

367.    Defendants violated **15 U.S.C. § 1692f**, which prohibits unfair or unconscionable collection conduct, including premature default notice activity and leveraging defective affidavits.

368.    Defendants violated the Pennsylvania Fair Credit Extension Uniformity Act, 73 P.S. § 2270.4(b) ("FCEUA"), which integrates FDCPA violations into Pennsylvania law, such that any FDCPA violation is per se unlawful in Pennsylvania.

369.    Defendants violated the **Pennsylvania Unfair Trade Practices and Consumer Protection Law**, **73 P.S. § 201-3**, which prohibits "unfair or deceptive acts or practices" in the collection of

debts and the procurement of financial advantage through misrepresentation. Filing a false and deceptive "Damages Assessed Against Defendants" statement in its Praecipe to Enter Default Judgment cleverly give the impression to the prothonotary that damages had been judicially assessed, when there had yet to be a judicial determination of damages. This was a clear and malicious attempt to gain an unfair litigation advantage over then-unrepresented Plaintiffs. Defendants took this action in a further attempt to harass and ruin Plaintiffs financially through the precise avalanche of motions and discovery requests Plaintiffs later orchestrated – all based on this improperly obtained interlocutory judgment that Plaintiffs deceptively and maliciously dressed up as a final judgment.

370. Defendants violated **Pa. R.C.P. 237.1(a)(2)** by issuing defective and/or premature 10-day default notices, without satisfying rule prerequisites.

371. Defendants violated **Pa. R.C.P. 237.3**, which authorizes striking or opening default judgments based on defective certifications or notices — precisely the procedural defects Plaintiffs identify.

372. Defendants violated **Pa. R.C.P. 205.4(g)** by submitting or relying upon inaccurate electronic certifications of service, attachments, or amounts, depriving Plaintiffs of required procedural safeguards.

### B. Class of Persons Protected

373. Plaintiffs Mr. and Mrs. Peer are within the class of consumers and debt-subjects the FDCPA, FCEUA and UTPCPL are designed to protect from:

    (a) premature default efforts,

    (b) defective notices/certifications, and

    (c) misrepresentations regarding amount, timing, or service.

### C. Type of Harm Protected

374. The statutes listed above were expressly enacted to prevent:

94

(a) economic destabilization,

(b) reputational harm caused by default activity,

(c) emotional distress triggered by premature litigation pressure,

(d) coerced asset liquidation,

(e) misleading demands that induce overpayment.

375.    These statutes were enacted to prevent deceptive debt-collection conduct, premature liti-

gation pressure, and economic destabilization of consumers.

376.    Those are the precise injuries suffered here.

### D. Duty, Breach, and Causation

377.    Under **negligence per se**, the statutory violations listed above **establish breach as a

matter of law**, leaving only factual causation and damages for the jury. *See Mahan v. Am-Gard, Inc.*,

841 A.2d 1052, 1059 (Pa. Super. Ct. 2003) (statutory breach constitutes negligence per se).

378.    Defendants' conduct directly and foreseeably caused:

• I1. Economic collapse / household budget destabilization;

• I2. Reputational harm and community stigma;

• I3. Anxiety, fear, sleeplessness, chronic psychological distress;

• I6. Marital strain and family deterioration;

• I9. Physical manifestations of stress; and

• I10. Forced liquidation of personal assets.

379.    No superseding, intervening cause exists. Plaintiffs' harms are the natural, direct, fore-

seeable results of statutory violations.

### E. Damages

380.    As a direct and proximate result of Defendants' negligence per se, Plaintiffs suffered:

(a) financial losses, including forced liquidation;

(b) emotional distress and physical symptoms;

(c) reputational damage;

(d) loss of access to substitute counsel;

(e) attorney's fees to mitigate the default-judgment efforts; and

(f) continuing economic instability.

## F. Punitive Damages Reserved

381.    Where statutory violations are willful or reckless, punitive damages may be awarded.

*See Hutchison ex rel. Hutchison v. Luddy*, 870 A.2d 766, 772 (Pa. 2005) (punitive damages appropriate for reckless indifference).  The above violations are clearly willful, for they are produced by the knowing and intentional judgment and actions of Defendants.

## G. Prayer for Relief (Count 9 only)

382.    WHEREFORE, Plaintiffs respectfully request that this Court enter judgment in their favor and against Defendant(s), awarding:

(1) Compensatory damages in an amount to be proven at trial;

(2) Treble damages under UTPCPL, where applicable;

(3) Attorney's fees and costs;

(4) Pre- and post-judgment interest;

(5) Punitive damages for reckless disregard of statutory duties; and

(6) Such other relief as this Court deems just and proper.

## COUNT 10
## COMMON-LAW FRAUD
### Against Defendants Atty. Frank and Alan L. Frank Law Associates, P.C.

383.    Plaintiffs incorporate by reference all preceding paragraphs as though fully set forth herein.

### A. Legal Framework

384.    Note: This count does not seek relief from Defendants attorney-representation or judgment, but of billing and deliberate Defendant misrepresentations that are outside the bounds of the attorney conduct for which the Pennsylvania Supreme Court has exclusive jurisdiction and a malpractice claim.

385.    Under Pennsylvania law, common law fraud consists of: (1) a misrepresentation; (2) material to the transaction; (3) made falsely, with knowledge of its falsity or reckless disregard of its truth; (4) with intent to mislead; (5) justifiable reliance; and (6) resulting injury proximately caused thereby. *See Gibbs v. Ernst*, 647 A.2d 882, 889 (Pa. 1994); *Toy v. Metro. Life Ins. Co.,* 928 A.2d 186, 208 (Pa. 2007). Defendants' acts and omissions were taken with reckless indifference to Plaintiffs' rights, warranting punitive damages. *See Hutchison*, 870 A.2d at 772.

### B & C. Material Misrepresentations

386.    Defendants falsely represented that litigation in Case ID #230200583 would be resolved in Plaintiffs' favor and within six months, despite possessing no factual, procedural, or probabilistic basis for such a guarantee.

387.    Defendants misrepresented that Plaintiffs would receive guaranteed insurance proceeds or reimbursements if they continued paying invoices, inducing Plaintiffs to expend additional funds on illusory recoveries.

388.    Defendants misrepresented the true nature, amount, and purpose of invoiced legal fees by block-billing unrelated tasks, concealing duplicative work, and refusing to validate entries despite repeated written requests.

389.    Defendants misrepresented the imminence and legitimacy of debt-collection threats, including premature default and negative credit consequences, overshadowing consumer protection rights, while validation/dispute periods remained open.

390.    Defendants misrepresented the nature and effect of deed-leverage clauses and acceleration triggers in settlement documents, inducing consent without disclosure of personal-liability exposure, asset seizure risk, or independent counsel advisement.

### D. Knowledge and Intent

391.    At the time these statements were made, Defendants knew, or recklessly disregarded, that:

(a) litigation timelines were unpredictable;

(b) insurance recoveries were uncertain or unavailable;

(c) billed work was duplicative or unnecessary;

(d) Collection efforts that overshadow their consumer protection rights during validation windows; and

(e) deed-leverage clauses created disloyal proprietary interest.

392.    Defendants' statements were made intentionally to:

(a) induce continued billing payments;

(b) deter challenge or substitution of counsel;

(c) justify excessive or duplicative invoices;

(d) sign a negligence-laden and

(d) create leverage over household assets.

*See Gibbs*, 647 A.2d at 889 (intent may be inferred from circumstances).

## E. Justifiable Reliance

393.    As lay clients without access to internal billing records, procedural expertise, or litigation likelihood metrics, Plaintiffs reasonably relied on Defendants' superior knowledge, fiduciary duties, and apparent professional authority. *See Bortz v. Noon*, 729 A.2d 555, 561 (Pa. 1999) (fiduciary relationship heightens reliance).

394.    Plaintiffs relied by:

> (a) continuing to pay rapidly escalating invoices;

> (b) foregoing alternative counsel;

> (c) signing documents affecting real property that were harmful to their interests;

> (d) delaying risk-containment decisions; and

> (e) suffering household budget destabilization.

395.    Reliance is especially reasonable in the fiduciary posture of attorney-client relationships, where the client is entitled to trust professional representations. *See Bortz*.

## F. Causation and Damages

396.    As a direct and proximate result of Defendants' fraudulent misrepresentations, Plaintiffs suffered:

> • **I1.** Economic collapse and household budget destabilization;

> • **I2.** Reputational harm and community stigma;

> • **I3.** Anxiety, sleeplessness, and chronic psychological distress;

> • **I4.** Personal-liability exposure and heightened risk to household assets;

> • **I6.** Marital strain and family deterioration;

> • **I9.** Physical manifestations of stress; and

> • **I10.** Forced liquidation of personal assets.

99

397.    Defendants' fraud foreseeably induced over-payment, asset encumbrance, deterioration of household creditworthiness, community stigma, and forced liquidation.

## G. No Intervening Cause

398.    There is no superseding or intervening cause; the harms complained of are the natural, direct, and expected consequences of billing.  But-for these negligent acts, Plaintiffs would not have suffered the above damages.

## H. Availability of Punitive Damages

399.    Fraud constitutes a tort of intentional misconduct, and punitive damages are available where the defendant acts with reckless disregard to the rights of others. *See Hutchison*, 870 A.2d at 772.

## I. Prayer for Relief (Count 10 Only)

400.    WHEREFORE, Plaintiffs respectfully request that this Court enter judgment in their favor and against Defendants, awarding:

(1) Compensatory damages;

(2) Consequential and special damages;

(3) Mr. and Mr. Peer Only: Damages for emotional distress;

(4) Damages flowing from reputational harm;

(5) Attorney's fees incurred to remediate the fraudulent conduct;

(6) Punitive damages for intentional and reckless misrepresentations;

(7) Pre- and post-judgment interest; and

(8) Such other relief as the Court deems just and proper.

## COUNT 11
### BREACH OF CONTRACT / UNJUST ENRICHMENT / VOID DEFAULT
### Against All Defendants

401.    Plaintiffs incorporate by reference all preceding paragraphs as though fully set forth herein. No written retainer agreement was provided. Where terms are not memorialized, fees must be reasonable. Plaintiffs received no proportionate benefit relative to cost.

### A. Verbal Retainer / No Written Contract

402.    No signed retainer agreement exists between Plaintiffs and Defendants, and the purported "Letter Proposal" was neither accepted nor executed by any Plaintiff. Under Pennsylvania law, where no written fee agreement exists, **equity** (not contract) governs compensation, and the burden shifts to counsel to prove the **reasonableness** of fees. *Meyer, Darragh, Buckler, Bebenek & Eck, P.L.L.C. v. Law Firm of Malone Middleman, P.C.*, 635 Pa. 427, 137 A.3d 1247, 1259 (2016) (quantum meruit governs attorney compensation absent enforceable contract).

403.    Unjust enrichment applies where "the party sought to be charged either wrongfully secured or passively received a benefit that would be unconscionable to retain." *Wilson Area Sch. Dist. v. Skepton*, 586 Pa. 513, 895 A.2d 1250, 1254 (2006). Here, Defendants wrongfully retained ~$40,000 in payments through failure to obey their own "pay what you can" commitments, duplicative billing, senior-rate clerical work, unauthorized scope expansion and self-dealing.

### B. Contract Law Is Inapplicable

404.    Defendants cannot enforce a breach-of-contract theory because the essential material terms (billing rates; staffing; scope; cadence; authorization; budgeting; interest; dispute resolution) were never agreed upon. A contract requires mutual assent to all essential terms. *ATACS Corp. v. Trans World Commc'ns*, 155 F.3d 659, 666 (3d Cir. 1998) (applying Pennsylvania law). Ambiguous, missing, or silent essential terms **defeat contract formation**.

405.    Because no written retainer exists, Defendants' fee collection suit (Case ID #250601482) lacks enforceable contractual foundation and is, instead, subject to equitable defenses.

### C. Attorneys Cannot Exploit Absence of Written Fee Terms

406.    Pennsylvania Rules of Professional Conduct 1.5(b) require written disclosure of basis or rate of the fee "when the lawyer has not regularly represented the client." Failure to comply precludes fee enforcement beyond quantum meruit. See *Meyer, Darragh*, supra.

407.    Where counsel violates the ethical disclosure duty, Pennsylvania law requires that **all doubts be resolved against the attorney**.

### D. Quantum Meruit Requires Reasonable Value — Not Inflated Invoices

408.    Quantum meruit only compensates the *reasonable value* of services rendered. *Durst v. Milroy Gen. Contracting, Inc.*, 52 A.3d 357, 360 (Pa. Super. Ct. 2012). Fees inflated by block billing, duplication, partner-rate clerical assignments, and unconsented scope escalation are **not reasonable as a matter of law**.

### E. Defendants Were Unjustly Enriched

409.    Defendants were enriched by:

    a.   unauthorized scope expansion;

    b.   failure to honor "pay what you can" commitments;

    c.   duplicative multi-attorney drafting cycles;

    d.   block-billing that concealed inefficiency;

    e.   partner-rate clerical tasks; and

    f.   withholding risk disclosures).

410.    Retaining ~$40,000 obtained through such conduct is inequitable.

## F1. The Unlawful Default Judgment Must Be Vacated or Addressed to Achieve Fundamental Fairness.

411.    The Philadelphia CCP default judgment is voidable — and void *ab initio* — because the default judgment rests upon (1) premature FDCPA-violative filing, (2) a misquoted demand, (3) defective Rule 237.5 notice, and (4) an unenforceable verbal retainer absent judicial determination of reasonableness.  More specifically, it is based on:

i.    <u>Litigation During FDCPA Validation Window Is Improper Process</u> -- Filing suit during the 30-day validation period overshadows consumer protection rights when a defective Notice of debt has been issued, per 15 U.S.C. § 1692g(a) and (b). Judgments entered while statutory rights are impaired are inequitable and subject to vacatur. See *Heintz v. Jenkins*, 514 U.S. 291 (1995).

ii.    <u>Misstated Judgment Amount</u> -- Defendants requested $144,028.91 in their praecipe despite demanding $134,243.91 in the complaint (*compare* Ex. 11 *with* Ex. 8). A default judgment entered for an amount **not pleaded** is reversible error. *Mother's Restaurant, Inc. v. Krystkiewicz*, 861 A.2d 327, 336 (Pa. Super. Ct. 2004) (default may not exceed amount demanded).

iii.    <u>Failure to Verify Under Penalty of Perjury</u> -- Philadelphia's standard Rule 237 forms require verification under penalty of perjury (*see* Ex. 10). Defendants filed only a signature certification (Ex. 9). Defects in Pa. R.C.P. 237.5 notice **mandate** opening or vacatur. *Cintas Corp. v. Lee's Cleaning Servs.*, 700 A.2d 915, 917 (Pa. 1997).

iv.    <u>Non-Compliance With Pa. R.C.P. 237.1(a)(2)</u> -- Rule 237.1 requires strict compliance with notice prerequisites. Defective notice deprives the court of authority to enter default.

v.    <u>Judicial Preference for Decisions on the Merits</u> -- Pennsylvania courts disfavor defaults, applying a "liberal standard" for opening. *Balk v. Ford Motor Co.*, 446 A.2d 1281, 1283 (Pa. 1982).

vi. <u>Prompt and Reasonable Explanation</u> -- Plaintiffs attempted to dispute and validate the debt — lawful under federal statute — and acted diligently. Good-faith dispute constitutes meritorious defense. *See Duckson*.

vii. <u>On-Its-Face Unconscionability</u> -- Default judgments entered on facially inflated, duplicative, or opaque invoices are unjust. See *LaRocca v. Pennsylvania*, 246 A.2d 337, 339 (Pa. 1968) ("fees must relate to result").

### F2. In the Alternative to the Default Judgment Being Vacated, This Court Should Award an Amount Equal to the Default Judgment Amount against Them in the State Court Action

412.    Should this Honorable Court deem it improper to disturb the default judgment for reasons stemming from the fact that judgment is a state court judgment, an equitable solution to any relevant doctrinal prohibition against disturbing a state court judgment is to award a judgment in the same amount to Plaintiffs.

### G. Equity Requires Disgorgement

413.    Where a fiduciary profits from breach of duty, disgorgement is available regardless of "degree of benefit." *Restatement (Third) of Restitution § 43*. Attorneys are fiduciaries; unreasonable billing triggers disgorgement.

### H. Relief Requested Under Count 11

414.    Plaintiffs request:

a.    Disgorgement of ~$40,000 paid as unjust enrichment;

b.    Injunctive relief in the form of vacatur of the CCP default judgment as defective, misstated, and inequitable. In the alternative, the Court should award Plaintiffs an amount equal to the final state court judgment, in the interest of justice;

c.    Restitution of all payments rendered under misleading billing circumstances;

d.   Quantum meruit offset limited to the reasonable value of services rendered;

e.   Equitable reduction of unreasonable charges;

f.   Costs and interest.

415.   Retaining funds obtained through undisclosed escalation, coercive billing, and defective process constitutes unjust enrichment. Plaintiffs are entitled to equitable relief.

# VII. DAMAGES
## (in the alternative to other damages described above)

### A. Personal Damages

416.   **FDCPA Damages (15 U.S.C. § 1692k(a))**: Plaintiffs are entitled to actual damages (emotional distress, reputational injury, business loss, physical injury), statutory damages up to $1,000 per consumer Plaintiff, and reasonable attorneys' fees and costs. These injuries flow directly from premature litigation and billing misrepresentation.

417.   **FCEUA Damages**: FCEUA adopts FDCPA remedies and violations constitute per se UTPCPL claims, except that the FCEAU does not permit recovery for emotional distress. Damages include actual loss, attorneys' fees, and equitable relief.

418.   **UTPCPL Damages (73 P.S. § 201-9.2(a))**: Plaintiffs are entitled to actual damages, treble damages, and attorneys' fees. Deceptive billing and nondisclosure caused ascertainable loss.  The UTPCPL does not permit recovery for emotional distress.

419.   **Malpractice Damages**: Plaintiffs are entitled to all reasonably foreseeable injuries caused by attorney negligence, including lost business, reputational harm, emotional injury, and physical injury (*Ellenbogen, supra*).

420.   **Abuse of Process**: Plaintiffs suffered humiliation, reputational harm, and wasted legal fees.

421.    **Defamation**: Plaintiffs are entitled to presumed damages, special damages and the foreseeable damages that flowed from those losses.

422.    **Unjust Enrichment**: ~$40,000 in fees should be disgorged.  If this Honorable Court cannot void the default judgment on a basis stemming from its status as a state court award, then the equitable solution is to award a judgment for Plaintiffs in the exact amount of that default judgment.

423.    **Punitive Damages**: Under Restatement § 49 ("conscious indifference to the rights of the client, or reckless disregard"), Defendants' conduct warrants $15,000,000.

424.    **Physical Injuries**: Plaintiffs sustained hypertension, nausea, dizziness, fatigue, and **two miscarriages**.

425.    **Emotional Distress**: Panic attacks, humiliation, insomnia, depressive episodes, marital strain, occupational dysfunction (recoverable under the FDCPA; not recoverable under the FCEAU or UTPCPL).

## B. Corporate-Entity Damages

426.    Corporate-Entity Plaintiffs are entitled to all damages listed above as Personal Damages, except those for physical injury and emotional distress, per the following injuries:

- Peer Management, Inc. lost vendors, client accounts, and credit facilities.

- 2727 Thompson Webb, LLC lost transactional confidence and financing opportunities.

- SLNP Properties, LLC lost tenant relationships and lender trust.

- Goorin, LLC experienced operational disruption due to reputational contamination.

- Pakal Property, Inc. suffered stalled negotiations and lost capital access.

## VIII. JURY DEMAND

427.    Plaintiffs demand trial by jury on all issues triable by right.

## IX. PRAYER FOR RELIEF

WHEREFORE, Plaintiffs respectfully demand as follows:

A. $5,000,000 compensatory damages;

B. Punitive damages under 42 U.S.C. §§ 1981, 1982 and 1988, FHA, UTPCPL in an amount to be determined through discovery and expert witnesses at trial;

C. Treble UTPCPL damages;

D. Attorneys' fees under FHA, FDCPA, FCEUA, UTPCPL;

E. Disgorgement of ~$40,000 Plaintiffs paid in legal fees to Defendants;

F. Injunctive Relief in the form of vacatur of default judgment taken in violation of the FDCPA (or, in the alternative a complementary award in the same amount) and due process as well as any lis pendens imposed, in the Philadelphia County Court of Common Pleas Case #250601482, pursuant to 42 U.S.C. § 3613(c);

G. Costs;

H. Pre- and post-judgment interest;

I. Any other relief which the learned Court deems just and proper;

Dated: Feb. 15, 2026          **Submitted by:**

                     /s/ Alson Clayton Alston, Esq.
                     Alson Clayton Alston, Esq.
                     2836 W. Girard Avenue
                     Philadelphia, PA 19130
                     Phone: 610-803-7124
                     ACAlstonLaw@protonmail.com
                     Attorney for the Plaintiffs
                     PA Bar Id: 333339